# No. 1:15-cv-06569 (KPF)

IN THE

# United States District Court

FOR THE SOUTHERN DISTRICT OF NEW YORK

————▶◀◀————

In re AMPAL-AMERICAN ISRAEL CORPORATION
(Chapter 7 Case No. 12-13689) (SMB) (Bankr. S.D.N.Y.)

————————————

YOSEF A. MAIMAN AND MERHAV (M.N.F.) LIMITED,

*Appellants,*

v.

ALEX SPIZZ,

*Appellee.*

————————————

*On Appeal from the United States Bankruptcy Court
For the Southern District of New York*

## APPELLANTS' APPENDIX
## VOLUME V of VII (Pages APP-301 to APP-350)

David M. Friedman
Daniel A. Fliman
Michele L. Angell
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
DFriedman@kasowitz.com
DFliman@kasowitz.com
MAngell@kasowitz.com

*Attorneys for Appellants
Yosef A. Maiman and Merhav (M.N.F.) Limited*

## TABLE OF CONTENTS

<div align="right"><u>Page</u></div>

Bankruptcy Court Chapter 7 Docket Entries (Case No. 12-13689) ........................................ APP-1

Bankruptcy Court Adversary Proceeding Docket Entries (Adv. Pro. No. 14-02385) ......... APP-15

Transcript of Hearing Held on July 11, 2013 [Docket No. 318] ........................................... APP-21

Transcript of Hearing Held on November 14, 2013 [Docket No. 374]................................. APP-36

Memorandum Decision Denying Motion for Relief Based on Violation of the
    Automatic Stay [Docket No. 382].................................................................................. APP-70

Supplemental Order Concerning Trustee's Access to Debtor's Files, Books and
    Records [Docket No. 532] .............................................................................................. APP-91

Notice of Presentment of Order Authorizing Retention of Tarter Krinsky & Drogin
    LLP in Place of Spizz Cohen & Serchuk, P.C. as Substitute Counsel to the
    Trustee Pursuant to 11 U.S.C. § 327 and Federal Rule of Bankruptcy Procedure
    2014 [Docket No. 573].................................................................................................... APP-96

Yosef A. Maiman and the Controlling Shareholders' (I) Objection to the Retention
    of Tarter Krinsky & Drogin LLP as Substitute Counsel to the Trustee and (II)
    Motion to Disqualify Alex Spizz as Chapter 7 Trustee [Docket No. 576].................. APP-115

Joinder of Irit Eluz in Support of Yosef A. Maiman and the Controlling
    Shareholders' (I) Objection to the Retention of Tarter Krinsky & Drogin LLP
    as Substitute Counsel to the Trustee and (II) Motion to Disqualify Alex Spizz
    as Chapter 7 Trustee [Docket No. 577].......................................................................... APP-137

Supplemental Declaration of Arthur Goldstein Pursuant to Bankruptcy Rule 2014
    on Behalf of Tarter Krinsky & Drogin LLP as Proposed Substitute Counsel to
    Trustee and Disclosure Pursuant to Bankruptcy Code Sections 327 and 329 and
    Bankruptcy Rule 2014 [Docket No. 582] ...................................................................... APP-139

Affidavit of Alex Spizz as Trustee in Response to the (1) Objection Filed By
    Yosef A. Maiman and the Controlling Shareholders to the Retention of Tarter
    Krinsky & Drogin LLP in Place of Spizz Cohen & Serchuk, P.C. as Substitute
    Counsel to the Trustee; and (2) Cross-Motion to Disqualify Alex Spizz as
    Chapter 7 Trustee [Docket No. 587] .............................................................................. APP-142

Chapter 7 Trustee's and Tarter Krinsky & Drogin LLP's Memorandum of Law in
    Response to Yosef A. Maiman and the Controlling Shareholders' (I) Objection
    to the Retention of Tarter Krinsky & Drogin LLP as Substitute Counsel to the
    Trustee and (II) Motion to Disqualify Alex Spizz as Chapter 7 Trustee [Docket
    No. 588] ........................................................................................................................... APP-269

Tarter Krinsky & Drogin LLP's Response to: (1) the Objection of Yosef A. Maiman and the Controlling Shareholders to the Retention of Tarter Krinsky & Drogin LLP in Place of Spizz Cohen & Serchuk, P.C. as Substitute Counsel to the Trustee; and (2) Cross-Motion to Disqualify Alex Spizz as Chapter 7 Trustee [Docket No. 589] ............................................................... APP-296

Second Supplemental Declaration of Arthur Goldstein Pursuant to Bankruptcy Rule 2014 on Behalf of Tarter Krinsky & Drogin LLP as Proposed Substitute Counsel to Trustee and Disclosure Pursuant to Bankruptcy Code Sections 327 and 329 and Bankruptcy Rule 2014 [Docket No. 590]................................. APP-312

Reply in Further Support of Yosef A. Maiman and the Controlling Shareholders' (I) Objection to the Retention of Tarter Krinsky & Drogin LLP as Substitute Counsel to the Trustee and (II) Motion to Disqualify Alex Spizz as Chapter 7 Trustee [Docket No. 594] ............................................................... APP-315

Transcript of Hearing Held on May 21, 2015 [Docket No. 596] ....................................... APP-405

Response to the Court's Request for the United States Trustee's Position With Respect to the Appointment of a Co-Trustee or Estate Representative [Docket No. 599] ...................................................................................................... APP-435

Transcript of Hearing Held on June 9, 2015 [Docket No. 602]........................................... APP-439

Findings of Fact and Conclusions of Law Granting Trustee's Motion to Retain Tarter Krinsky & Drogin LLP as Counsel and Denying Cross-Motion to Disqualify the Trustee [Docket No. 611]........................................................................ APP-517

Order (I) Authorizing Retention of Tarter Krinsky & Drogin LLP in Place of Spizz Cohen & Serchuk, P.C. as Substitute Counsel to the Trustee Pursuant to 11 U.S.C. § 327 and Federal Rule of Bankruptcy Procedure 2014, and (II) Denying Cross-Motion to Disqualify Trustee [Docket No. 615] .......................... APP-550

Notice of Appeal from Order (I) Authorizing Retention of Tarter Krinsky & Drogin LLP, and (II) Denying Cross-Motion to Disqualify Trustee [Docket No. 618] .......................................................................................................... APP-554

**APP-301**

10.     The motion to retain Shapira was withdrawn at the suggestion of the Court because the Court felt that the proposed representation of Shapira was actually for the non-Debtor subsidiaries rather than for the Debtor.

> The Court: "Look I come back to how I started. You haven't convinced me that the firm is needed to represent the Estate as opposed to the nondebtor subsidiaries. And the nondebtor subsidiaries are free to hire the firm and represent them in these matters. I understand the Estate has obviously a moving interest - -
>
> Mr. Spizz: yes. Well - -
>
> The Court - - in these matters, but - -
>
> Mr. Spizz: your Honor, based on—
>
> The Court: - - MAG is free to take whatever position it wants in the IDB matter.
>
> Mr. Spizz: Your Honor, based upon the - - the Court's statement, I would ask that I can withdraw the motion without prejudice.
>
> The Court: Any objection to that?
>
> Mr. Novack: No, Judge.
>
> The Court: Alright. I'll - - just write a letter withdrawing the motion without prejudice but I think the easiest thing is to have the subsidiaries retain the firm.
>
> Mr. Spizz: Correct.
>
> The Court: The subsidiaries' going to pay them anyway.
>
> Mr. Spizz: Yes, they can.

(Transcript p. 13 line 25; p. 14 lines 1-22)

11.     The record demonstrates that the Trustee withdrew the Shapira Retention Application at the suggestion of the Court since the services to be rendered by Shapira were to directly benefit the Debtor's subsidiaries as opposed to the Debtor's Estate. The Court found no actual conflict on the part of Shapira.

## APP-302

12.     The Objectors again attempt to claim that Shapira has a conflict as a result of this Court's decision dated December 16, 2013 (the "Stay Decision") (Doc. No. 382) denying the Objectors' motion for relief against Shapira and Mishmeret for violating the automatic stay (the "Stay Violation Motion").  It is true that the Court found a *prima facia* showing that Shapira had violated the automatic stay by writing a letter dated October 4, 2013 on behalf of the Indenture Trustees demanding payment from the Objectors and others for breach of fiduciary duty, waste and mismanagement.  The Court, however, found that the Stay Violation Motion was an overreaction to the October 4th letter motivated by the Objectors' concern about being sued, not about the effect the lawsuit would have on the Debtor's Estate.  The Court then held that there was no conflict on the part of Shapira and denied the movant's motion to compel the Trustee to terminate Shapira's representation of the non-Debtor subsidiaries.  The Court found that any conflict was potential and hypothetical since Shapira had not taken any steps to collect on the Debtor's D&O insurance policy or act on the October 4th letter (Stay Decision at p. 21).  The Objectors cannot cite to any action taken by Shapira since this Court's Stay Decision of December 16, 2013 which would demonstrate that Shapira now has a conflict.

13.     The Objectors further assert that TKD is conflicted because of its former representation of Mishmeret as proposed post-petition lender to the Ampal Estate.  This is another example of the Objectors' misstating the facts in order to serve their own purposes.  Paragraph 8 of the June 24, 2014 Order approving the litigation loan (Doc. No. 429) provided as follows:

> "The Indenture Trustees shall have the right to assign their rights and obligations under the LFA and this Order to Klirmark Opportunity Fund L.P. and Meitav Gemel & Pension Ltd., identified on Annex A to the LFA as the funders of the litigation loan."

14.     Following approval of the litigation financing, on June 25, 2014 the parties enter into a First Amendment to a Litigation Financing Agreement executed May 20, 2014 (see Exhibit "B" to Affidavit of Alex Spizz) whereby the rights and obligations of the Indenture Trustees under the Litigation Financing Agreement were transferred to Klirmark and Meitav, both of which funded the entire $1,500,000 litigation financing loan.  Mishmeret is not and was not at any time a post-petition lender to the Estate.  TKD has never represented Klirmark or Meitav.

**C.      To The Extent There Are Any Valid Claims By The Estate Against Mishmeret and Shapira, Those Claims Can Be Asserted Using Conflicts Counsel**

15.     The Objectors make unsupported allegations against the Trustee in a desperate attempt to disqualify him and TKD in hopes of getting a less worthy adversary. The Court should be sensitive to the strategic abuse of this type of disqualification motion. The causes of action which the Objectors claim belong to the Ampal Estate, and which the Trustee allegedly has failed to pursue, can be summed up as follows:   Alleged, untrue and defamatory statements against Maiman and other officers and directors of the Debtor were made to the Israeli press, the result of which drove the Debtor into bankruptcy and had the effect "of dissuading the potential equity partners in the Colombia Ethanol Project from carrying out their planned investments, preventing the closing of financing that was already negotiated, thereby derailing the project entirely."

16.     The bona fides of any such alleged causes of action are cast into doubt by the Debtor's own filings.

17.     On August 29, 2012, the Debtor filed its Local Rule 1007-2 Declaration of Irit Eluz, the Chief Financial Officer and Senior Vice President of the Debtor ("Eluz Declaration") (Doc. No. 2).  Paragraphs 21 through 31 describe the reasons for the Debtor's Chapter 11 filing.

## APP-304

Nowhere in the Eluz Declaration does the Debtor state that the alleged untrue and defamatory statements made to the press by Mishmeret and Shapira in any way caused the Debtor to file for bankruptcy protection.

18.    In addition, the Debtor's Schedules do not list any cause of action against Mishmeret and Shapira or others that they are now claiming the Trustee has failed to pursue. (Doc. No. 37).  If the Debtor had a valid prepetition cause of action against Mishmeret and Shapira, as the Objectors claim, it was the Debtor's obligation to disclose such course of action in Schedule B-21 (Contingent and unliquidated claims of every nature).

19.    These alleged causes of action were not raised by Maiman or the Controlling Shareholders until late in these proceedings and after they became aware of the Trustee's action on the Note and Guaranty.  Even now the Objectors have not identified what was done or said to the Israeli press that "impaired" Ampal.  Further, the Objectors did not present to the Trustee any facts or evidence supporting any claims that the Estate allegedly has against Shapira or Mishmeret.  Nor did the Objectors request the Trustee to take action on behalf of the Ampal Estate.  Instead, the Objectors now raise weak and speculative claims, and complain that the Trustee has not pursued them.

20.    The Trustee first learned of the alleged claim that the Colombia Ethanol Project proposed financing had been hindered as a result of the actions of others when Maiman filed a proof of claim (the "Maiman POC") on September 15, 2014 (Claim No. 6).[5]  In ¶ 5 of the Maiman POC, Maiman alleges:

> "Ampal, MAG and certain representatives of Ampal's Debenture Trustees and Bondholders impeded Merhav from obtaining financing for his Colombia Ethanol producing project and actively and deliberately hindered the occurrence of the ("qualified financing date") (as defined in the Agreement).    Conduct by Ampal's Debenture Trustees and

---

[5]  Affidavit of Alex Spizz, ¶ 21.

APP-305

Bondholders is imputed to Ampal through their extensive control over Ampal, MAG and Mr. Spizz, Ampal's Chapter 7 Trustee".

In ¶ 6, Maiman contends:

"As such, Ampal is obligated to compensate Maiman for any harm, cost and damages that Mr. Maiman has and/or may have in connection with the Note, the Agreement and the Guaranty."

21.     As of September 15, 2014, Maiman was not alleging that the Ampal Estate had claims based upon the actions of the Bondholders and Shapira but rather that he and Merhav had claims not only against the Indenture Trustees and Bondholders but also against Ampal and its subsidiaries and therefore was seeking compensation by way of indemnification.

22.     The next time Maiman and Merhav raised the issue of tortious interference by the Bondholders was when they filed their answer to the complaint brought in this Court by Merhav Ampal Group, Ltd. ("MAG") against Merhav and Maiman seeking recovery of the $20,000,000 Note and Guaranty.

23.     Maiman's answer contained sixteen (16) affirmative defenses.   The fifth affirmative defense dealt with the alleged tortious interference by the Bondholders and read as follows:

"Plaintiff's claims are barred, in whole or part, because the Debtor's Bondholders and their trustees and representatives (the "Bondholder Parties") made consummation of the Colombia Ethanol Project impossible through their tortious interference. The Bondholder Parties, who asserted claims comprised nearly all of the Debtor's debts, are essentially the sole beneficiaries of this action and also exert extensive control and influence over the Trustee and the Plaintiff.  Indeed, the Bondholder parties elected the Trustee as Chapter 7 Trustee, thereby hand selecting him.  And, the Bondholder parties are financing this litigation by loaning funds to the Plaintiff in exchange for liens on any recoveries.  For these reasons, the conduct of the Bondholder parties should be imputed to the Trustee and to Plaintiff.  Otherwise, the very parties that block the Colombia Ethanol Project will receive a windfall."

24.     Again Maiman asserts in his papers filed with the Court that as a result of the Bondholders' alleged tortious interference and alleged influence over the Trustee, the Bondholders as well as the Trustee are responsible for blocking the Colombia Ethanol Project. As of today, the Trustee is not aware that financing for the ethanol project was ever anywhere close to imminent or that anything was done by the Bondholders and/or the Indenture Trustees that affected the project.

25.     It is interesting to note that the Trustee was elected on May 20, 2013, more than five (5) months after Maiman's and Merhav's last extension to pay under the Note and Guaranty, and thus the Trustee could not have been in any way responsible for the alleged actions of the Bondholders.  Maiman and Merhav again raised the same theory in a third party complaint which they filed in connection with the Note and Guaranty action against the Indenture Trustees and Shapira.  (See Exhibit "E" to Affidavit of Alex Spizz.)

26.     The crux of the alleged cause of action which Maiman and Merhav contend the Debtor's Estate possessed, is that the Debtor, as a result of the actions by the Bondholders, lost the opportunity to obtain a twenty five (25%) percent interest in a Colombia ethanol project that had never gotten off the ground.  Maiman's and Merhav's alleged theory, with respect to the cause of action that they claim the Debtor possesses, directly conflicts with a substantial cause of action that does exist, to wit, the claim by MAG against Merhav and Maiman on the twenty million dollar ($20,000,000) Note and Unconditional Guaranty.  The clear implication of Maiman's and Merhav's position is that the Trustee should forego the Estate's claim of over $25,000,000 on the Note and Unconditional Guaranty in favor of prosecuting a cause of action that is highly suspect as to liability and completely speculative as to damages.

27.     A trustee has a fiduciary obligation to pursue all claims that will benefit the Debtor's Estate.  A trustee also has a fiduciary duty not to pursue expensive and time consuming

APP-307

speculative claims which he believes are based upon insufficient legal grounds and will not benefit the Estate. Why did Maiman, when he was in control of the Debtor until the Trustee was appointed, not pursue these claims on behalf of the Estate if he felt that they represented a substantial asset?  It was only after the Trustee commenced the action against Merhav and Maiman on the Note and the Guaranty that they asserted these alleged claims against the Bondholders. In addition, when these alleged claims were first advanced by Maiman they were not claims in favor of Ampal but rather against Ampal and the Bondholders.

28.     Notwithstanding the fact that the Trustee does not believe there would be any benefit to the Estate in prosecuting the claims advanced by Maiman, the Trustee has the benefit of allowing the ongoing judicial proceedings to be resolved before making any final and definitive determination.  The Bondholders and Shapira, who are represented by Akin Gump Strauss Hauer & Feld LLP with respect to the third party complaint, have filed a motion to dismiss Merhav and Maiman's third party complaint.  If this Court, or any other court, finds merit in the claims advanced by Maiman, and that the Debtor's Estate was possibly damaged as a result, those claims can and will be pursued in Israel, which has a seven (7) year statute of limitation on the type of tortious acts alleged by Maiman and Merhav.[6]

29.     The Bankruptcy Code provides for creditors to elect a Chapter 7 trustee.  It would be incorrect for a Court to infer that there is a special bias on the part of an elected trustee toward those creditors who elected him without a factual basis for such alleged bias.  Notwithstanding that the Indenture Trustees elected Spizz as Chapter 7 Trustee, Spizz would not hesitate to commence any viable cause of action against them which would benefit the Estate.  As an example, shortly after the Trustee's election, a dispute between the Trustee and the Indenture

---

[6]  Paragraph 18 and Exhibit 17 to the Declaration of Patrick M. Mott in Support of Third Party Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Third Party Complaint, dated February 26, 2015.

Trustees arose over ownership of pre-petition sinking funds that had been established in connection with the various indentures, which sinking funds were listed on the Debtor's Schedules as assets of the Estate.  In the event the negotiations regarding ownership of the sinking funds were unsuccessful the Trustee had prepared a complaint (the "Draft Complaint") against the Indenture Trustees for turnover of the sinking funds as well as for avoidance and recovery of preferential transfers.  (See Exhibit "F" to Affidavit of Alex Spizz.)

30.     The Draft Complaint was delivered to the Indenture Trustees' attorneys with the caveat that if a settlement was not reached, the Draft Complaint would be filed and the claims therein pursued.  A settlement was subsequently reached with the Indenture Trustees resolving the issues involving the sinking funds and the alleged preferences, and the settlement was subsequently approved by this Court.

31.     The Trustee was able to resolve a difficult and complex issue relating to the sinking funds without resorting to expensive litigation because the Indenture Trustees were mindful that the Trustee was prepared to commence litigation against them if a settlement could not be reached.  The record is clear that the Trustee has exercised prudent business judgment in thus far not pursuing claims which Maiman and Merhav are currently pursuing at their expense and not at the expense of the Ampal Estate as well as what the Trustee believes to be a strong case by the Estate against Merhav and Maiman based upon the Note and Unconditional Guaranty.

32.     The Objectors further allege that as a result of a statement made by Mr. Shapira to the Israeli press in late 2013 that the Bondholders intended to force a sale of Gadot Tankers and Terminals Ltd. ("Gadot"), Israel Discount Bank ("IDB") nominated a receiver for the Gadot shares in an effort to try to recover on financing it had made to acquire such shares.  They further claim that the appointment of the Israeli receiver caused Ampal to lose tens of millions of dollars

## APP-309

in its investment in Gadot. Regardless of whether there is any cause of action against Shapira for speaking to the press about the Bondholders' intentions during negotiations with the Debtor, these assertions, like many of the other claims made by the Objectors, are patently untrue. The Objectors do not assert that this alleged cause of action was brought to the attention of the Trustee. That is because prior to the time of the Trustee's election IDB had already applied to the Israeli court for the appointment of a receiver.

33.     IDB applied to the Israeli Court for the appointment of a receiver on December 6, 2012, a year before the date claimed by the Objectors. IDB's application for the appointment of a receiver, (see Exhibit "G" to Affidavit of Alex Spizz), demonstrates that IDB's decision to seek the appointment of a receiver was based upon financial reasons, including the filing of Chapter 11 by Ampal, and had nothing to do with alleged statements to the press, especially those that had not as yet occurred.

34.     The Eluz Declaration further cast doubt on the Objectors' allegations set forth in the Objection. Paragraph 19 of the Eluz Declaration discusses the acquisition of Gadot and the outstanding debt due IDB, which at the time of the filing of the Debtor's petition was 75.5 million dollars. The obligation to IDB was MAG's obligation which was in turn guaranteed by the Debtor. The Eluz Declaration states in ¶19 the following:

> "the Debtor determined that in connection with the preparation of its June 30, 2012 financial statements, it would not meet required covenants due to the Debtor's other debts (mainly, to its debenture holders), and in accordance with the terms of the IDB Credit Facility, IDB may decide to accelerate the IDB Credit Facility and set it to immediate prepayment".[7]

35.     Eluz goes on in ¶ 25 of the Eluz Declaration to state:

> "In addition, Gadot's business has suffered as a result of a global economic uncertainty, particularly in Europe…." "During the last

---

[7] Declaration of Irit Eluz (Doc. No. 2, ¶ 19).

APP-310

> year the Debtor has taken measures aimed to partially realize value on its holdings of Gadot's stock, new investor(s) or an initial public offering. In the current market, it is not an advantageous time to procure a new investor(s) or conduct an initial public offer. The Debtor continues actively to pursue its alternatives, including negotiations with an international investor to invest in Gadot and to purchase a minority stake in Gadot from the Debtor and negotiations to sell the Debtor's stake in Gadot".

36.     The IDB application for a receiver states that Maiman and Ampal were attempting to sell Gadot for more than a year prior to the December 6, 2012 application. The record is clear that IDB was aware that the Debtor would be forced to sell its interest in Gadot because of its financial problems long before any alleged statements were made to the press by the Indenture Trustees or their representatives.

**D.     TKD Has No Actual Conflict of Interest**

37.     As demonstrated above and in the Trustee's memorandum of law, TKD neither holds nor represents an interest adverse to the Ampal Estate, is a "disinterested person", and has no actual conflict of interest in representing the Trustee as his general bankruptcy counsel in this case.

**E.     Conflicts Counsel**

38.     While TKD neither holds nor represents any interest adverse to the Ampal Estate, is disinterested, and has no actual conflict of interest, in the event that it is determined in the exercise of the Trustee's business judgment that the Estate has one or more valuable causes of action against Mishmeret or Shapira or a contest arises involving Mishmeret's proof of claim, the Trustee agrees that those matters would not be handled by TKD but would instead be referred to special conflict counsel to be retained by the Trustee.

**APP-311**

## F.     <u>Ethical Wall</u>

39.     Notwithstanding the fact that TKD does not have an actual conflict because it no longer represents either Mishmeret or Shapira, the firm in an abundance of caution has established an Ethical Wall.  All attorneys and paralegals who were previously involved in the representation of Mishmeret and Shapira have been blocked from access to any of TKD's electronic files and records involving Ampal.  Likewise, the SCS attorneys who joined TKD have also been blocked from access to any of the electronic files and records having to do with TKD's representation of Mishmeret and/or Shapira.   In addition, any TKD attorneys or paralegals who were involved in the Mishmeret and Shapira matters will not be involved in TKD's representation of the Trustee.[8]

<div align="center"><u>CONCLUSION</u></div>

40.     For the reasons set forth herein, it is respectfully submitted that the Objection of Yosef A. Maiman and the Controlling Shareholders to the retention of TKD be overruled and the cross-motion to disqualify Alex Spizz as Chapter 7 trustee should be denied.

Dated: New York, New York
       May 14, 2015

<div style="margin-left:40%">

TARTER KRINSKY & DROGIN LLP
Proposed Substitute Counsel to the
Chapter 7 Trustee


By:_____/s/ Arthur Goldstein_____
     Alex Spizz, Esq.
     Arthur Goldstein, Esq.
     Jill Makower, Esq.
     1350 Broadway
     New York, NY 10018
     (212) 216-8000

</div>

---

[8]  Affidavit of Alex Spizz, ¶ 37.

APP-312

TARTER KRINSKY & DROGIN LLP
*Proposed Substitute Counsel to the Chapter 7 Trustee*
1350 Broadway, 10th Floor
New York, New York 10018
Tel (212) 216-8000
Fax (212) 216-8001
Arthur Goldstein, Esq.
(agoldstein@tarterkrinsky.com)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

In re                                                          Chapter 7

AMPAL-AMERICAN ISRAEL CORPORATION           Case No. 12-13689 (SMB)

                                  Debtor

------------------------------------------------------------X

**SECOND SUPPLEMENTAL DECLARATION OF ARTHUR GOLDSTEIN PURSUANT TO BANKRUPTCY RULE 2014 ON BEHALF OF TARTER KRINSKY & DROGIN LLP AS PROPOSED SUBSTITUTE COUNSEL TO TRUSTEE AND DISCLOSURE PURSUANT TO BANKRUPTCY CODE SECTIONS 327 AND 329 AND BANKRUPTCY RULE 2014**

Arthur Goldstein, Esq., declares under penalty of perjury, as follows:

1.      I am an attorney duly licensed to practice law in the State of New York.  I am admitted and in good standing to practice before the United States District Courts for the Southern, Eastern and Northern Districts of New York.

2.      I am a counsel with the firm of Tarter Krinsky & Drogin LLP ("TKD") which maintains an office at 1350 Broadway, New York, New York 10018.

3.      I make this second supplemental declaration in further support of the application (the "Application") of Alex Spizz, the Chapter 7 Trustee (the "Trustee") of Ampal-American Israel Corporation (the "Debtor") to retain TKD as his substitute counsel in this case.

APP-313

4.     I have previously submitted a declaration in support of TKD's application on April 17, 2015 [Doc. No. 573-2], and a supplemental declaration on May 1, 2015 [Doc. No. 582].  Even though the aforementioned declarations disclosed TKD's prior representation of Mishmeret-Trust Company Services, Ltd. ("Mishmeret") and Ofer Shapira and Shapira & Co. (collectively, "Shapira"), I am submitting this additional supplemental declaration because it has been brought to my attention that it is still not clear as to exactly what TKD's former representation was in this Chapter 7 case.

5.     TKD was involved in three (3) matters before this Court on behalf of Mishmeret, which included in one (1) matter also representing Shapira.  The first matter involved a motion brought by several of the Debtor's former officers on October 22, 2013, which motion sought damages against debenture holders (including Mishmeret) and Shapira based upon a violation of the automatic stay, as well as directing the Chapter 7 Trustee to discharge Shapira as attorney for the Debtor's non-debtor subsidiaries ("Stay Violation Motion") [Doc. No. 352].   TKD represented both Mishmeret and Shapira in connection with the Stay Violation Motion.  TKD's representation of Shapira terminated in January of 2014 after this Court issued an Order on December 16, 2013 resolving the Stay Violation Motion [Doc. No. 382].

6.     TKD also represented Mishmeret in connection with (i) a motion filed by Mishmeret on October 31, 2013 seeking clarification that the automatic stay was inapplicable or alternately lifting the automatic stay to permit Mishmeret to proceed in the District Court of Tel Aviv to enforce its rights as trustee to a sinking fund [Doc. No. 357]; and (ii) a motion filed by the Trustee on May 21, 2014 seeking authority to enter into a Litigation Financing Agreement [Doc No. 407].  TKD's representation of Mishmeret in both of these matters terminated in July of 2014 after this Court entered orders approving both motions.

**APP-314**

7.      The above matters represent the only representations by TKD of Mishmeret and/or Shapira.   TKD has not represented Mishmeret and/or Shapira in any other matters including matters unrelated to the Ampal Estate.   Each of the matters where TKD has represented either Mishmeret or Shapira have been before this Court and are a matter of public record.

8.      To the extent that my prior declaration and supplemental declaration did not accurately reflect the above representations, I wish to assure the Court that any inaccuracies were unintentional.

9.      I make this declaration under the penalty of perjury in accordance with Bankruptcy Rule 2014(a) and 9011(b).


Dated: New York, New York
       May 15, 2015


       s/ Arthur Goldstein
       Arthur Goldstein

APP-315

David M. Friedman (DFriedman@kasowitz.com)
Daniel A. Fliman (DFliman@kasowitz.com)
Nii-Amar Amamoo (NAmamoo@kasowitz.com)
KASOWITZ, BENSON, TORRES &
FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone:  (212) 506-1700
Facsimile:  (212) 506-1800

*Counsel for Yosef A. Maiman and Merhav*
*(M.N.F.) Limited*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 7 |
| AMPAL-AMERICAN ISRAEL CORP., | Case No. 12-13689 (SMB) |
| Debtor. | |

**REPLY IN FURTHER SUPPORT OF YOSEF A. MAIMAN AND THE CONTROLLING
SHAREHOLDERS' (I) OBJECTION TO THE RETENTION OF TARTER KRINSKY &
DROGIN LLP AS SUBSTITUTE COUNSEL TO THE TRUSTEE AND
(II) MOTION TO DISQUALIFY ALEX SPIZZ AS CHAPTER 7 TRUSTEE**

APP-316

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ................................................................ 1

REPLY ................................................................................................ 4

   A.   Section 327 Mandates that the Court Deny the Application.................................. 4

      1.   Mishmeret and Shapira Clearly Have Interests Adverse to the Estate ........................... 4

      2.   Mishmeret and Shapira's Adverse Interests Bar TKD from Investigating and Pursuing Valuable Estate Causes of Action ............................................................ 8

      3.   TKD Cannot be Retained Even if its Representation of Mishmeret and Shapira Ended, Which has Not Been Established ......................................................... 9

      4.   TKD is in Possession of Private Information .............................................. 13

      5.   Conflicts Counsel is of No Help to the Trustee ......................................... 14

      6.   The Ethical Wall (if it Even Exists) is Meaningless ................................... 15

   B.   The Court Should Remove the Trustee For Cause ...................................... 16

      1.   The Case Law Supports the Removal of the Trustee in this Case ................................ 16

      2.   The Trustee is Conflicted and Cannot Discharge his Fiduciary Duties ....................... 17

      3.   The Trustee Cannot and Will Not Bring Valuable  Causes of Action Against Mishmeret and Shapira ......................................................... 18

      4.   Conflicts Counsel Does Not Resolve the Trustee's Conflict........................................ 19

APP-317

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bank Brussels Lambert v. Coan (In re AroChem Corp.)*,
  176 F.3d 610 (2d Cir. 1999).................................................................2, 9, 10, 11

*Bergin v. Eerie World Entertainment, LLC*,
  No. 03 Civ. 4501(SAS), 2003 WL 22861948 (S.D.N.Y. Dec. 2, 2003)...................................2

*In re Diva Jewelry Design, Inc.*,
  367 B.R. 463 (Bankr. S.D.N.Y. 2007)........................................................................8

*In re Dynamark, Ltd.*,
  137 B.R. 380 (Bankr. S.D. Cal. 1991)........................................................................8

*In re Enron Corp.*,
  No. 01-16034, 2002 WL 32034346 (Bankr. S.D.N.Y. May 23, 2002) ...................................8

*In re Granite Partners, L.P.*,
  219 B.R. 22 (Bankr. S.D.N.Y. 1998).......................................................................4, 11

*Gosser v. Arkison (In re Hammer)*,
  Nos. WW–06–1373–MODJ, 04–22244, 2007 WL 7540945
  (B.A.P. 9th Cir. Aug. 17, 2007)..............................................................................7

*In re Leslie Fay Cos., Inc.*,
  175 B.R. 525 (Bankr. S.D.N.Y. 1994).......................................................................4

*In re Lundborg*,
  110 B.R. 106 (Bankr. D. Conn. 1990) ......................................................................16

*In re Marvel Entertainment Grp., Inc*,
  140 F.3d 463 (3d Cir. 1998).................................................................................8

*In re MF Global Inc.*,
  464 B.R. 594 (Bankr. S.D.N.Y. 2011).......................................................................19

*Pereira v. Foong (In re Ngan Gung Rest.)*,
  254 B.R. 566 (Bankr. S.D.N.Y. 2000).......................................................................16

*In re Persaud*,
  496 B.R. 667 (E.D.N.Y. 2013) ...............................................................................8

*In re Project Orange Assocs. LLC*,
  431 B.R. 363 (S.D.N.Y. 2010)..........................................................................7, 8, 14

APP-318

*In re Rockaway Bedding, Inc.*, No. 04-14898, 2007 WL 1461319
    (Bankr. D.N.J. May 14, 2007) ........................................................................8

**Statutes**

11 U.S.C. § 324(a) ........................................................................................16

11 U.S.C. § 327(a) ...............................................................................4, 7, 10

**Other**

Rules of Professional Conduct [22 NYCRR 1200.0] rule 1.10 ...............................17, 19

APP-319

Yosef A. Maiman and the Controlling Shareholders,[1] through their undersigned counsel, hereby file this reply (the "**Reply**") in further support of their Objection/Cross-Motion and in response to the Trustee and TKD's *Response to: (1) Objection of Maiman and Controlling Shareholders to Retention of Tarter Krinsky & Drogin LLP and (2) Cross-Motion to Disqualify Trustee* [Docket No. 589] (the "**Response**") and accompanying memorandum of law [Docket No. 588] (the "**Memo of Law**" and, together with the Response, the "**Trustee/TKD Objection**")[2] and respectfully represent as follows:

**PRELIMINARY STATEMENT**

Notwithstanding three supplemental affidavits and a lengthy attack on our motives, the Trustee does not and cannot refute the salient fact that his new firm has represented Mishmeret, one of the estate's largest and most active creditors, in this very case. Mishmeret asserts a claim against the estate of approximately $44 million, was a member of the creditors' committee, was one of the few creditors who participated in the election of the Trustee, has been subject to a claim of violation of the automatic stay, has sought substantive relief in this Court and has provided Litigation Financing to the Trustee. This activity all has been accomplished through TKD. This is not a circumstance where the adverse party is of minimal importance or where the adverse representation was unrelated to Ampal. This is a classic conflict that precludes the retention of TKD and mandates the disqualification of the Trustee.

---

[1]     Capitalized terms not defined herein have the meanings ascribed to them in *Yosef A. Maiman and the Controlling Shareholders' (I) Objection to the Retention of Tarter Krinsky & Drogin LLP as Substitute Counsel to the Trustee and (II) Motion to Disqualify Alex Spizz as Chapter 7 Trustee*, dated April 28, 2015 [Docket No. 576] (the "**Objection/Cross-Motion**").

[2]     In support of the Trustee/TKD Objection, the Trustee filed the *Affidavit of Alex Spizz as Trustee in Response to the (1) Objection Filed by Yosef A. Maiman and the Controlling Shareholders to the Retention of Tarter Krinsky & Drogin LLP in Place of Spizz Cohen & Serchuk, P.C. as Substitute Counsel to the Trustee; and (2) Cross-Motion to Disqualify Alex Spizz as Chapter 7 Trustee* [Docket No. 587] (the "**Spizz Declaration**" or "**Spizz Decl.**"). Additionally, in support of the Application, TKD filed on April 17, 2015 the Declaration of Arthur Goldstein [Docket No. 573-2] (the "**Initial Goldstein Decl.**"), which Mr. Goldstein supplemented on May 1, 2015 [Docket No. 582] (the "**First Suppl. Goldstein Decl.**") and again on May 15, 2015 [Docket No. 590] (the "**Second Suppl. Goldstein Decl.**") (collectively, the "**Goldstein Declaration**").

APP-320

The Trustee, in his belated affidavit, reveals in his own words the futility of the

Application. He testifies that, in satisfying himself that he could join and retain TKD, he relied

upon the Second Circuit's decision in *AroChem*. But that decision is entirely inapposite to our

facts. In *AroChem*, the trustee sought to retain special litigation counsel for a very limited

purpose and the trustee was not part of or seeking to join the conflicted firm. Here, the

Application seeks to retain TKD as general bankruptcy counsel and the Trustee is a member of

that firm.

The factual submissions of the Trustee do little more than sow confusion with respect to

the conflicted relationships. Significantly, in none of the four declarations is the affiant even

competent to testify on this subject. Neither Mr. Spizz nor Mr. Goldstein was affiliated with

TKD during the period when TKD was actively representing Mishmeret and Shapira in the

Ampal case. Accordingly, their entire testimony is based upon hearsay – either through a

purported review of documents that have not been submitted to the Court, or through

conversations with Mr. Markowitz, the partner at TKD who led the representation of these

adverse parties. That no declaration has been submitted by Mr. Markowitz speaks volumes as to

the absence of reliable evidence and the failure of the Trustee to meet his burden.[3]

The internally inconsistent testimony offered by the Trustee is also contradicted by the

deposition testimony of Mr. Goldstein. Among other things,

---

[3]      As reflected in Judge Scheindlin's decision in *Bergin v. Eerie World Entertainment, LLC*, No. 03 Civ.
4501(SAS), 2003 WL 22861948 (S.D.N.Y. Dec. 2, 2003), Mr. Markowitz is well-versed in the requirements of full
disclosure by court-retained counsel. In that case, Mr. Markowitz was a partner *of Mr. Spizz* and others at Todtman,
Nachamie, Spizz & Johns, P.C. ("**TNS&J**"). That firm represented a Chapter 11 debtor, with Mr. Markowitz as the
lead lawyer. After Judge Blackshear denied a request to disqualify TNS&J, the District Court reversed. Judge
Scheindlin took issue with many of Mr. Markowitz and TNS&J's statements, actions and inactions, and found that
"TNS & J has engaged in conduct warranting disqualification," and that "the impression of impropriety is
unavoidable." *Id.* at *7. Responding to the allegation that TNS&J, due to misplaced loyalties, "breached its
fiduciary responsibilities to the debtor's estate by failing to pursue certain allegedly avoidable transfers," Judge
Scheindlin found that "[n]one of Markowitz's explanations provide a sufficient excuse for TNS&J's failure to
pursue a potentially avoidable transaction . . . ." *Id.* at *5,6. For the reasons discussed below, the same misplaced
loyalties that disqualified Mr. Markowitz and Mr. Spizz's firm before, should disqualify TKD now.

APP-321

- Mr. Goldstein testified in his deposition on the morning of May 14, 2015, that no ethical wall had been established at TKD to protect the Trustee's files and communications from being revealed to lawyers representing Mishmeret or Shapira. Mr. Goldstein testified that he was not even going to address the ethical wall issue until after the Court ruled on the Application, and that it was not certain whether Mr. Markowitz would represent the Trustee.[4] In contrast, Mr. Spizz testifies that an ethical wall was put in place on May 8, 2015.

- Mr. Goldstein testified at his deposition that TKD had not analyzed the ethical implications of TKD suing Mishmeret or Shapira;[5] Mr. Spizz testifies that conflicts counsel should be retained for that purpose.

- Mr. Goldstein testified that he was unaware of the Trustee performing any analyses of the merits of the estate's potential claims against Mishmeret or Shapira.[6] On the same day as that testimony, the Trustee filed his response in which he argues that any such claims are baseless.

- While several declarations state that TKD's representation of Mishmeret and Shapira has ended, Mr. Goldstein testified that he was unaware of any correspondence between TKD and Mishmeret terminating the representation,[7] nor of any written consent by Mishmeret or Shapira for TKD to represent the Trustee.[8]

Incredibly, the Trustee proposes to retain "conflicts counsel" to pursue any potential claims against (or objections with respect to the claims of) Mishmeret and Shapira. This proposal ignores the fact that the Trustee himself – the decision maker with regard to such litigation – would remain a partner in the conflicted firm and TKD's conflicts are imputed to him. Conflicts counsel is occasionally a solution in appropriate circumstances. But to our knowledge no court has ever approved a "conflicts trustee."

Finally, the Court is well aware of the intensely difficult and complex issues surrounding the turnover of electronic data to the Trustee maintained on the server jointly operated by Ampal and Merhav, and containing personal information of Mr. Maiman as well. We have consistently

---

[4]    *See* Transcript of Deposition of Arthur Goldstein, dated May 14, 2015, at 53:12-54:6; 54:18-55:4 (attached hereto as **Exhibit A** and cited herein as "**Dep. Tr.**").

[5]    Dep. Tr. at 74:8-12.

[6]    Dep. Tr. at 71:19-72:2.

[7]    Dep. Tr. at 25:21-26:6.

[8]    Dep. Tr. at 41:10-12; 41:15-17; 41:23-25; 42:4-10.

APP-322

stressed the importance of confidentiality and the need for any sharing of data to protect Merhav,

Mr. Maiman and others from the risk that parties such as Mishmeret and Shapira would leak

information to the media. The parties have worked out a detailed protocol designed to protect

against this risk. It is unfathomable that Merhav and Mr. Maiman would ever have agreed to

such a protocol where access is granted to parties working at TKD. The unfortunate fact is that

files containing Private Information of Mr. Maiman and Merhav have already been transported to

TKD. The Trustee will ultimately have to account for this action.

For the foregoing reasons, and on the additional bases discussed herein, the

Objection/Cross-Motion should be granted, the Application should be denied, and the Trustee

should be removed.

## **REPLY**

**A.**     **Section 327 Mandates that the Court Deny the Application**[9]

    **1.**     **Mishmeret and Shapira Clearly Have Interests Adverse to the Estate**

1.     Section 327(a) of the Bankruptcy Code prohibits attorneys "that . . . hold or

represent an interest adverse to the estate" from representing the estate. 11 U.S.C. § 327(a). An

adverse interest is any interest "however slight, that would even faintly color the independence

and impartial attitude required by the Code and Bankruptcy Rules." *In re Granite Partners, L.P.*,

219 B.R. 22, 33 (Bankr. S.D.N.Y. 1998) (Bernstein, J.) (citations and internal quotation marks

omitted). If it is even "*plausible* that the representation of another interest may cause the

debtor's attorneys to act any differently than they would without that other representation, then

they have a conflict and an interest adverse to the estate." *In re Leslie Fay Cos., Inc.*, 175 B.R.

525, 533 (Bankr. S.D.N.Y. 1994) (emphasis added).

---

[9]     The Trustee and TKD assert that the Controlling Shareholders may lack standing to object to the Application because they are shareholders. (*See* Memo of Law at 8.) They are mistaken. The Controlling Shareholders are also creditors of Ampal. Indeed, the Response itself alleges that Maiman filed a proof of claim. (Response ¶ 20.)

4

## APP-323

2.      The Trustee and TKD do not argue that Mishmeret has no adverse interest to the estate.  Nor could they.  As a trustee to Ampal's bondholder creditors, and having filed a proof of claim against the estate, Mishmeret obviously has interests adverse to those of the estate in this bankruptcy case.  Moreover, the Trustee's argument that Shapira has no adverse interests to the estate[10] is flatly incorrect.  Shapira represents Mishmeret, an Ampal debenture trustee.  It was Ofer Shapira that first got Mr. Spizz involved in this bankruptcy case when – on behalf of Mishmeret and another debenture trustee – he caused Mr. Spizz to be hired to monitor the Chapter 11 case.[11]  In fact, Mr. Shapira cast Mishmeret's vote to elect the Trustee.  Further, Shapira sent the Shapira Letter on Mishmeret's behalf – in violation of the automatic stay – because Shapira represented Mishmeret and had done so for years prior.

3.      The Trustee baldly states that the Objectors "fail to cite a single example of any position or argument made by Mishmeret or Shapira that TKD is now on the other side of."[12]  While the Trustee misstates the legal standard – it is he, not the Objectors, who must satisfy the conflict requirements of the Bankruptcy Code – Mishmeret's adversity is patently obvious: it filed a large proof of claim in the case, thereby rendering it adverse to the estate.  Even looking beyond that, the Objection/Cross-Motion discusses at length TKD's positions taken on behalf of Mishmeret and Shapira that they did not violate the automatic stay by demanding payment on estate claims (with which this Court disagreed).[13]

---

[10]      Response ¶¶ 8-12.

[11]      *See Declaration of Disinterestedness of Alex Spizz,* dated May 21, 2013 [Docket No. 273] ("On or about August 31, 2012, I was asked by the Hermatic Trust (1975) Ltd. and Mishmeret-Trusts Company, Ltd. (collectively, the "Trusts") to put in a Notice of Appearance on their behalf so that I would be able to monitor Ampal's Chapter 11 proceedings pending the appointment of a creditors' committee.  In that regard I attended the first hearing held in this case on August 30, 2012…. The monitoring of the Chapter 11 case until the appointment of a creditors' committee was a professional courtesy at the request of Ofer Shapira, an attorney in Israel, whom I worked with in the past, in an unrelated Chapter 11 case in this district.").

[12]      Memo of Law at 11.

[13]      *See* Objection/Cross-Motion ¶¶ 17-20.

## APP-324

4.      Additionally, the Trustee and TKD have not demonstrated adequately that Mishmeret's role in the Litigation Financing facility – on which TKD represents it – did not create an adverse interest.  Indeed, while Mr. Goldstein asserts that Mishmeret has no current interest in the Litigation Financing loan (notwithstanding that it was the initial lender), he never confirmed whether Mishmeret has any existing participation or secondary interest in the loan and does not know whether Mishmeret has any remaining indemnification or reimbursement rights that could ultimately be chargeable to the estate.[14]

5.      Likewise, we still do not know exactly what role TKD played in the Litigation Financing loan on behalf of Mishmeret.  While Mr. Goldstein claims the role was "limited," he also acknowledges that he does not really know.  Mr. Goldstein does not know if TKD provided any comments to the agreement,[15] does not know TKD's role in inserting language into the loan that makes funding contingent on the sinking fund settlement TKD negotiated for Mishmeret[16] and does not know why Mishmeret could not sign the loan document and had Mr. Markowitz sign it on Mishmeret's behalf.[17]

6.      TKD cannot belittle the Litigation Financing representation by hiding all knowledge of its scope.  It is noteworthy that TKD and the Trustee never even disclosed this aspect of the representation.[18]  The Trustee can hardly contend that this non-disclosure was mere oversight given that in the Spizz Declaration, the Trustee proclaims:  "Before joining TKD, I was *of course aware* that TKD had represented Mishmeret . . . in connection with a motion for the approval of a Litigation Financing Agreement."[19]

---

[14]      Dep. Tr. at 50:16-23.
[15]      Dep. Tr. at 47:7-9.
[16]      Dep. Tr. at 49:16-18.
[17]      Dep. Tr. at 48:4-6.
[18]      *See generally* Application and Initial Goldstein Decl.
[19]      Spizz Decl. ¶ 3 (emphasis added).

7.    The Trustee fails in his attempts to discredit the black letter law cited by the

Objectors in opposition to the Application.  For example, although TKD attempts to distinguish

*Gosser v. Arkison (In re Hammer)*, Nos. WW–06–1373–MODJ, 04–22244, 2007 WL 7540945

(B.A.P. 9th Cir. Aug. 17, 2007) by contending that it applies only to one narrow set of

circumstances,[20] the case stands for the proposition that the concept of holding an adverse

interest is far broader than that suggested by the Trustee.  Indeed, *Hammer* held that the law firm

in question held an adverse interest where it failed to adequately rebut the objectors' arguments

that it would be "exposed to liability" if it acted in its role as trustee's counsel to undermine legal

work it previously conducted for a creditor in the same case.  *Id*. at *7 ("Law Firm therefore has

an incentive not to expose any defect in [its prior legal work].  *Whether or not Law Firm would

actually be influenced by that incentive, it is disqualified from reviewing [its client's] claim*.")

(emphasis added).

8.    The Trustee's cited authorities are distinguishable as well.  *In re Project Orange

Assocs. LLC*, 431 B.R. 363 (S.D.N.Y. 2010) actually *supports* the Objection/Cross-Motion.

There, DLA Piper, as trustee's counsel, obtained a conflicts waiver.  *Id.* at 369.  Nevertheless,

the court held that it was still disqualified from serving as trustee's counsel under section 327(a)

because even a conflicts waiver "cannot trump requirements of section 327(a)" and "[e]ven if

[the creditor] agreed that DLA Piper could act against [the creditor] on *all issues*, through

litigation, negotiation or otherwise, DLA Piper must still satisfy the statutory requirements of

section 327(a) . . . ."  *Id.* at 374 (emphasis added).  Notably, the court highlighted the fact that,

despite DLA Piper's position that there was only the "*potential* for adversity with [the

creditor] . . . other bankruptcy judges in this district have refused to distinguish between actual

and potential conflicts."  *Id.* at 373.  It further stated that courts should "focus on the facts of

---

[20]    *See* Memo of Law at 12.

7

APP-326

each case to determine whether an attorney has an adverse interest without limiting labels." *Id.* Additionally, the court held that the "fig leaf" of conflicts counsel is not acceptable where general bankruptcy counsel has a conflict of interest that is central to the debtor's case. *Id.* at 375-77. Indeed, where counsel is prohibited from "investigat[ing] and prosecut[ing] claims against [a] key creditor," it is hopelessly conflicted. *Id.* at 377 (citing *In re Amdura Corp.*, 121 B.R. 862 (D. Colo. 1990)).[21]

9.      In sum, Mishmeret and Shapira clearly have interests adverse to the estate.

**2.      Mishmeret and Shapira's Adverse Interests Bar TKD from Investigating and Pursuing Valuable Estate Causes of Action**

10.      A chapter 7 trustee and his or her counsel must be independent and unbiased to explore, investigate and prosecute potential causes of action on the estate's behalf. The estate here has potentially valuable causes of action (which, as discussed below, the Trustee egregiously discredits) against Mishmeret and Shapira, which, *by the Trustee's own admission*, TKD may not assert.

11.      The Trustee and TKD's admission in the Memo of Law says it all:

> [T]he Trustee and TKD concede that TKD's prior representation of Shapira and Mishmeret may **preclude TKD from representing the**

---

[21]      The Trustee and TKD's other cited cases are inapposite as well. *See In re Marvel Entertainment Grp., Inc*, 140 F.3d 463, 477 (3d Cir. 1998) (firm sought to be disqualified "never represented [the creditor] on a matter related to this bankruptcy . . . ."); *In re Persaud*, 496 B.R. 667, 674, 678 n.11 (E.D.N.Y. 2013) (finding no conflict only after "a full hearing – which included multiple witnesses, expert affidavits, discovery, and extensive briefing," and only where the objector's testimony about his sharing confidential information with counsel lacked credibility); *In re Diva Jewelry Design, Inc.*, 367 B.R. 463, 475 (Bankr. S.D.N.Y. 2007) (counsel in question "never had a one-on-one relationship with any creditor . . . did not review creditors' books, records or documents . . . ." and never received "any confidential information" related to the creditors) (footnotes omitted); *In re Rockaway Bedding, Inc.*, No. 04-14898, 2007 WL 1461319, at *2-4 (Bankr. D.N.J. May 14, 2007) (ethical wall in place, conflicts waiver obtained, law firm argued that "replacement bankruptcy counsel would lead to irreparable injury to the Debtors' reorganization," and there were no litigations related to the creditor in question even "envisioned"); *In re Enron Corp.*, No. 01-16034, 2002 WL 32034346, at *9-11 (Bankr. S.D.N.Y. May 23, 2002) (law firm sought to represent official creditors' committee after it represented debtors and received preferential transfers from debtors prepetition; law firm had the authority to waive any right to challenge preferences because it was the holder of the payments; moreover, examiner was appointed to investigate all transactions at issue), *aff'd sub nom.*, *Exco Res., Inc. v. Milbank, Tweed, Hadley & McCloy LLP (In re Enron Corp.)*, No. 02 CIV. 5638, 2003 WL 223455 (S.D.N.Y. Feb. 3, 2003); *In re Dynamark, Ltd.*, 137 B.R. 380, 381 (Bankr. S.D. Cal. 1991) (firm represented the creditor in "matters totally unrelated to the Chapter 11 proceeding.").

## APP-327

> *Trustee in any contest as to Mishmeret's proof of claim or in any other matter that may arise that would be directly adverse to Shapira or Mishmeret in this case.*[22]

In other words, *after* over a dozen pages of defensive rhetoric, the Trustee and TKD *admit* that TKD would be powerless to investigate, analyze and assert valuable estate causes of action against Mishmeret and Shapira.

12.    It is especially perplexing and troubling that the Trustee and TKD made this important concession less than seven hours after Mr. Goldstein testified as follows:

> Q.  Has anybody performed the legal analysis as to whether any ethical limitations would preclude TKD from representing the trustee in a suit against Shapira or Mishmeret?
>
> A.  No.[23]

**3.    TKD Cannot be Retained Even if its Representation of Mishmeret and Shapira Ended, Which has Not Been Established**

13.    The Trustee's primary counter is that TKD no longer represents Mishmeret and Shapira and, therefore, can represent whomever it pleases.  But, that is not the law and, even if TKD's representation of those adverse parties ended, TKD still holds or represents adverse interests.

14.    <u>First</u>, the Trustee and TKD's reliance on *Bank Brussels Lambert v. Coan (In re AroChem Corp.)*, 176 F.3d 610 (2d Cir. 1999) is misplaced because that case is inapposite.  In *AroChem*, the chapter 7 trustee retained a law firm, at which he was a partner, as general counsel.  *Id.* at 615.  That firm performed an extensive analysis of the causes of action in question and recommended that the trustee bring certain lawsuits through contingency counsel. *Id.*  The trustee proposed retaining Caddell as special counsel for the limited purpose of pursuing the lawsuits, on a contingency basis.  *Id.* at 615-16.  Caddell had previously represented parties

---

[22]    Memo of Law at 15 (emphasis added).
[23]    Dep. Tr. at 74:8-12.

APP-328

that brought lawsuits that largely overlapped with the lawsuits the trustee now sought to bring and was the only qualified firm that the trustee, after due diligence, could find to retain. *Id.* The defendants in those lawsuits objected to Caddell's retention. *Id.* at 616. In affirming the retention, the Second Circuit stressed that "[w]hether an adverse interest exists is best determined on a case-by-case basis." *Id.* at 623. It then discussed, at length, the relevant inquiry that governed the application, noting repeatedly, the very limited nature of Caddell's representation. *Id.* at 624, 627-28. The court evaluated the conflict *only* within the context of that limited proposed representation and noted that "Caddell has never represented any interests that are adverse to the Estates with respect to the subject matter of the cases it has been hired to litigate and, as a result does not run afoul of section 327(a) or (c)." *Id.* at 627.

15.     In contrast to *AroChem,* here TKD is proposed *general counsel* for the Trustee and its role necessarily will be unlimited and pervade all aspects of the discharge of the Trustee's duties. Moreover, here  the Trustee is a partner of TKD and no showing has been made or even offered that TKD is the only firm that the Trustee could retain for the proposed role.  TKD's retention thus finds no support from *AroChem*.

16.     <u>Second</u>, even if *AroChem's* holding is applied to the Application, it nonetheless should be denied.  Assuming, *arguendo,* as TKD and the Trustee contend, that the "adverse interest" test requires that TKD *presently* hold or represent the adverse interest, that test is still met here.  As argued in the Objection/Cross-Motion and as TKD and the Trustee now concede, TKD's purported prior representation of Mishmeret and Shapira created an *ongoing and presently existing* conflict that today prevents TKD from being adverse to those clients.  That is because TKD continues to owe duties and ethical responsibilities to Mishmeret and Shapira arising from work done in this case.  Those duties extend beyond just not suing Mishmeret or

10

## APP-329

Shapira, but include continuing obligations regarding maintenance of client confidences, records and privileges – presumably why TKD (allegedly) instituted ethical walls. Combined, these duties owed to parties that are adverse to the estate amount to "a predisposition under circumstances that render such a bias against the estate." *AroChem*, 176 F.3d at 623 (citation omitted).

17. Invariably, because TKD remains beholden to Mishmeret and Shapira with respect to the aforementioned obligations, there exists *today* a relationship and an interest that absolutely would "color the independence and impartial attitude required by the Code and Bankruptcy Rules." *Granite Partners*, 219 B.R. at 33 (citation and internal quotation marks omitted).

18. <u>Third</u>, TKD and the Trustee have failed to establish that the relationship with Mishmeret and Shapira definitely terminated. The Trustee and TKD assert that "[t]here can be no doubt that the attorney/client relationship between TKD and Mishmeret/Shapira terminated no later than July 2014" because the "limited purpose set forth in the [R]etainer [A]greement had been accomplished by that time."[24] However, the Trustee and TKD have offered no evidence in support of this assertion.

19. Indeed, while Mr. Goldstein's declaration states that the representations ended in July 2014,[25] the record shows that he lacks personal knowledge and is not qualified to testify about these facts. Mr. Goldstein testified at his deposition that the sole source of information he had concerning the purported end of TKD's representation was time records he reviewed and conversations with Mr. Markowitz.[26] Mr. Goldstein never reviewed the engagement letters that

---

[24]      Memo of Law at 5, n.2.
[25]      First Supp. Goldstein Decl. ¶ 5; Second Supp. Goldstein Decl. ¶ 6.
[26]      Dep. Tr. at 27:10-23:

11

APP-330

purportedly set forth the scope of retentions and has no personal knowledge of what they say.[27]

He never reviewed any client files or spoke to anybody at Mishmeret or Shapira. He does not

know whether TKD continued communicating with Mishmeret and Shapira after June 2014,

when the representations purportedly ended.[28] Indeed, he is aware of no written confirmation of

the end of representation or anything terminating the retention agreements.[29]

---

"Q.     What you know is that no time was entered?
A.      If I may, no time was entered or billed
        subsequent to the July 2014 invoice for June time.

Q.      And is that the sole basis for your
        understanding that TKD no longer represents Shapira
        or Mishmeret?
A.      No.

Q.      What else forms the basis of your
        understanding?
A.      Conversations with Mr. Markowitz
        confirming that TKD no longer had – had not
        provided any services to Mishmeret or Shapira
        subsequent to that time frame."

[27]    Dep. Tr. at 20:15-25:

"Q.     How do you know there were two engagements?
A.      There were two engagement agreements.

Q.      You reviewed the engagement agreements?
A.      No, I didn't.

Q.      So how do you know there were two engagement agreements?
A.      I was advised that there were two engagement agreements.

Q.      By whom?
A.      Mr. Markowitz and Mr. Spizz".

[28]    Dep. Tr. at 43:10-13, 18-21:

"Q.     Has any partner or employee of TKD
        communicated with any employee of Shapira & Co.
        since July of 2014?
A.      I have no knowledge of that."

"Q.     Are you aware of any communications
        between anybody at TKD and Mishmeret, since July of
        2014?
A.      I am -- I wouldn't have that knowledge."

[29]    Dep. Tr. at 25:21-26:6.

**APP-331**

20.     At most, Mr. Goldstein can testify with personal knowledge that the TKD time

records show no time being entered for work after June 2014.  But that is insufficient to prove

the end of representation.  The fact that TKD may not be actively billing to Mishmeret and

Shapira does not mean that TKD ceased to be their counsel.  In fact, Mr. Goldstein

acknowledges that Mishmeret and Shapira have not consented to TKD representing the Trustee

and have not waived conflicts.[30]

### 4.     TKD is in Possession of Private Information

21.     As discussed in the Objection/Cross Motion, by joining TKD, the Trustee is

currently in violation of this Court's Discovery Order.  The Trustee insists that no one at TKD

other than Mr. Goldstein has access to the Private Information.[31]  This argument simply misses

the point.  The fact that the Private Information is now in TKD's hands – regardless of if anyone

has seen it – is a violation of the plain terms of this Court's Discovery Order.  The Discovery

Order prohibits Shapira and its representatives and agents – including TKD – from accessing the

---

[30]     Dep. Tr. at 41:10-12;41:15-17; 41:23-25; 42:4-10:

"Q.     Has Shapira & Co. ever given a waiver
        of conflicts to TKD?
A.      Not that I'm aware of."

"Q.     Has Shapira & Co. provided consent to
        TKD representing Mr. Spizz?
A.      No."

"Q.     Has Mishmeret ever given a waiver of
        conflicts to TKD?
A.      No."

"Q.     Has Mishmeret provided consent to TKD
        representing the trustee?

                *  *  *

A.      No, they haven't."

[31]     *See* Response ¶¶ 4-7; Memo of Law at 20-21.

13

## APP-332

Private Information.[32]  It certainly does not say that certain individuals within Shapira's representative or agent entities may possess it.

22.     This provision in the Discovery Order was *vital* to the resolution of an extremely contentious discovery dispute in this case.  Instead of engaging in a time-consuming and costly document review process, the Controlling Shareholders consented to provide the Private Information to the Trustee, conditioned upon the critical assurance that Shapira – who has relentlessly defamed Ampal and the Controlling Shareholders in the Israeli press and purports to be beyond the reach of this Court's jurisdiction – would never be able to access the Private Information.  The Controlling Shareholders would *never* have agreed to release the Private Information to a firm that represented Shapira.  The Trustee and TKD should not be allowed to trample on this Court's Discovery Order.

**5.     Conflicts Counsel is of No Help to the Trustee**

23.     The Trustee's assertion that he would retain conflicts counsel, should he decide to sue Mishmeret and Shapira, does not salvage the Application.[33]

24.     <u>First</u>, as discussed further below, *the Trustee himself* is still charged with determining whether claims exist against Mishmeret and Shapira (which they do), but he is now a partner of a law firm that represented them in this case.  He is simply not impartial – a concern the Court raised even *before* TKD's proposed retention.[34]

25.     <u>Second</u>, "where proposed counsel is conflicted from representing [a trustee] with regards to matters central to the bankruptcy, even the presence of conflicts counsel does not make the retention appropriate."  *Project Orange*, 431 B.R. at 376 (footnote omitted).

---

[32]     *See* Discovery Order ¶ 4.

[33]     *See* Response ¶ 38; Memo of Law at 15-16; Spizz Decl. ¶¶ 31, 36.

[34]     *See* Stay Decision at 20-21 ("Shapira cast the votes that elected Shapira, Spizz immediately sought to retain Shapira *nunc pro tunc* to the date of his election, and this might have created the impression that Spizz has already taken sides in the disputes between Mishmeret/Shapira and the Movants.  In the same vein, the *Spizz Opposition* opposed the Movants' claim for damages – an issue that concerned Mishmeret and Shapira but not the estate.").

## APP-333

Mishmeret is one of the debtor's largest creditors and an active participant in the bankruptcy

case.  Invariably, it will continue to have substantial involvement and input in the liquidation

process.  Conflicts counsel, therefore, does not fix things.  For instance, if the Trustee files an

application for approval of a settlement or compromise and Mishmeret objects, TKD would be

unable to respond.  Conflicts counsel would need to prosecute the application, leading to

inefficiency, distraction and delay.

### 6. The Ethical Wall (if it Even Exists) is Meaningless

26.    According to the Trustee/TKD Objection, an ethical wall was implemented within

TKD to prevent attorneys involved in the representation of Mishmeret and Shapira from

accessing files involving Ampal.[35]  Mr. Spizz is unequivocal in testifying that "TKD on May 8,

2015 established an Ethical Wall within the firm."[36]

27.    Yet, just a few hours earlier, Mr. Goldstein testified that there was no wall in

place:

> Q.    Is there any ethical wall or procedure barring lawyers that
> represented Mishmeret or Shapira from working on
> representation of the trustee?
> A.    Not at the moment.
>
> Q.    Do you anticipate that such wall or procedure will be put in
> place?
> A.    It is possible.
>
> Q.    Well, do you expect that Mr. Markowitz
> will work on TKD's representation of the trustee?
> A.    Unlikely.
>
> Q.    And why is that?
> A.    To avoid even the appearance of any
> type of conflict.
>
> Q.    You said it's unlikely. What will

---

[35]    *See* Response ¶ 39; Memo of Law at 21; Spizz Decl. ¶ 37.
[36]    Spizz Decl. ¶ 37.

APP-334

> determine with certainty what will happen?
>
> A.    I would assume it would depend, in part, on the court's ultimate ruling on the TK- - on Mr. Spizz's application for the retention of TKD.
>
> <div align="center">. . .</div>
>
> Q.    Does TKD have any client files from its representation of Mishmeret and Shapira?
>
> A.    Yes.
>
> Q.    Has TKD put into place any protocol precluding lawyers . . . representing the Trustee from accessing those files?
>
> A.    Not at the moment.
>
> Q.    Has TKD put into place any protocols precluding lawyers representing the trustee from discussing the representation of Mishmeret and Shapira with other TKD lawyers?
>
> A.    No.[37]

28.    Necessarily, either Mr. Goldstein's testimony *or* the representations in the Trustee/TKD Objection are false.

29.    Even accepting the Trustee/TKD Objection's contention (as opposed to Mr. Goldstein's) that the wall was established on May 8, 2015, it means that for nearly a *month*, everything TKD is now supposedly preventing already has occurred.

**B.**    **The Court Should Remove the Trustee For Cause**

    **1.**    **The Case Law Supports the Removal of the Trustee in this Case**

30.    Although the Trustee and TKD cite numerous cases purporting to require actual fraud or injury in order to remove a trustee under section 324(a), the Bankruptcy Code sets forth no such requirement.  *See* 11 U.S.C. § 324(a) ("The court, after notice and a hearing, may remove a trustee . . . for cause."); *see In re Lundborg*, 110 B.R. 106, 108 (Bankr. D. Conn. 1990) ("Cause has been found to exist . . . where the trustee is not disinterested . . . .") (citations omitted); *Pereira v. Foong (In re Ngan Gung Rest.)*, 254 B.R. 566, 576 (Bankr. S.D.N.Y. 2000)

---

[37]    Dep. Tr. at 53:12-54:6; 54:18-55:4.

## APP-335

(considering lack of disinterestedness as a factor in section 324 cause analysis). It would be nonsensical to wait until an estate is actually injured *before* removing a trustee for cause.

### 2. The Trustee is Conflicted and Cannot Discharge his Fiduciary Duties

31. The Trustee should be removed because TKD's conflicts are imputed to him and prevent the Trustee from carrying out his assignment.

32. The Trustee, as an attorney working at TKD, is bound by his law firm's ethical obligations and limitations. The New York Rules of Professional Conduct provide that any lawyer associated with a law firm is imputed with the duties and loyalties of every other lawyer in the firm.[38] As the commentary to the rules explains:

> The rule of imputed disqualification . . . gives effect to the principle of loyalty to the client as it applies to lawyers who practice in a law firm. Such situations can be considered from the premise that a firm of lawyers is essentially one lawyer for purposes of the rules governing loyalty to the client, or from the premise that each lawyer is vicariously bound by the obligation of loyalty owed by each lawyer with whom the lawyer is associated.[39]

33. TKD cannot be adverse to Mishmeret or Shapira. Mr. Spizz, as an attorney associated with TKD, cannot be adverse either. That means he cannot as the Trustee take actions adverse to Mishmeret or Shapira, including bringing against them any action, claim objection, stay enforcement motion or other type of proceeding, or opposing any relief they may seek in this Court or elsewhere.

34. Moreover, as discussed above, TKD holds or represents an interest adverse to the estate and cannot be retained. *See* Sections A.2-3, *supra*. TKD's disqualifying conflict likewise taints the Trustee.

---

[38] *See* Rules of Professional Conduct [22 NYCRR 1200.0] rule 1.10(a) ("While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rule 1.7, 1.8 or 1.9, except as otherwise provided therein."); *see also Granite Partners*, 219 B.R. at 34 (citing to predecessor professional rules: "DR 5-105(d) forbids a lawyer from knowingly accepting or continuing a representation that any other lawyer in the firm could not.")

[39] Rules of Professional Conduct [22 NYCRR 1200.0] rule 1.10 Comment [2].

## APP-336

**3.    The Trustee Cannot and Will Not Bring Valuable
Causes of Action Against Mishmeret and Shapira**

35.    The Trustee insists that he is prepared to prosecute estate causes of action against

Mishmeret and Shapira and that he will "continue to keep an open mind", but then offers various

reasons as to why he has not done so to date.[40]  These reasons are either irrational, disingenuous

or both.

36.    To start, Mr. Goldstein was unaware of any analysis undertaken by the Trustee of

claims asserted in the Third Party Complaint against Mishmeret or Shapira:

> Q.    Has the trustee or have you analyzed the merits of our
> third-party complaint?
> A.    I have not.
>
> Q.    Has the trustee analyzed the merits of our third-party
> complaint?
> A.    You would have to ask Mr. Spizz.
>
> Q.    Does that mean that you don't know the answer?
> A.    The answer is I don't know the answer . . . .[41]

Yet, the Trustee hails Mr. Goldstein as having the "most familiarity" with this bankruptcy case.[42]

If an analysis was in fact undertaken, it seems inconceivable that Mr. Goldstein did not know

about it.

37.    Nonetheless, apparently with no analysis, the Trustee contends that the potential

causes of action are "dubious at best" and "the damages are highly speculative."[43]

38.    The Trustee then expends pages of the Response and Memo of Law, not to

mention his own Spizz Declaration, trying to discredit the allegations in the Third Party

Complaint, labeling them (inaccurately) as, among other things, "weak."[44]

---

[40]    The Trustee's assertion, even if true, that he and his former law firm, Spizz Cohen & Serchuk, P.C., drafted a complaint against Mishmeret is an irrelevant attempt at distracting the Court from the real issues. It is pure speculation that the Trustee would have pulled the trigger and actually sued Mishmeret.
[41]    Dep. Tr. at 71:19-72:2.
[42]    Application at ¶ 2.
[43]    Spizz Decl. ¶ 29; Memo of Law at 9.

18

**APP-337**

39.    It is disturbing that the Trustee – apparently with no actual analysis and while purporting to "keep an open mind" -- would disparage the claims in the Third Party Complaint which are potential estate causes of action translating into valuable assets.  Why would an estate fiduciary go out of his way to provide an unnecessary, premature and uninformed attack of potential sources of recovery?  The obvious, unfortunate, answer is:  TKD and, by extension, the Trustee, has a pre-existing loyalty to Mishmeret and Shapira.  This is of course reminiscent of the Trustee's entirely unnecessary challenge to the Controlling Shareholders' entitlement to sanctions in the automatic stay proceeding, as observed by the Court.[45]

### 4.    Conflicts Counsel Does Not Resolve the Trustee's Conflict

40.    Even if conflicts counsel were a viable option as to TKD's conflict (and it is not), it is of *no* benefit to the Trustee.  There is no such thing as a "conflicts chapter 7 trustee."  No matter which firm the Trustee retains as conflicts counsel, the Trustee is a partner at TKD, whose conflicts are imputed to the Trustee.[46]

WHEREFORE the Controlling Shareholders respectfully request that the Court deny the Application, remove the Trustee, and grant such other and further relief as it deems just and proper.

---

[44]    *See* Response ¶¶ 15-28, 32-36; Memo of Law at 9-10, 19-20; Spizz Decl. ¶¶ 25-26, 29-31, 34.

[45]    *See* Stay Decision at 20-21 ("In the same vein, the *Spizz Opposition* opposed the Movants' claim for damages – an issue that concerned Mishmeret and Shapira but not the estate.").

[46]    *See In re MF Global Inc.*, 464 B.R. 594, 605 n.10 (Bankr. S.D.N.Y. 2011) (stating there is a "presumption that 'associated' attorneys share client confidences") (citation and internal quotation marks omitted); *see also* Rules of Professional Conduct [22 NYCRR 1200.0] rules 1.10(a).

**APP-338**

Dated:  May 18, 2015
New York, New York

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP

_/s/ Daniel A. Fliman_____
David M. Friedman (DFriedman@kasowitz.com)
Daniel A. Fliman (DFliman@kasowitz.com)
Nii-Amar Amamoo (NAmamoo@kasowitz.com)
1633 Broadway
New York, New York 10019
Telephone:  (212) 506-1700
Facsimile:  (212) 506-1800

_Counsel for Yosef A. Maiman and_
_Merhav (M.N.F.) Limited_

APP-339

# Exhibit A

## APP-340

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------x

In re:

                                 Chapter 11

AMPAL-AMERICAN ISRAEL CORP.,     Case No.
                                  12-13689-(SMB)

           Debtor.

-------------------------------------x


DEPOSITION OF ARTHUR GOLDSTEIN

New York, New York

Thursday, May 14, 2015

11:18 a.m.


Reported by:
KAREN PERLMAN, RPR, CRR
JOB NO.: 39130

APP-341

1
2
3    Arthur Goldstein
4    May 14, 2015
5    11:18 a.m.
6
7
8
9
10        DEPOSITION OF ARTHUR GOLDSTEIN,
11    Pursuant to Notice, held at the offices of KASOWITZ
12    BENSON TORRES & FRIEDMAN, LLP, 1633 Broadway, New
13    York, New York, before KAREN PERLMAN, RPR, CRR and
14    Notary Public within and for the State of New York.
15
16
17
18
19
20
21
22
23
24
25

3

1    A P P E A R A N C E S :
2
3    On Behalf of Yosef A. Maiman and Merhav (M.N.F.)
4    Limited
5        KASOWITZ BENSON TORRES & FRIEDMAN, LLP
6        1633 Broadway
7        New York, New York  10019
8        (212) 506-1700
9        BY:  DANIEL A. FLIMAN, ESQ.
10            dfliman@kasowitz.com
11            NII-AMAR AMAMOO, ESQ.
12            namamoo@kasowitz.com
13
14
15
16    On Behalf of the Trustee, Tarter Krinsky & Drogin,
17    LLP and The Witness
18        TARTER KRINSKY & DROGIN, LLP
19        1350 Broadway
20        New York, New York  10018
21        (212) 216-8000
22        BY:  ROBERT WOLF, ESQ.
23            rwolf@tarterkrinsky.com
24            ALEX SPIZZ, ESQ.
25            aspizz@tarterkrinsky.com

4

1
2    A P P E A R A N C E S: (continued)
3
4    On Behalf of Independent Directors
5        CLARICK GUERON REISBAUM, LLP
6        220 Fifth Avenue, 14th Floor
7        New York, New York  10001
8        (646) 398-5074
9        BY:  SARAH LOUISE BISHOP, ESQ.
10            sbishop@cgr-law.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

5

1        STIPULATIONS
2        IT IS HEREBY STIPULATED AND AGREED by
3    and between the attorneys for the respective parties
4    hereto, that all objections, except as to form,
5    shall be reserved to the time of trial.
6        IT IS FURTHER STIPULATED AND AGREED
7    that the sealing and filing of the within deposition
8    are hereby waived.
9        IT IS FURTHER STIPULATED AND AGREED
10    that the within deposition may be subscribed and
11    sworn to by the witness being examined before a
12    Notary Public other than the Notary Public before
13    whom this deposition was begun.
14
15
16
17
18
19
20
21
22
23
24
25

2  (Pages 2 to 5)

**6**

1     A R T H U R   G O L D S T E I N, stating a business
2     address of 1350 Broadway, 10th Floor, New
3     York, New York, having been first duly sworn
4     by the Notary Public, was examined and
5     testified under oath as follows:
6
7     EXAMINATION
8     BY MR. FLIMAN:
9     **Q.**   Good morning, Mr. Goldstein. By whom
10   are you currently employed?
11     A.   Tarter Krinsky & Drogin, LLP.
12     **Q.**   And could we agree during this
13   deposition to refer to that firm as "TKD"?
14     A.   Absolutely.
15     **Q.**   When did you begin your employment at
16   TKD?
17     A.   April 13, 2015.
18     **Q.**   Where were you previously employed?
19     A.   Spizz Cohen & Serchuk, P.C.
20     **Q.**   And what were the circumstances of the
21   end of your employment at that firm?
22     A.   Spizz Cohen & Serchuk ceased operating
23   as of April -- approximately April 10, 2015.
24     MR. SPIZZ: Excuse me. Can we stop for
25   a second?

**7**

1     (Discussion held off the record.)
2     **Q.**   And Spizz Cohen previously represented
3   Mr. Spizz as Chapter 7 trustee; is that correct?
4     A.   That is --
5     MR. WOLF: Let me hear that question
6   again, please.
7     (The record is read.)
8     A.   That is correct.
9     **Q.**   Does Spizz Cohen presently represent
10   Mr. Spizz as Chapter 7 trustee?
11     A.   Technically, there is a -- still an
12   order in the Ampal-American proceeding which
13   reflects that Spizz Cohen & Serchuk is still -- is
14   counsel for Mr. Spizz as Chapter 7 trustee.
15     **Q.**   Has Spizz Cohen withdrawn its
16   appearance on behalf of Mr. Spizz?
17     A.   No.
18     **Q.**   Why not?
19     A.   I don't know.
20     MR. FLIMAN: I would like to mark the
21   following two documents, please. I would
22   like to mark this as Exhibit 1.
23     (Exhibit 1, document entitled
24   "Declaration of Arthur Goldstein Pursuant to
25   Bankruptcy Rule 2014 on Behalf of Tarter

**8**

1   Krinsky & Drogin LLP As Proposed Substitute
2   Counsel to Trustee and Disclosure Pursuant to
3   Bankruptcy Code Sections 327 and 329 and
4   Bankruptcy Rule 2014", marked for
5   identification.)
6     MR. FLIMAN: I would like to mark this
7   as Exhibit 2, please.
8     (Exhibit 2, document entitled
9   "Supplemental Declaration of Arthur Goldstein
10   Pursuant to Bankruptcy Rule 2014 on Behalf of
11   Tarter Krinsky & Drogin LLP As Proposed
12   Substitute Counsel to Trustee and Disclosure
13   Pursuant to Bankruptcy Code Sections 327 and
14   329 and Bankruptcy Rule 2014", marked for
15   identification.)
16     MR. FLIMAN: And for the record,
17   Exhibit 1 is a declaration in the bankruptcy
18   case dated April 17, 2015. And Exhibit 2 is
19   a supplemental declaration in the bankruptcy
20   case dated April 1, 2015.
21     **Q.**   Turning to --
22     MR. WOLF: I'm sorry. What date did
23   you say for the supplemental?
24     MR. FLIMAN: April 1st, 2015.
25     MR. WOLF: I think you meant "May 1st."

**9**

1     MR. FLIMAN: I'm sorry. May 1st.
2   Thank you.
3     **Q.**   Turning to Exhibit 1, please.
4     A.   Mm-hmm.
5     **Q.**   Did you draft this declaration?
6     A.   Yes, I did.
7     **Q.**   What did you rely on in drafting this
8   declaration?
9     A.   Bankruptcy conflict check form, the
10   results thereof; billing summaries, Tarter Krinsky
11   billing summaries and -- Tarter Krinsky billing
12   summaries.
13     **Q.**   Anything else?
14     A.   Not that I can recall at the moment.
15     **Q.**   Describe for me the conflicts check
16   that you referenced.
17     A.   Upon commencing work at Tarter Krinsky,
18   I prepared and submitted to the Tarter Krinsky
19   conflict department a bankruptcy conflict check form
20   to ascertain whether there were any conflicts with
21   Tarter Krinsky being retained as counsel.
22     **Q.**   What was the result of that conflict
23   check?
24     A.   The result was that there were no
25   conflicts.

3  (Pages 6 to 9)

10

1     **Q. And describe for me the billing**
2 **summaries that you reviewed.**
3     A. I reviewed the bill -- the billing
4 summary reflects the -- the monthly invoices that
5 were generated and billed to Tarter Krinsky's former
6 client, Mishmeret Trust Company Services Limited,
7 which I'll refer to as "Mishmeret" going forward.
8     **Q. Anything else in the billing summaries?**
9     A. No.
10     **Q. Did you discuss the statements in your**
11 **declaration before it was filed with anybody**
12 **employed at TDK -- at TKD, I'm sorry?**
13     A. Yes.
14     **Q. With whom?**
15     A. Mr. Spizz and Scott Markowitz.
16     **Q. Anybody else?**
17     A. Not that I can recall.
18     **Q. On how many instances did you discuss**
19 **the statements in the declaration before it was**
20 **filed with Mr. Markowitz?**
21     A. I don't recall.
22     **Q. Would it be more than five?**
23     A. Likely not.
24     **Q. Do you recall how long before the**
25 **declaration was filed you had the conversation with**

11

1 **Mr. Markowitz?**
2     A. We're making reference to the
3 Exhibit 1 --
4     **Q. Yes.**
5     A. -- correct?
6     Well, I joined the firm in -- on
7 April 13th. And April seven-- -- which was a Monday.
8 And April 17th I believe it was a -- was a
9 Thursday --
10     MR. WOLF: Friday.
11     A. Or Friday -- it was a Friday. So
12 during that week.
13     **Q. What did --**
14     MR. FLIMAN: Strike that.
15     **Q. What did you discuss with**
16 **Mr. Markowitz?**
17     A. I wanted Mr. Markowitz to verify the
18 services that had previously been provided by Tarter
19 Krinsky to Mishmeret as well as Shapira & Co. and
20 Ofer Shapira.
21     **Q. And did Mr. Markowitz verify what you**
22 **just referred to?**
23     A. Yes.
24     **Q. What did he tell you?**
25     A. He told me that the representation of

12

1 Mishmeret had terminated as of July 2014; and that
2 the representation of Shapira & Company and Ofer
3 Shapira, which I will, going forward, just make
4 reference to as "Shapira" collectively --
5     **Q. Okay.**
6     A. -- terminated in approximately January
7 of 2014.
8     **Q. Is it your understanding that TKD**
9 **represented both Ofer Shapira personally and Shapira**
10 **& Company?**
11     A. That is my understanding.
12     **Q. You referenced discussions with**
13 **Mr. Spizz regarding the statements in Exhibit 1**
14 **before you filed it --**
15     A. Correct.
16     **Q. -- is that right?**
17     How many conversations did you have
18 with Mr. Spizz on this topic?
19     A. I don't recall.
20     **Q. What did you discuss with Mr. Spizz?**
21     A. I drafted the declaration and I
22 provided it to Mr. Spizz for his review and his
23 input.
24     **Q. Did you discuss any changes to the**
25 **declaration with Mr. Spizz?**

13

1     A. I don't recall.
2     **Q. Did Mr. Spizz provide a markup with any**
3 **revisions to the declaration before it was filed?**
4     A. I don't recall.
5     **Q. Did Mr. Markowitz provide a markup with**
6 **any revisions to the declaration before it was**
7 **filed?**
8     A. No, he did not.
9     **Q. Did Mr. Markowitz provide you any**
10 **comments to the statements in the declaration before**
11 **it was filed?**
12     A. Yes.
13     **Q. Do you recall what comments he gave**
14 **you?**
15     A. That it appeared that the declaration
16 was accurate.
17     **Q. Did you discuss the statements in**
18 **Exhibit 1 before it was filed with anybody outside**
19 **of TKD?**
20     A. No.
21     **Q. Have you discussed the statements in**
22 **Exhibit 1 with anybody at all, since it has been**
23 **filed?**
24     MR. WOLF: I'll allow the witness to
25 answer that only for the period between the

4 (Pages 10 to 13)

**APP-344**

14

```
 1    time the declaration was filed on April 17th
 2    and the time your clients filed their
 3    objection to the retention.
 4         Once that objection was filed, this
 5    became a contested proceeding, and any
 6    discussions that might have been had after
 7    that would, in my mind, be attorney-client
 8    privilege and/or attorney work product and/or
 9    material prepared for litigation.
10         You may answer the question solely for
11    the period I stated.  Do you understand?
12         THE WITNESS:  I do.  But could you
13    repeat the question.
14         MR. WOLF:  Sorry.
15    Q.  I'm actually going to rephrase the
16    question, given counsel's direction.
17         Have you had any discussions concerning
18    the statements in Exhibit 1 with anybody outside of
19    TKD, since it was filed?
20    A.  I don't -- within the confines as set
21    forth by Mr. Wolf, I don't believe so.
22    Q.  Well, I don't believe --
23         MR. WOLF:  You may answer the question.
24         MR. FLIMAN:  In full.
25         MR. WOLF:  The present question without
```

16

```
 1         (Discussion is held off the record.)
 2         MR. WOLF:  Back on the record.
 3         MR. FLIMAN:  Back on the record.
 4         MR. WOLF:  The witness has a statement
 5    to --
 6    A.  In response to your question, I had
 7    conversations with Mr. Dantzler and/or Mr. Campo
 8    sub-- -- with respect to the declaration and
 9    supplemental declaration after an objection was
10    filed to the firm -- to Tarter Krinsky's retention.
11    DIR  Q.  What did you discuss with them?
12         MR. WOLF:  That is privileged.  And I
13    direct the witness not to answer the
14    question.
15    Q.  Did you have these discussions in your
16    capacity as counsel for the trustee?
17    A.  Yes.
18    Q.  All right.  Turn your attention to
19    Exhibit 2, please.  Did you draft this declaration?
20    A.  Yes, I did.
21    Q.  What did you rely on in drafting this
22    declaration?
23    A.  I relied on the time records, the
24    Tarter Krinsky time records, as well as the -- as
25    well as the objector's objection to the TKD
```

15

```
 1    the period.
 2    A.  The answer is yes.
 3    Q.  With whom?
 4    A.  Ampal-American or Mr. Spizz's outside
 5    litigation counsel.
 6    Q.  Who is that?
 7    A.  Troutman Sanders.
 8    Q.  With whom at Troutman did you discuss
 9    this?
10    A.  David Dantzler and John Campo.
11    Q.  What did you discuss with them?
12         MR. WOLF:  I'm sorry.  I need the
13    witness to indicate -- there could be a
14    privilege here also.
15         I need the witness to indicate whether
16    that communication occurred before the
17    objection was filed to the retention
18    application or subsequent thereto.
19         THE WITNESS:  I don't recall.
20    Q.  What did you discuss --
21         MR. WOLF:  I'm going to need to consult
22    with the witness.  This could be privileged.
23    I need to consult with the witness.
24         MR. FLIMAN:  Why don't we go off the
25    record, please.
```

17

```
 1    retention.
 2    Q.  You're referring to the objection filed
 3    by my firm?
 4    A.  Mm-hmm.  That is correct.  Why don't
 5    we -- for purposes of going forward, that we make
 6    reference to that as "the objection."
 7    Q.  That is fine.
 8         Are the TKD time records you just
 9    mentioned the same as the billing summaries you
10    referenced with respect to Exhibit 1?
11    A.  No.
12    Q.  How are they different?
13    A.  Billing summaries is exactly what
14    it -- what it sounds like.  It would just be a line
15    item showing the month, the amount of the -- the
16    amount of the -- the amount that was billed, and I
17    don't recall, but probably collection, how much was
18    paid.
19    Q.  And the time records would have shown
20    the actual narrative entries by the professionals
21    billing to the case?
22    A.  That is correct.
23    Q.  Why did you review the time records?
24    A.  I wanted to -- to the extent that we
25    needed to expand the declaration with respect to the
```

5  (Pages 14 to 17)

18

1  -- TKD's prior representation, I wanted to confirm
2  those facts.
3      Q.  What did you learn, if anything, from
4  your review of time records?
5      A.  I learned that the last time that --
6  the last time a billing -- an invoice was generated
7  and billed to Mishmeret was in July of 2014 -- 2014?
8  Right.  It can't be 2015.  July of 2014 -- for
9  services rendered in June of that year.  And that in
10  August, there were two entries of 3/10 of an hour
11  each; and those amounts were never billed to the
12  client.
13      I also ascertained that the last time
14  that TKD represented Shapira was in early January of
15  2014.
16      And that the termination with respect
17  to Mishmeret had terminated sometime in June of
18  2014.
19      Q.  Do you know how much, in total, TKD
20  billed to Mishmeret?
21      A.  No, I don't.  I would only be guessing.
22      MR. WOLF:  No guessing.
23      THE WITNESS:  No guessing.
24      Q.  Do you know how much in total TKD
25  billed to Shapira?

19

1      A.  No.
2      Q.  Did TKD keep separate billing matters
3  for Shapira versus Mishmeret?
4      A.  No.
5      Q.  So the time records that you reviewed
6  included narratives for work done both on behalf of
7  Mishmeret and Shapira?
8      A.  That is correct.
9      Q.  And they were combined in the same time
10  records?
11      A.  That is correct.
12      Q.  Was Mishmeret billed for the work done
13  on behalf of Shapira?
14      A.  Yes.
15      Q.  And did Mishmeret pay for work done on
16  behalf of Shapira?
17      A.  Yes.
18      Q.  Do you know why?
19      A.  No.
20      Q.  Were the bills rendered to Mishmeret
21  fully paid?
22      A.  No.
23      Q.  There remains an outstanding balance?
24      A.  No.
25      Q.  Was there a resolution of the billed

20

1  amount?
2      A.  Yes.
3      Q.  So as of today, is there a balance due
4  and owing to TKD?
5      A.  No.
6      Q.  Do you know why a reduction was applied
7  to the bill?
8      A.  Yes.
9      Q.  And why is that?
10      A.  The retention -- the engagement that --
11  I believe there were two separate engagements and it
12  was a cap on the amount to be billed to Mishmeret.
13      Q.  What were the two engagements?
14      A.  The -- I would be guessing.
15      Q.  How do you know there were two
16  engagements?
17      A.  There were two engagement agreements.
18      Q.  You reviewed the engagement agreements?
19      A.  No, I didn't.
20      Q.  So how do you know there were two
21  engagement agreements?
22      A.  I was advised that there were two
23  engagement agreements.
24      Q.  By whom?
25      A.  Mr. Markowitz and Mr. Spizz.

21

1      Q.  Do you know how Mr. Spizz knows that
2  there were two engagement agreements?
3      A.  I believe he was provided with those
4  engagement agreements by Mr. Markowitz.
5      Q.  Which --
6      MR. FLIMAN:  Strike that.
7      Q.  Do you know which of the engagement
8  agreements had a cap?
9      A.  Yes.
10      Q.  Which had a cap?
11      A.  Both.
12      Q.  Do you know how much the cap was?
13      A.  I believe the cap, for both, was less
14  than $30,000.
15      MR. WOLF:  Just to clarify,
16  Mr. Goldstein, are you talking in the
17  aggregate?
18      THE WITNESS:  Yes.
19      MR. FLIMAN:  Thank you for that.
20      Q.  So the cap for both engagements, in
21  total, was 30,000?
22      A.  I believe it was under 30,000, in the
23  aggregate, for the two.
24      Q.  Okay.  Do you know who signed the
25  engagement letters on behalf of Mishmeret?

6  (Pages 18 to 21)

APP-346

**22**

1    A.    No, I don't.
2    Q.    Do you know who signed the engagement
3 letters on behalf of TKD?
4    A.    No, I don't.
5    Q.    Beyond the time records and the
6 objection, did you rely on anything else in drafting
7 Exhibit 2?
8    A.    I don't believe so.
9    Q.    Did you have any discussions with
10 anybody at TKD regarding Exhibit 2, before it was
11 filed?
12    A.    Yes, I did.
13    Q.    With whom?
14    A.    I spoke to an individual in the TKD
15 conflict department; but to follow up, I don't
16 recall that person's name.
17    Q.    Anybody else?
18    A.    Not that I'm aware of.
19    Q.    Did you discuss Exhibit 2 before it was
20 filed with Mr. Markowitz?
21    A.    I might have.
22    Q.    Did you show him a draft before it was
23 filed?
24    A.    Likely.
25    Q.    Likely yes?

**23**

1    A.    Mm-hmm.
2    Q.    Did you discuss Exhibit 2 before it was
3 filed with Mr. Spizz?
4    A.    Yes.
5    Q.    And did you show him a draft of it
6 before it was filed?
7    A.    Yes.
8    Q.    Did Mr. Markowitz provide you any
9 comments to Exhibit 2 before it was filed?
10    A.    I don't believe so.
11    Q.    Did Mr. Spizz provide you any comments
12 before it was filed?
13    A.    I don't recall.
14    Q.    Why did you decide to review the time
15 records in preparing Exhibit 2?
16    A.    After review of the objection, I wanted
17 to verify the -- the scope of the representation by
18 TKT -- TKD during that one-year time frame.
19    Q.    And did you discover anything from
20 reviewing the time records that was inconsistent
21 with your prior understanding?
22    A.    Yes.
23    Q.    What was that?
24    A.    I was not aware of the litigation
25 financing agreement motion and approval at the time

**24**

1 I prepared the initial declaration.
2    Q.    If we could turn to Exhibit 1, please.
3 And I'm going to direct your attention to
4 paragraph 6, which begins on page 3 --
5    A.    Mm-hmm.
6    Q.    -- and ends on page 4.
7        And I'm looking at the end of the
8 paragraph, which is on page 4.  And the last
9 sentence specifically, the one that begins, "To the
10 best of my knowledge."  Do you see that sentence?
11    A.    Yes, I do.
12    Q.    And you say there, "To the best of my
13 knowledge and based upon information presently
14 available to me, TKD is a disinterested person."  Do
15 you see that language?
16    A.    Yes, I do.
17    Q.    What information are you referring to
18 in that sentence?
19    A.    The information set forth in the
20 declaration.
21    Q.    Meaning -- you say "Based upon
22 information presently available to me."
23    A.    Mm-hmm.
24    Q.    What information was presently
25 available to you when you made this statement?

**25**

1    A.    I believe it -- I believe I had
2 previously responded to that.
3        MR. WOLF:  It has been asked and
4 answered.
5    Q.    Anything beyond what we've discussed so
6 far?
7    A.    No.
8    Q.    Okay.  Continuing to paragraph 7, you
9 begin by saying "TKD formerly represented."
10        And then at the end of the paragraph
11 you say, "TKD no longer represents either of the
12 aforementioned parties and will not represent such
13 parties for the duration of the Chapter 7."  Do you
14 see that?
15    A.    Yes.
16    Q.    And what is the basis of your statement
17 that TKD no longer represents those parties?
18    A.    The services for which TKD had been
19 retained by Mishmeret and Shapira had -- had
20 terminated.
21    Q.    Was there any writing confirming
22 termination of the representation?
23    A.    I'm not aware of one.
24    Q.    Were either of the engagement letters
25 that you referenced terminated?

7 (Pages 22 to 25)

**26**

1    MR. WOLF: One second. I'll object to
2  the form of the question.
3    You may answer, if you know.
4  A.   I don't know.
5  **Q.   Did you understand my question?**
6  A.   Yes, I did.
7  **Q.   How do you know that the services for**
8  **which TKD had been retained by Mishmeret and Shapira**
9  **had terminated?**
10  A.   No services were rendered by TKD
11  subsequent to June -- approximately June of 2014.
12  And both Mishmeret and Shapira were parties to a
13  third-party complaint, I believe initiated by your
14  firm on behalf of your clients.  And Akin Gump
15  represents both parties in that proceeding.
16  **Q.   And do you know why TKD is not**
17  **representing them in that proceeding?**
18  A.   No.
19  **Q.   How do you know that no services were**
20  **rendered by TKD subsequent to, approximately, June**
21  **of 2014?**
22  A.   I --
23    MR. WOLF: Just -- object -- I'll just
24  note that that -- I belive that that has been
25  asked and answered.

**27**

1    But you may answer it.
2  A.   Based upon the time records.
3  **Q.   So what you know is that no time was**
4  **billed to these clients --**
5  A.   No time was entered --
6  **Q.   -- subsequent --**
7  A.   -- with respect to the two parties.
8  **Q.   So let's -- let me just clean that up a**
9  **little bit.**
10  **What you know is that no time was**
11  **entered?**
12  A.   If I may, no time was entered or billed
13  subsequent to the July 2014 invoice for June time.
14  **Q.   And is that the sole basis for your**
15  **understanding that TKD no longer represents Shapira**
16  **or Mishmeret?**
17  A.   No.
18  **Q.   What else forms the basis of your**
19  **understanding?**
20  A.   Conversations with Mr. Markowitz
21  confirming that TKD no longer had -- had not
22  provided any services to Mishmeret or Shapira
23  subsequent to that time frame.
24  **Q.   Did you review any files to confirm**
25  **whether any services were rendered for Mishmeret or**

**28**

1  Shapira after June of 2014?
2  A.   I don't believe there were any files
3  available to review subsequent to that date.
4  **Q.   So the answer is no, you did not review**
5  **any such files?**
6  A.   That is correct.
7  **Q.   Do you know why TKD did not provide any**
8  **services to Mishmeret or Shapira after June of 2014?**
9  A.   Yes.
10  **Q.   And why is that?**
11  A.   Their engagement -- the last engagement
12  had to do with the litigation financing agreement
13  and motion, which was approved by the court, I
14  believe, in June of 2014.
15  **Q.   When you say "their engagement," are**
16  **you referring to an engagement letter?**
17  A.   The rep- -- I'm sorry.  I stand
18  corrected.  The representation.
19  **Q.   When did TKD start representing Shapira**
20  **& Co. in connection with the Chapter 7 case?**
21  A.   I believe it was sometime in late
22  spring, early summer of 2013.
23  **Q.   And how do you know that?**
24  A.   Based upon my review of the time
25  records and billing summaries.

**29**

1  **Q.   When did TKD start representing**
2  **Mishmeret in connection with the Chapter 7 case?**
3  A.   I believe -- I don't know.  I don't
4  want to guess.
5  **Q.   Wouldn't that be reflected in the time**
6  **records --**
7  A.   Yes.
8  **Q.   -- you reviewed?**
9  A.   Yes.
10  **Q.   Do you know the circumstances of**
11  **Shapira & Co. retaining TKD initially?**
12  A.   No, I don't.
13  **Q.   Do you know the circumstances of**
14  **Mishmeret retaining TKD initially?**
15  A.   No, I don't.
16  **Q.   Who was the relationship partner at TKD**
17  **for these engagements?**
18  A.   I believe it was Scott Markowitz.
19  **Q.   Do you know why Mishmeret retained TKD?**
20  A.   No, I don't.
21  **Q.   Do you know why Shapira & Co. retained**
22  **TKD?**
23  A.   No, I don't.
24  **Q.   Who was the client contact at Mishmeret**
25  **for the representation?**

8  (Pages 26 to 29)

**APP-348**

30

1     MR. WOLF:  By TKD?
2     MR. FLIMAN:  No.  I'm sorry.
3     Q.   Who was the client contact internally
4  at Mishmeret for the representation?
5     MR. WOLF:  I'm sorry.  But by TKD?
6     MR. FLIMAN:  I'm asking who at
7  Mishmeret --
8     A.   Who at Mishmeret?
9     MR. WOLF:  Yes.
10    MR. FLIMAN:  -- was the contact that
11 interfaced with TKD.
12    MR. WOLF:  While TKD represented them?
13    MR. FLIMAN:  Correct.
14    MR. WOLF:  If you know.
15    I just want to point out for the record
16 that Mr. Goldstein was obviously not with TKD
17 at that time.  I'm not sure why you're asking
18 that question.  How would -- he could not
19 have firsthand knowledge of that fact, unless
20 he was participating in those communications.
21    MR. FLIMAN:  Well, Mr. Goldstein
22 doesn't have firsthand knowledge of virtually
23 anything he has testified to today.
24    MR. WOLF:  That brings into the
25 question of why you're even bothering with

31

1  the deposition today, but we're here.
2     MR. FLIMAN:  Well, it raises the
3  question of why we have a declaration from
4  him and not Mr. Markowitz, which I'm sure
5  Mr. Goldstein has asked too.
6     MR. WOLF:  Actually, no.
7     THE WITNESS:  No.
8     MR. WOLF:  But that is okay.
9     THE WITNESS:  I can answer.
10    MR. WOLF:  Hold on.
11    Repeat the question again, please.
12    (The record is read.)
13    MR. WOLF:  I am cautioning you,
14 Mr. Goldstein, that you can only answer that
15 question if you have knowledge, information
16 or belief.
17    THE WITNESS:  I understand.
18    MR. WOLF:  Okay.
19    A.   And the answer is I don't know.
20    Q.   Do you know who the client contact was
21 at Shapira & Co. for the representation?
22    A.   No, I don't.
23    Q.   Did TKD, in connection with
24 representation of Mishmeret, have contact with any
25 other law firms representing Mishmeret?

32

1     A.   I don't know.
2     Q.   Now, you had testified that your
3  understanding is that TKD represented Ofer Shapira
4  personally, correct?
5     A.   Yes.
6     Q.   In connection with what?
7     A.   I believe there was a motion brought by
8  your firm to hold Mr. Shapira, as well as Shapira &
9  Company, in contempt.
10    Q.   That was the stay enforcement motion?
11    A.   I believe so.
12    Q.   And your declaration at Exhibit 2
13 identifies that TKD represented Shapira & Co. in
14 connection with that stay enforcement motion; is
15 that right?
16    A.   That's correct.
17    Q.   Did TKD do any other work for Shapira &
18 Co., other than with respect to the stay enforcement
19 motion?
20    A.   I believe there was one other motion
21 brought by your firm where Mr. Shapira and/or his
22 firm was a -- a party to.  But I don't recall
23 the -- the -- the exact name or the circumstances of
24 that motion.
25    Q.   That is not included in your

33

1  declarations, correct?
2     MR. SPIZZ:  Dan, it's 12 o'clock.  I
3  have to make a quick call.  Can we finish the
4  question, and then can we stop so I can make
5  the call?
6     MR. FLIMAN:  Sure.
7     MR. SPIZZ:  Thank you.
8     A.   I'm not sure if my paragraph 7 includes
9  or doesn't include that motion, the motion I'm
10 making reference to.
11    MR. FLIMAN:  Let me just finish this
12 line of questioning.
13    MR. SPIZZ:  Sure.
14    Q.   You're not sure whether what you wrote
15 here includes the motion that you're referring to?
16    A.   That is correct.
17    Q.   Is there something vague about the
18 language in here?
19    A.   I -- the vagueness has to do with
20 number two, which has to do with the sinking fund.
21 And I'm not sure whether Mr. Shapira was or was not
22 involved in that proceeding.
23    Q.   So it's your understanding that the
24 sinking fund is somehow related to a motion to
25 compel brought by my firm?

9  (Pages 30 to 33)



**APP-349**

34

1   A.   I don't want to guess. I'm not sure.
2   Q.   Okay.
3        MR. FLIMAN: Let's take a break.
4        MR. SPIZZ: Thank you very much.
5        (Time noted: 12:01 p.m.)
6        (Brief recess taken.)
7        (Time noted: 12:09 p.m.)
8   A.   Statement: Just a -- Mr. Wolf has
9   pointed out to me that I might have stated
10  previously, during the course of this deposition,
11  that time was entered in August, those two
12  3/10 entries.
13       MR. WOLF: Be specific about the year.
14  A.   I'm sorry. 2014.
15       Just to be clear, there were -- the
16  last time entries entered was in July of 2014, each
17  of which was 3/10 of an hour. Neither of which were
18  billed.
19  **Q.   So your testimony is that no time was**
20  **entered for August --**
21  A.   That is correct.
22  **Q.   -- 2014?**
23  A.   That is correct. Just to be clear.
24  **Q.   Has TKD ever represented Shapira & Co.**
25  **or any of its employees in any matters unrelated to**

35

1   **Ampal?**
2   A.   I'm not aware of any -- any
3   engagements.
4   **Q.   Has TKD ever represented Mishmeret in**
5   **any matters unrelated to Ampal?**
6   A.   Again, I am not aware of any.
7   **Q.   You say you're not aware of any. Did**
8   **you check?**
9   A.   The con- -- the bankruptcy conflict
10  check -- check form would have reflected if there
11  were. And the conflict check form did not reflect
12  any other engagements on the part of TKD concerning
13  Mishmeret or Shapira.
14  **Q.   Well, my question was about Shapira or**
15  **any of its employees. Would the conflicts check**
16  **have picked up employees of Shapira & Co.?**
17  A.   I'm not aware of any conflicts with
18  respect to Mr. Shapira. I can't respond with
19  respect to employees.
20  **Q.   So just to understand, so your**
21  **testimony is that you're not aware of any other**
22  **representation by TKD of Mr. Shapira?**
23  A.   That is correct.
24       MR. WOLF: I thought the testimony was
25       also of the Shapira firm.

36

1        THE WITNESS: Right. Shapira &
2   Company.
3   Q.   Okay.
4   A.   I was correct.
5   **Q.   But you don't have knowledge, one way**
6   **or the other, about any other employees of Shapira &**
7   **Co.?**
8   A.   That is correct.
9        MR. WOLF: Just to be clear, are you
10       talking about employees of Shapira & Co. in
11       their individual capacities?
12       MR. FLIMAN: Yes.
13       MR. WOLF: Unrelated to Shapira & Co.?
14       MR. FLIMAN: Correct.
15       MR. WOLF: Just note my objection on
16       the record to the relevance of that question.
17  **Q.   Do you know whether TKD has ever**
18  **represented affiliates of Mishmeret?**
19       MR. WOLF: Objection to the form of the
20       question.
21  A.   No, I don't.
22  **Q.   Do any partners or employees of TKD**
23  **have relatives that are partners or employees at**
24  **Shapira & Co.?**
25  A.   I believe the bankruptcy conflict check

37

1   form would take that into account. So the answer is
2   no.
3   **Q.   Do any partners or employees of TKD**
4   **have close, personal relationships with any partners**
5   **or employees at Shapira & Co.?**
6        MR. WOLF: Object to the form of the
7        question.
8   A.   I don't know.
9   **Q.   Do any partners or employees at TKD**
10  **have relatives that are employees of Mishmeret?**
11  A.   I don't know.
12  **Q.   Would that have been picked up by the**
13  **bankruptcy conflicts check?**
14       MR. WOLF: Hold on.
15       All right. Just note my objection for
16       the record.
17       You may answer if you have knowledge,
18       information or belief.
19  A.   I don't have any knowledge whether it
20  would or would not.
21  **Q.   Do any partners or employees of TKD**
22  **have close, personal relationships with any**
23  **employees of Mishmeret?**
24       MR. WOLF: Objection to the form of the
25       question.

10 (Pages 34 to 37)



APP-350

38

1    A.   I don't know.
2    Q.   Has TKD ever represented Mishmeret in
3  any matters unrelated --
4         MR. FLIMAN:  Strike that.  Strike that.
5    Q.   When you referred to the bankruptcy
6  conflicts check --
7         MR. FLIMAN:  Strike that.
8    Q.   What do you mean by "the bankruptcy
9  conflicts check"?
10   A.   As I previously testified, when I
11 joined the firm on April 13th, I prepared a
12 bankruptcy -- TKD has a bankruptcy conflicts check
13 form, which is completed for the conflict department
14 before engagement is approved.
15   Q.   What does that form contain?
16   A.   Names of the parties to the proceeding,
17 a list of all creditors in the proceeding, a list of
18 all attorneys and other professionals in the
19 proceeding.  Actually, it attaches -- it attaches
20 the schedules that were filed by the debtor.  It
21 attaches the docket sheet of each of the respective
22 adversary proceedings in the case.  Information of
23 that nature.
24   Q.   And then the firm uses that form to
25 find any existing or prior relationships that TKD

39

1  may have?
2    A.   Yes.
3  DIR  Q.   Did TKD receive any waivers from
4  Shapira & Co. in connection with the end of its
5  representation?
6         MR. WOLF:  I'm having a problem
7         understanding that question.  Any waiver in
8         connection with the end of the
9         representation?  I don't see --
10   Q.   Mr. Goldstein, do you understand the
11 question?
12        MR. WOLF:  I'm sorry.  There are two
13        people on this side of the table that have to
14        understand the question, not just the
15        witness, but me, because I represent him.  I
16        don't understand the question.  It doesn't
17        really make sense.  What kind of waiver in
18        connection with the end of a representation?
19        I don't understand what that means.
20        MR. FLIMAN:  You don't understand the
21        concept of waiver or you don't understand my
22        question?
23        MR. WOLF:  I understand the concept of
24        a waiver.  And I understand the concept of
25        end of representation.  I don't understand

40

1  the context of your question, how the two
2  would be related.
3         MR. FLIMAN:  So then --
4         MR. WOLF:  When a representation by a
5         firm ends, it ends.  What kind of waiver are
6         you talking about?  Are you talking
7         about -- I just don't understand.
8         MR. FLIMAN:  It seems like you
9         understand my question just fine.
10        MR. WOLF:  I don't.  I don't understand
11        your question.
12 I ask that you rephrase your question
13 so that I can understand it.
14        MR. FLIMAN:  I think my question is
15        perfectly clear.  And I'll ask the witness to
16        answer it, please.
17        MR. WOLF:  He's directed not to answer
18        the question until you rephrase it.
19 DIR  Q.   Did Shapira & Co. waive any conflicts
20 in connection with the end of the representation?
21        MR. WOLF:  Same objection; same
22        direction.
23        MR. FLIMAN:  Meaning, to be clear, you
24        don't understand the question and you're
25        directing the witness not to answer?

41

1         MR. WOLF:  That is correct, because the
2         question is unintelligible.  If a
3         representation ends, I don't understand in
4         what context there would be a waiver.
5         Do you want to ask the witness if
6         Shapira & Co. entered into a waiver at some
7         point in time?  Ask that.  How it's related
8         to the specific time when a representation
9         ends is beyond me.
10   Q.   Has Shapira & Co. ever given a waiver
11 of conflicts to TKD?
12   A.   Not that I'm aware of.
13   Q.   Has Shapira & Co. --
14        MR. FLIMAN:  Strike that.
15   Q.   Has Shapira & Co. provided consent to
16 TKD representing Mr. Spizz?
17   A.   No.
18   Q.   Do you know if they've been asked?
19        THE WITNESS:  Repeat the question,
20        please.
21        (The record is read.)
22   A.   They have not been asked.
23   Q.   Has Mishmeret ever given a waiver of
24 conflicts to TKD?
25   A.   No.

11  (Pages 38 to 41)