# No. 1:15-cv-06569 (KPF)

IN THE

# United States District Court

FOR THE SOUTHERN DISTRICT OF NEW YORK

In re AMPAL-AMERICAN ISRAEL CORPORATION
(Chapter 7 Case No. 12-13689) (SMB) (Bankr. S.D.N.Y.)

_____

YOSEF A. MAIMAN AND MERHAV (M.N.F.) LIMITED,

*Appellants,*

v.

ALEX SPIZZ,

*Appellee.*

_____

*On Appeal from the United States Bankruptcy Court
For the Southern District of New York*

## APPELLANTS' APPENDIX
## VOLUME VI of VII (Pages APP-351 to APP-425)

David M. Friedman
Daniel A. Fliman
Michele L. Angell
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
DFriedman@kasowitz.com
DFliman@kasowitz.com
MAngell@kasowitz.com

*Attorneys for Appellants
Yosef A. Maiman and Merhav (M.N.F.) Limited*

# TABLE OF CONTENTS

**Page**

Bankruptcy Court Chapter 7 Docket Entries (Case No. 12-13689) ........................................ APP-1

Bankruptcy Court Adversary Proceeding Docket Entries (Adv. Pro. No. 14-02385) ......... APP-15

Transcript of Hearing Held on July 11, 2013 [Docket No. 318] ........................................... APP-21

Transcript of Hearing Held on November 14, 2013 [Docket No. 374]............................... APP-36

Memorandum Decision Denying Motion for Relief Based on Violation of the
    Automatic Stay [Docket No. 382]...................................................................... APP-70

Supplemental Order Concerning Trustee's Access to Debtor's Files, Books and
    Records [Docket No. 532] ................................................................................. APP-91

Notice of Presentment of Order Authorizing Retention of Tarter Krinsky & Drogin
    LLP in Place of Spizz Cohen & Serchuk, P.C. as Substitute Counsel to the
    Trustee Pursuant to 11 U.S.C. § 327 and Federal Rule of Bankruptcy Procedure
    2014 [Docket No. 573]...................................................................................... APP-96

Yosef A. Maiman and the Controlling Shareholders' (I) Objection to the Retention
    of Tarter Krinsky & Drogin LLP as Substitute Counsel to the Trustee and (II)
    Motion to Disqualify Alex Spizz as Chapter 7 Trustee [Docket No. 576].................. APP-115

Joinder of Irit Eluz in Support of Yosef A. Maiman and the Controlling
    Shareholders' (I) Objection to the Retention of Tarter Krinsky & Drogin LLP
    as Substitute Counsel to the Trustee and (II) Motion to Disqualify Alex Spizz
    as Chapter 7 Trustee [Docket No. 577]........................................................... APP-137

Supplemental Declaration of Arthur Goldstein Pursuant to Bankruptcy Rule 2014
    on Behalf of Tarter Krinsky & Drogin LLP as Proposed Substitute Counsel to
    Trustee and Disclosure Pursuant to Bankruptcy Code Sections 327 and 329 and
    Bankruptcy Rule 2014 [Docket No. 582] ....................................................... APP-139

Affidavit of Alex Spizz as Trustee in Response to the (1) Objection Filed By
    Yosef A. Maiman and the Controlling Shareholders to the Retention of Tarter
    Krinsky & Drogin LLP in Place of Spizz Cohen & Serchuk, P.C. as Substitute
    Counsel to the Trustee; and (2) Cross-Motion to Disqualify Alex Spizz as
    Chapter 7 Trustee [Docket No. 587] .............................................................. APP-142

Chapter 7 Trustee's and Tarter Krinsky & Drogin LLP's Memorandum of Law in
    Response to Yosef A. Maiman and the Controlling Shareholders' (I) Objection
    to the Retention of Tarter Krinsky & Drogin LLP as Substitute Counsel to the
    Trustee and (II) Motion to Disqualify Alex Spizz as Chapter 7 Trustee [Docket
    No. 588] ............................................................................................................ APP-269

Tarter Krinsky & Drogin LLP's Response to: (1) the Objection of Yosef A. Maiman and the Controlling Shareholders to the Retention of Tarter Krinsky & Drogin LLP in Place of Spizz Cohen & Serchuk, P.C. as Substitute Counsel to the Trustee; and (2) Cross-Motion to Disqualify Alex Spizz as Chapter 7 Trustee [Docket No. 589] .............................................................................. APP-296

Second Supplemental Declaration of Arthur Goldstein Pursuant to Bankruptcy Rule 2014 on Behalf of Tarter Krinsky & Drogin LLP as Proposed Substitute Counsel to Trustee and Disclosure Pursuant to Bankruptcy Code Sections 327 and 329 and Bankruptcy Rule 2014 [Docket No. 590].................................................. APP-312

Reply in Further Support of Yosef A. Maiman and the Controlling Shareholders' (I) Objection to the Retention of Tarter Krinsky & Drogin LLP as Substitute Counsel to the Trustee and (II) Motion to Disqualify Alex Spizz as Chapter 7 Trustee [Docket No. 594] ....................................................................................... APP-315

Transcript of Hearing Held on May 21, 2015 [Docket No. 596] ........................................ APP-405

Response to the Court's Request for the United States Trustee's Position With Respect to the Appointment of a Co-Trustee or Estate Representative [Docket No. 599] ........................................................................................................................... APP-435

Transcript of Hearing Held on June 9, 2015 [Docket No. 602].......................................... APP-439

Findings of Fact and Conclusions of Law Granting Trustee's Motion to Retain Tarter Krinsky & Drogin LLP as Counsel and Denying Cross-Motion to Disqualify the Trustee [Docket No. 611]......................................................................... APP-517

Order (I) Authorizing Retention of Tarter Krinsky & Drogin LLP in Place of Spizz Cohen & Serchuk, P.C. as Substitute Counsel to the Trustee Pursuant to 11 U.S.C. § 327 and Federal Rule of Bankruptcy Procedure 2014, and (II) Denying Cross-Motion to Disqualify Trustee [Docket No. 615] ........................... APP-550

Notice of Appeal from Order (I) Authorizing Retention of Tarter Krinsky & Drogin LLP, and (II) Denying Cross-Motion to Disqualify Trustee [Docket No. 618] ............................................................................................................................. APP-554



**42**

```
1        Q.   Do you know if Mishmeret has been
2   asked?
3        A.   They have not been asked.
4        Q.   Has Mishmeret provided consent to TKD
5   representing the trustee?
6             MR. WOLF:  I'm sorry.  I didn't hear
7   the question.
8             (The record is read.)
9             MR. WOLF:  Go ahead.
10       A.   No, they haven't.
11       Q.   Have they been asked?
12       A.   No, they have not.
13       Q.   Has the --
14            MR. FLIMAN:  Strike that.
15       Q.   Has TKD's representation of the trustee
16  been discussed with Mishmeret?
17       A.   No, it has not.
18       Q.   Has it been discussed with Shapira &
19  Co. or any of its employees?
20       A.   No, it has not.
21       Q.   Has any partner or employee of TKD
22  communicated with respect to any matter with any
23  partner --
24            (Phone rings.)
25            THE WITNESS:  Excuse me.  I'm sorry.
```

**43**

```
1             MR. FLIMAN:  No problem.  I'll start
2   the question over.
3             THE WITNESS:  I don't even know who it
4   is.
5             MR. FLIMAN:  Mr. Shapira.
6        Q.   Has any part- --
7        A.   Do you want to check?
8             MR. FLIMAN:  Alex is trying not to
9   laugh.
10       Q.   Has any partner or employee of TKD
11  communicated with any employee of Shapira & Co.
12  since July of 2014?
13       A.   I have no knowledge of that.
14       Q.   Are you aware of any communications
15  with anybody at Shapira & Co. since you joined TKD?
16       A.   I am not aware of any communications
17  with Shapira & Co.
18       Q.   Are you aware of any communications
19  between anybody at TKD and Mishmeret, since July of
20  2014?
21       A.   I am -- I wouldn't have that knowledge.
22       Q.   No communications since you joined TKD?
23       A.   That's correct.  I'm sorry.  I would
24  like to correct that.  I have -- I -- there have
25  been no communications by anyone in the bankruptcy
```

**44**

```
1   department since we've joined the firm.  I certainly
2   cannot testify with respect to any other members,
3   partners of TKD.  But I am not aware of any
4   communications with Mishmeret since our joining of
5   the firm.
6        Q.   Were any services at any point provided
7   to Mishmeret outside of the bankruptcy group at TKD?
8        A.   I'm not aware of any.
9        Q.   TKD represents Mishmeret in connection
10  with the stay enforcement motion brought by my firm,
11  correct?
12       A.   Yes.
13       Q.   Was that disclosed in either of your
14  declarations?
15       A.   Paragraph 7 of the declaration.
16       Q.   Can you direct me to the language?
17       A.   With respect to a motion filed by Yosef
18  Maiman, et al., to enforce the automatic stay, which
19  motion was denied by the court.
20       Q.   You're referring to romanette (i) in
21  paragraph 7?
22       A.   That is correct.
23       Q.   That begins with "Shapira & Co."?
24       A.   That is correct.
25       Q.   So your understanding is that romanette
```

**45**

```
1   (i) discloses the representation of Mishmeret?
2        A.   I stand corrected.  Roman numeral I has
3   to do with Shapira & Company.
4        Q.   Is there any disclosure in either of
5   your declarations concerning TKD's representation of
6   Mishmeret with respect to the stay enforcement
7   motion?
8        A.   If my memory serves me correctly, there
9   were three separate proceedings:  There was the --
10  to enforce the automatic stay; there was the sinking
11  fund motion; and there was the litigation funding
12  agreement motion.
13       Q.   So my question is -- which I don't
14  believe you've answered -- is there any disclosure
15  in either of your declarations concerning TKD's
16  representation of Mishmeret concerning the stay
17  enforcement motion?
18       A.   Paragraph 7 makes reference to Shapira
19  & Company and not Mishmeret.  That might have been
20  an inadvertent omission.
21       Q.   TKD represented Mishmeret in connection
22  with the post-petition litigation financing
23  facility; is that correct?
24       A.   That is my understanding.
25       Q.   And that was not disclosed in
```

12  (Pages 42 to 45)

APP-352

46

1 Exhibit 1, correct?
2     A.   When you say "Exhibit 1," I'm sorry,
3 you're talking about Roman numeral I, in the whole?
4     Q.   I'm referring, in total, to your first
5 declaration.
6     A.   That is correct.
7     Q.   And that is -- that is referenced in
8 Exhibit 2, which is your second declaration,
9 correct?
10     A.   That is correct.
11     Q.   And by your second, I'm referring to
12 your supplemental declaration.
13     A.   That is correct.
14     Q.   If I could turn your attention to
15 Exhibit 2, please, to paragraph 6, specifically.  In
16 the second sentence of that paragraph, you write
17 that TKD's engagement relating to the litigation
18 funding agreement was limited; is that correct?
19     A.   That is correct.
20     Q.   What do you mean by "limited"?
21     A.   It's my understanding that TKD did not
22 put in any papers in opposition or in support of the
23 litigation financing agreement.  And that they
24 were -- that they did not do any -- they didn't
25 negotiate any of the terms of the litigation

47

1 financing agreement.
2     Q.   And on what --
3     MR. FLIMAN:  Strike that.
4     Q.   On what do you base those statements?
5     A.   The time records and my discussions
6 with Mr. Markowitz.
7     Q.   Do you know whether TKD provided any
8 comments to the funding agreement?
9     A.   I have no knowledge of that.
10     Q.   Did you ask Mr. Markowitz?
11     A.   I don't recall.
12     Q.   At the end of paragraph 6 of Exhibit 2,
13 you reference the fact that the funding agreement
14 was executed by TKD strictly as an accommodation to
15 Mishmeret.  Do you see that?
16     A.   Yes, I do.
17     Q.   And what do you mean by "strictly as an
18 accommodation"?
19     A.   I was advised by Mr. Markowitz that
20 Mishmeret had requested that he sign the agreement
21 on their behalf, inasmuch as they were in Israel and
22 could not sign the agreement.
23     Q.   Was TKD compensated by Mishmeret for
24 work done in connection with the funding agreement?
25     A.   I believe so.

48

1     Q.   Was there work reflected in the time
2 records that you reviewed?
3     A.   Yes.
4     Q.   And why couldn't Mishmeret sign this
5 agreement on its own?
6     A.   I don't know.
7     MR. FLIMAN:  I would like to mark this
8 as Exhibit 3, please.
9     (Exhibit 3, document entitled
10 "Declaration of Arthur Goldstein Pursuant to
11 Bankruptcy Rule 2014 on Behalf of Tarter
12 Krinsky & Drogin LLP As Proposed Substitute
13 Counsel to Trustee and Disclosure Pursuant to
14 Bankruptcy Code Sections 327 and 320 and
15 Bankruptcy Rule 2014", marked for
16 identification.)
17     MR. FLIMAN:  Counsel.
18 For the record, Exhibit 3 is Docket
19 Number 407 from the Ampal bankruptcy case.
20     Q.   If I could please turn your attention
21 to what is listed at the top as page 30 of 36.  One
22 of the conditions of funding under the litigation
23 facility was approval of the sinking fund
24 settlement, correct?
25     A.   That is correct.

49

1     Q.   And I believe your testimony is -- in
2 your declaration is that TKD did represent Mishmeret
3 in connection with the sinking fund issues, correct?
4     A.   That is correct.
5     Q.   And another condition to the funding of
6 the litigation loan is the actual funding of
7 payments to Mishmeret under the sinking fund
8 settlement, right?
9     A.   I'm sorry.  Can you direct me to the
10 paragraph, please?
11     Q.   It is still at paragraph 5.  I'll
12 direct you to the language which is "the
13 distribution of the Sinking Funds to the Series B
14 and C Bondholders."
15     A.   Mm-hmm.  Yes, I do.
16     Q.   Was this -- were either of these
17 conditions conditions that were negotiated by TKD?
18     A.   I would not know.
19     Q.   Turning back to Exhibit 2, if we could,
20 please.  In paragraph 8, your testimony is that
21 Mishmeret never loaned any monies to the debtor
22 under the funding agreement, correct?
23     A.   That is correct.
24     Q.   How do you know that to be true?
25     A.   I reviewed a -- an amendment or

13  (Pages 46 to 49)

APP-353

### 50

1  assignment of the litigation funding agreement which
2  was executed the day after the court approved the
3  funding agreement, which assigned over to certain
4  parties the rights and obligations of the three
5  hermetic paths of Mishmeret to the financing
6  agreement.
7       Q.  Did TKD represent Mishmeret in
8  connection with that assignment?
9       A.  I don't know.
10      Q.  Do you know why Mishmeret assigned the
11  interest?
12      A.  No.
13      Q.  Does Mishmeret currently have any
14  interest in the loan?
15      A.  No.
16      Q.  Have you confirmed with Mishmeret
17  whether they have participation or secondary
18  interest in the loan?
19      A.  No.
20      Q.  Does Mishmeret have any indemnification
21  or reimbursement rights in connection with the loan
22  or the assignment?
23      A.  I don't know.
24      Q.  Do you know if the loan has been
25  repaid?

### 51

1       A.  I don't believe it has been repaid.
2       Q.  If we could turn back to Exhibit 1,
3  please.  And I would like to direct your attention
4  to paragraph 2.  In the middle of that paragraph,
5  your statement is that "the Trustee, for the sake of
6  efficiency, continuity and economy, believes it is
7  in the best interest of the estate for him to retain
8  TKD."  Do you see that?
9       A.  Yes, I do.
10      Q.  Did the trustee undertake any analysis
11  to determine whether retaining TKD was in the
12  estate's best interest?
13      A.  You would have to ask Mr. Spizz.
14      Q.  So you don't know the answer?
15      A.  I do not know the answer to that.
16      Q.  How do you know that the TK- --
17          MR. FLIMAN:  Strike that.
18      Q.  How do you know that the trustee has
19  made that determination?
20      A.  I was advised by Mr. Spizz of that.
21      Q.  So you're not aware of what factors he
22  considered in that analysis?
23      A.  No.  Paragraph 2 says, "as set forth in
24  the Trustee's accompanying Application."
25      Q.  So you make the statement relying

### 52

1  solely on what the trustee wrote in the application
2  and your discussions with Mr. Spizz about his
3  ultimate conclusion?
4       A.  That is correct.
5       Q.  Has TKD put in place any ethical wall
6  or similar procedure with respect to representation
7  of the trustee?
8       A.  It has set up an ethical wall with
9  respect to the private information at the moment.
10      Q.  Okay.
11      A.  And private information is defined in
12  the supplemental order.
13      Q.  We'll get to that in just one sec.
14          Is there any ethical wall barring
15  lawyers that represented Mishmeret or Shapira from
16  working on representation of the trustee?
17      A.  We are in the process of doing that.
18      Q.  What do you mean by that?
19      A.  Subject to -- we are in the process of
20  preparing an internal memorandum to establish
21  procedures so that the only parties who will
22  be -- who will have access will be Mr. Spizz, Jill
23  Makower, myself, and possibly some other members of
24  the bankruptcy department; but not those attorneys
25  who were representing Mishmeret in the past.

### 53

1       Q.  So in your answer you said, "will have
2  access."  What are you referring to?
3       A.  They will be barred from being able to
4  enter the TKD computer system to retrieve any
5  Ampal-related documents.
6       Q.  So my question was about barring
7  lawyers that represented Mishmeret or Shapira from
8  working on representation of the trustee.  I'm not
9  sure you answered my question.
10      A.  I'm sorry.  Let's repeat the question.
11      Q.  Sure.  I'll just restate the question.
12          Is there any ethical wall or procedure
13  barring lawyers that represented Mishmeret or
14  Shapira from working on representation of the
15  trustee?
16      A.  Not at the moment.
17      Q.  Do you anticipate that such wall or
18  procedure will be put in place?
19      A.  It is possible.
20      Q.  Well, do you expect that Mr. Markowitz
21  will work on TKD's representation of the trustee?
22      A.  Unlikely.
23      Q.  And why is that?
24      A.  To avoid even the appearance of any
25  type of conflict.

14  (Pages 50 to 53)

54

1    Q.   You said it's unlikely.  What will
2  determine with certainty what will happen?
3    A.   I would assume it would depend, in
4  part, on the court's ultimate ruling on the
5  TK- -- on Mr. Spizz's application for the retention
6  of TKD.
7    Q.   I don't understand your answer.  My
8  question was what will determine --
9    MR. FLIMAN:  Well, strike that.
10    Q.   Is your testimony that if the court
11  approves TKD's retention, then Mr. Markowitz will
12  not work on the trustee's representation?
13    MR. WOLF:  I will -- you can only
14    answer with regard to knowledge, information
15    or belief.  You cannot conjecture.  Subject
16    to that, obviously, you can give an answer.
17    A.   I don't know.
18    Q.   Does TKD have any client files from its
19  representation of Mishmeret and Shapira?
20    A.   Yes.
21    Q.   Has TKD put into place any protocol
22  precluding lawyers from representing the trustee
23  from accessing those files?
24    A.   Not at the moment.
25    Q.   Has TKD put into place any protocols

55

1  precluding lawyers representing the trustee from
2  discussing the representation of Mishmeret and
3  Shapira with other TKD lawyers?
4    A.   No.
5    MR. SPIZZ:  You can continue.
6    Q.   Todtman Nachamie Spizz & Johns was the
7  predecessor to Nachamie Spizz, right?
8    A.   Yes.  And Spizz Cohen & Serchuk.
9    Q.   So --
10    A.   Same entity.  It was Todtman Nachamie
11  Spizz & Johns; it was Nachamie Spizz & Johns; and
12  then it was Spizz Cohen & Serchuk.  I think I got
13  that correct.
14    Q.   I wasn't testing you but thank you.
15    A.   Okay.
16    Q.   You are aware that Todtman Nachamie
17  Spizz & Johns filed an appearance for Mishmeret
18  early in the Chapter 11 case, right?
19    A.   No, I'm not.  I -- okay.
20    MR. FLIMAN:  Let's mark this as
21    Exhibit 4, please.
22    (Exhibit 4, document entitled "Notice
23    of Appearance and Demand For Papers", marked
24    for identification.)
25    Q.   For the record, this is Docket 15 from

56

1  the Chapter 11 case.
2    A.   Okay.  Yes.
3    Q.   Have you seen this before?
4    A.   I don't recall.
5    Q.   Does it refresh your recollection as to
6  an appearance entered by Todtman Nachamie Spizz on
7  behalf of Mishmeret?
8    A.   Yes, it does.
9    Q.   Do you know anything about the
10  circumstances of this appearance?
11    A.   Just --
12    MR. WOLF:  I'll just note for the
13    record my continuing objection to the
14    relevance of this line of questioning.
15    Subject to that objection, you may go
16    ahead and answer if you have knowledge and
17    information.  Excuse me.
18    A.   I -- no, I don't.
19    Q.   Do you know if prior to the Chapter 11
20  being filed Mr. Spizz -- Mr. Spizz had any contacts
21  with Mishmeret?
22    A.   I would not know that.
23    Q.   Do you know if prior to the Chapter 11
24  being filed Mr. Spizz had any contacts with Shapira
25  & Co.?

57

1    A.   I would not know that.
2    Q.   How about Mr. -- Mr. Shapira?  I'll
3  restate the question.
4    Do you know if prior to the Chapter 11
5  being filed if Mr. Spizz had any contacts with
6  Mr. Shapira?
7    A.   Any contacts whatsoever?
8    Q.   Yes.
9    A.   No, I don't.
10    Q.   Do you know why Todtman Nachamie Spizz
11  & Johns ceased representing Mishmeret?
12    A.   Just a point of information.  I'm not
13  sure if this is relevant or not, but the notice of
14  appearance is for Mishmeret Trust Company, LTD.  And
15  the entity that was -- that TKD had represented was
16  Mishmeret Trust Company Services, LTD.
17    Q.   Do you know those to be two different
18  entities?
19    A.   I don't know.  Just a point of
20  clarification.  I don't know.
21    Q.   Thank you.
22    Do you know why Todtman Nachamie Spizz
23  & Johns ceased representing Mishmeret Trusts Company
24  LTD?
25    A.   No, I don't.

15  (Pages 54 to 57)



**APP-355**

58

1  Q. Mr. Spizz was elected Chapter 11
2  trustee by vote of the creditors, correct?
3  A. Yes.
4  Q. And Mishmeret voted in favor of
5  Mr. Spizz's election, right?
6  A. That's my understanding.
7  Q. And, in fact, Ofer Shapira appeared at
8  the election and cast the vote on behalf of
9  Mishmeret, right?
10  A. I don't know. I was not in -- in
11  attendance at that meeting.
12  Q. Do you know why Mishmeret elected
13  Mr. Spizz as trustee?
14  A. You mean voted for Mr. Spizz --
15  Mr. Spizz?
16  Q. Yes.
17  A. No, I don't.
18  Q. Did TKD provide Mishmeret or Shapira
19  any advice in connection with the trustee election?
20  A. I don't have any information on that.
21  Q. So you don't know?
22  A. The answer is I don't know.
23  Q. Would that have been in the time
24  records that you reviewed?
25  A. I --

59

1  MR. WOLF: Objection to the form of
2  that question.
3  A. I -- likely. But -- I'm sorry. Just
4  point of clarification, Mr. Spizz was elected in May
5  of two thousand --
6  Q. May of 2013?
7  A. 2013. I don't believe the engagement
8  with Mishmeret and Shapira occurred until after that
9  election, by TKD.
10  Q. Shortly after his election, Mr. Spizz
11  sought permission to retain Shapira & Co. as counsel
12  in the bankruptcy case, correct?
13  A. I -- yes.
14  Q. And do you know why Mr. Spizz chose to
15  retain Shapira & Co.?
16  A. No, I don't.
17  Q. Do you know if Mr. Spizz interviewed
18  any other firms for the job?
19  A. I would not know that.
20  Q. Does Shapira & Co. currently represent
21  any Ampal subsidiaries?
22  MR. WOLF: I'm sorry. I didn't hear
23  the word before "subsidiaries."
24  Q. Does Shapira & Co. currently represent
25  any Ampal subsidiaries?

60

1  A. It is my understanding that Mr. Shapira
2  represents Ampal nondebtor subsidiaries in Israel.
3  Q. And by Mr. Shapira you mean Shapira &
4  Co.?
5  A. I'm sure -- Shapira & Co.
6  Q. Did TKD represent Shapira & Co. in
7  connection with Mr. Spizz's application to retain
8  Shapira & Co.?
9  A. I don't know.
10  Q. We had discussed briefly TKD's
11  representation of Shapira and Mishmeret in
12  connection with the stay enforcement motion brought
13  by my firm.
14  A. Yes.
15  Q. Do you recall that?
16  A. Mm-hmm.
17  Q. The trustee filed an opposition to our
18  motion; do you recall that?
19  A. No, I don't. I was not involved
20  in -- in that aspect of the case.
21  Q. Are you aware that the trustee defended
22  Mr. Shapira's letter in that proceeding, claiming
23  that it did not violate the automatic stay?
24  A. Yes.
25  Q. And are you aware the trustee opposed

61

1  my client's request for sanctions against Mishmeret
2  and Shapira?
3  A. Yes.
4  Q. Do you know why Mr. Spizz took that
5  position?
6  A. No, I don't.
7  MR. WOLF: Go ahead.
8  Q. Are you aware of the court's findings
9  with respect to our stay enforcement motion?
10  A. Partially.
11  Q. Do you believe that Mishmeret's
12  actions, in connection with the letter that was the
13  subject of that dispute --
14  MR. FLIMAN: I'm sorry. Mr. Spizz,
15  would you repeat that?
16  THE WITNESS: He can't hold it in.
17  MR. SPIZZ: I apologize. What you said
18  before wasn't funny; that, to me, was funny.
19  MR. WOLF: Go ahead. Go ahead and
20  state the question.
21  THE WITNESS: I don't know what the
22  question is.
23  MR. FLIMAN: No, no. It is on me. It
24  is on me.
25  MR. WOLF: Mr. Fliman has to finish the

16 (Pages 58 to 61)

**APP-356**

1  question.
2      **Q.   Do you believe that --**
3          MR. FLIMAN:  Strike that.
4  DIR    Q.   Do you have a view as to whether
5  Mishmeret's actions, in connection with the letter
6  that was the subject of that proceeding, were
7  adverse to the estate's interests?
8          MR. WOLF:  I'm going to object to that
9      question as -- both as to form, as to
10      relevancy.  And there is a decision, as I
11      understand it, by Judge Bernstein on the
12      record, with regard to that proceeding.  That
13      decision is what it is.  It states what it
14      states.  And I see no connection whatsoever
15      between what may be the witness's view on
16      that issue and the present contested
17      proceeding that this deposition is being
18      taken in.  So I'm going to direct the witness
19      not to answer the question.
20      **Q.   Are you familiar with a third-party**
21  **complaint that our clients have brought against,**
22  **among others, Shapira & Co. and Mishmeret?**
23      A.   I am aware that a third-party complaint
24  has been filed.
25      **Q.   What is your understanding of the**

1  **claims that we have brought?**
2      A.   It is my understanding that your
3  clients are asserting that as a result of statements
4  made by Mr. Shapira and others, that
5  Ampal-American's purported -- well, Ampal-American's
6  loan to your client and Merhav -- I believe
7  Merhav -- the company's ability to pay that loan,
8  i.e., or defer it to an equity interest in a
9  Columbia ethanol project, was impaired.  And as a
10  result, your client was seeking or asserting that
11  Ampal-American -- that your client had an indemn- --
12  indemnification claim against the estate, based upon
13  the comments made, the purported def- -- def- --
14          MR. WOLF: Defamatory.
15      A.   -- defamatory comments that were made
16  to the Israeli press.  But the third-party complaint
17  speaks for itself.  I had to say it.
18      **Q.   Are you aware of any alleged harm to**
19  **the estate that is claimed to have occurred --**
20          MR. FLIMAN:  Actually, let me restate
21      that.
22      **Q.   Are you aware that our third-party**
23  **complaint also alleges harm to the estate?**
24      A.   I would have to review the third-party
25  complaint in order to respond to that.

1  DIR    Q.   Has the trustee assessed whether the
2  allegations in our third-party complaint, if true,
3  would give rise to a state cause of action?
4      A.   If true --
5          MR. WOLF:  One second.  One second.
6          Mr. Fliman, the problem I have with
7      your question is that you're, at the very
8      least, on the brink of asking a question that
9      could elicit an answer that starts to get
10      into attorney-client privilege and the
11      attorney work product.
12          And you're talking about a separate
13      proceeding, which is not the subject matter
14      of this contested proceeding for which the
15      deposition is being taken.
16          I have to assert the privileges that I
17      mentioned and direct the witness not to
18      answer the question.
19  DIR    Q.   Has the trustee analyzed any potential
20  claims against Mishmeret or Shapira?
21          MR. WOLF:  Well, hold on.  I think
22      you're -- this question now that you've asked
23      suffers from the same problem.  This is -- by
24      definition you're asking this witness, who
25      represents the trustee, to answer a question,

1      which, if he does have knowledge of it, it
2      requires him to relay to you the nature of a
3      privileged attorney-client communication.  So
4      I have to object to the question on the
5      grounds of privilege and direct the witness
6      not to answer.
7          MR. FLIMAN:  Okay.
8  DIR    Q.   Assuming TKD's retention is approved in
9  this case, do you have a view as to whether TKD
10  could represent Shapira-Mishmeret in the third-party
11  action?
12          MR. WOLF:  Object -- objection to the
13      form.  It's a hypothetical question.
14          MR. SPIZZ:  They're being represented
15      by Akin Gump.
16          MR. WOLF:  We're each having a problem
17      on this end of the table understanding the
18      question, because the attorneys of record in
19      the third-party action for the third-party
20      defendants is the Akin Gump firm.  So I'm
21      not -- Tarter Krinsky doesn't represent those
22      third parties.
23          MR. FLIMAN:  That is exactly my
24      question.
25          MR. WOLF:  Are you asking him for a

                                17 (Pages 62 to 65)

66

```
1    legal conclusion as to whether or not it
2    would be ethically permissible to do that?
3         MR. FLIMAN:  Yes.
4         MR. WOLF:  Well --
5         MR. FLIMAN:  Given his testimony that
6    the declaration is about disinterestedness,
7    that is exactly what I'm asking.
8         MR. WOLF:  I'm sorry.  I don't
9    understand the connection.
10        MR. FLIMAN:  Let's stop the narrative.
11        Can he answer the question?  Are you
12   instructing him not to answer?
13        MR. WOLF:  I'm instructing him --
14        MR. FLIMAN:  You're instructing him not
15   to answer the question that I just posed?
16        MR. WOLF:  Well, you're asking him for
17   a legal conclusion.  He's here as a fact
18   witness.
19        MR. FLIMAN:  Okay.  Perfect.  That is
20   exactly what I wanted.  Thank you.
21   Q.   You're aware of the supplemental order
22   that you and I had actually negotiated at length
23   entered in December 2014 concerning the private
24   documents?
25        A.   Yes.
```

67

```
1    Q.   And I could put it in front of you.
2    But you are aware that one of the provisions clearly
3    states that Ofer Shapira and Shapira & Co. law firm
4    or any of its employees, representatives or agents
5    will not receive any of the private information?
6         A.   Yes, I am aware of that.
7    Q.   And I believe you started to testify
8    about this earlier, but let's go back to it.  What
9    procedures, if any, are in place at TKD to limit who
10   can view what I'm calling the "private information"
11   using the definition in the order?
12        A.   The private information is on a
13   portable hard drive -- and I believe that is how we
14   would describe it -- which is under my possession.
15   And under lock and key.
16   Q.   Is it uploaded on a network?
17        A.   No, it's not.  I'm sorry.  I stand
18   corrected.  It was uploaded onto the -- my personal
19   Spizz Cohen & Serchuk PC, which is not at TKD at the
20   moment.
21   Q.   Okay.  So is it uploaded on any TKD
22   network?
23        A.   No.
24        MR. FLIMAN:  Let's take a 10-minute
25   break.  Let me just review my notes.  And I
```

68

```
1    think we're almost done here.  But --
2         MR. SPIZZ:  So there is no need to take
3    a lunch break because I was getting hungry.
4         THE WITNESS:  He was looking forward to
5    you serving him lunch.
6         MR. FLIMAN:  We'll be right back.
7         (Time noted: 12:58 p.m.)
8         (Brief recess taken.)
9         (Time noted: 1:18 p.m.)
10   Q.   A few cleanup items here.  Have the
11   files from your former firm been brought over to
12   TKD?
13        A.   Yes.
14   Q.   Are the files related to the trustee
15   and the trustees's representation now at TKD?
16        A.   Yes.
17   Q.   Are they -- to the extent electronic,
18   are they now uploaded on the TKD network?
19        A.   No.
20   Q.   Why not?
21        A.   There -- the system doesn't -- the two
22   systems do not comport with each other, so there
23   will not be any full uploading of documents from
24   Spizz Cohen to TKD.
25   Q.   Do you have current access to your
```

69

```
1    Spizz Cohen files?
2         A.   That's a good question.  If the system
3    is working properly.
4    Q.   Well, if the system is working
5    properly, would any TKD employee have access to the
6    Spizz Cohen documents?
7         A.   No.
8    Q.   Why not?
9         A.   This is strictly for -- the only ones
10   who would have access to those documents would be
11   Mr. Spizz, myself, Jill Makower from my office
12   and -- are we talking about just Ampal-American now
13   or Spizz Cohen?
14   Q.   Yes.  Yes.
15        A.   That would be it.
16   Q.   And why would it be limited to those
17   people?
18        A.   Because we have established a -- I
19   don't know how to describe -- there is a -- we have
20   set up our system -- the former SCS system is at a
21   third-party location, and it is essentially a
22   log-me-in situation where you need a name and a
23   password to go into the system if it is working
24   properly.  So then you would have access to whatever
25   documents are on -- in that system.
```

18  (Pages 66 to 69)

APP-358

70

1    Q.   And so I take it from your answer that
2    the logins have only been provided to the people you
3    identified?
4    A.   Mm-hmm.  Yes.
5    Q.   And why is that?
6    A.   Former personnel of Spizz Cohen &
7    Serchuk.
8    Q.   Have you had any discussions with the
9    U.S. trustee's office concerning TKD's application?
10   A.   I have not.
11   Q.   Has anybody at TKD had discussions?
12   A.   Yes.
13   Q.   Who?
14   A.   Mr. Spizz.
15   Q.   Do you know what was discussed?
16   A.   Yes.
17   Q.   And what was that?
18   A.   Mr. --
19       MR. WOLF:  I'm cautioning the witness,
20   if you are not a party yourself to direct
21   discussions with the U.S. trustee to --
22   you're limited to testify as to what you have
23   information and belief as to.  Do you
24   understand the direction?
25       THE WITNESS:  Yes.

71

1        MR. WOLF:  Go ahead.
2    A.   Upon information and belief, Mr. Spizz
3    advised the U.S. trustee's office of the planned
4    move by Mr. Spizz and myself to Tarter Krinsky.  And
5    whether the U.S. trustee's office would have any
6    objections to TKT -- TKD representing Mr. Spizz and
7    the estate on a going-forward basis.
8    Q.   Is that all you know about those
9    discussions?
10   A.   Yes.
11   Q.   Are you aware of the U.S. trustee's
12   position with respect to Mr. Spizz's inquiry?
13   A.   Only what I have been told by
14   Mr. Spizz.
15   Q.   Which is?
16   A.   That they would have no objection.
17   Q.   Okay.  I'm going to ask you a question.
18   I'm looking for just a "yes" or "no" answer.
19       Has the trustee or have you analyzed
20   the merits of our third-party complaint?
21   A.   I have not.
22   Q.   Has the trustee analyzed the merits of
23   our third-party complaint?
24   A.   You would have to ask Mr. Spizz.
25   Q.   Does that mean that you don't know the

72

1    answer?
2    A.   The answer is I don't know the answer.
3    I've had discussions with Mr. Spizz -- I'm sorry.  I
4    apologize.
5        MR. FLIMAN:  Let the record reflect
6    that counsel has hit the deponent.
7        MR. WOLF:  Please wait until there is a
8    pending question.
9    DIR   Q.   What discussions have you had with
10   Mr. Spizz?
11       MR. WOLF:  I'm sorry.  Hold on a
12   second.  Okay.  Forgive me, but you did ask
13   for a "yes" or "no" answer before.  Obviously
14   it encompasses the fact that eliciting
15   anything more with regard to communications
16   that the witness may have had with the
17   trustee would be within the attorney-client
18   privilege.  This question is eliciting an
19   answer that would be protected by the
20   attorney-client privilege.  I invoke the
21   privilege and, therefore, direct the witness
22   not to answer the question.
23       MR. FLIMAN:  I was just being courteous
24   letting him finish his answer.  I'll move on.
25   I'll move on.

73

1    Q.   Could TKD represent the trustee in
2    suing Shapira or Mishmeret?
3        MR. WOLF:  One second.
4    I object to the question.
5        MR. FLIMAN:  I'll rephrase it.
6        MR. WOLF:  Okay.  Go ahead.
7        MR. FLIMAN:  I'll rephrase it.
8    DIR   Q.   Is TKD precluded, by any ethical
9    limitations, from representing the trustee in a suit
10   against Shapira or Mishmeret?
11       MR. WOLF:  Okay.  I object to the
12   question.  The witness is here as a fact
13   witness.  You're asking for a legal
14   conclusion.  And he is not here in a capacity
15   as a legal expert on ethics or on any other
16   topic for purposes of this deposition.  So I
17   have to direct the witness not to answer the
18   question.
19   Q.   Okay.  Has anybody performed the legal
20   analysis as to whether any ethical limitations would
21   preclude TKD from representing the trustee in a suit
22   against Shapira or Mishmeret?
23       MR. WOLF:  You're talking about anybody
24   at TKD?
25       MR. FLIMAN:  Anybody.  I don't know if

19 (Pages 70 to 73)

74

```
1     you hired outside counsel.  Anybody.
2          MR. WOLF:  Okay.  You are to limit your
3     answer to -- this is a "yes" or "no"
4     question.
5          MR. FLIMAN:  "Yes" or "no."
6     Q.   Do you want me to repeat it?
7     A.   Yes, please.
8     Q.   Has anybody performed the legal
9     analysis as to whether any ethical limitations would
10    preclude TKD from representing the trustee in a suit
11    against Shapira or Mishmeret?
12    A.   No.
13    Q.   We had discussed the private
14    information that was subject to that December order;
15    do you know what I'm referring to?
16    A.   Yes.
17    Q.   And we produced that information to you
18    in December, correct?
19    A.   I believe so.
20    Q.   Have you accessed the documents and the
21    files we provided you, you personally?
22    A.   Yes.
23    Q.   Other than yourself and the people at
24    Troutman, do you know if anybody else has accessed
25    those documents?
```

75

```
1          MR. FLIMAN:  Let me rephrase that.
2     Q.   Other than yourself and the people at
3     Troutman, do you know if anybody else has accessed
4     the files that we produced to you?
5     A.   I am -- I'm having difficulty answering
6     that, because Troutman, for purposes of discovery, I
7     would assume, have internal people doing the
8     formatting and the like to do the searches and then
9     providing that information to you to -- prior to
10    them releasing those documents.
11         MR. WOLF:  I thought the question is
12    "other than."
13         MR. SPIZZ:  Other than Troutman.
14         MR. WOLF:  Other than the witness and
15    Troutman.
16    A.   I'm not aware of anybody else, no.
17         MR. FLIMAN:  That is all I have.
18    THE WITNESS:  Okay.
19         MR. FLIMAN:  Thank you very much.
20         (Time noted:  1:28 p.m.)
21
22
23
24
25
```

76

```
1
2     STATE OF _____ )
3                           ) :ss
4     COUNTY OF _____ )
5
6
7          I, ARTHUR GOLDSTEIN, the witness
8     herein, having read the foregoing
9     testimony of the pages of this deposition,
10    do hereby certify it to be a true and
11    correct transcript, subject to the
12    corrections, if any, shown on the attached
13    page.
14
15
16         _____
17           ARTHUR GOLDSTEIN
18
19
20    Sworn and subscribed to before me,
21    this _____ day of _____, 2015.
22
23    _____
24      Notary Public
25
```

77

```
1              CERTIFICATE
2
      STATE OF NEW YORK )
3                       :
      COUNTY OF NEW YORK)
4
5          I, KAREN PERLMAN, RPR, CRR, a Shorthand
6     Reporter and Notary Public within and for the State
7     of New York, do hereby certify:
8          That ARTHUR GOLDSTEIN, the witness whose
9     deposition is hereinbefore set forth, was duly sworn
10    by me and that such deposition is a true record of
11    the testimony given by such witness.
12         I further certify that I am not related to
13    any of the parties to this action by blood or
14    marriage, and that I am in no way interested in the
15    outcome of this matter.
16         IN WITNESS WHEREOF, I have hereunto set my
17    hand this 14th day of May 2015.
18
19
20
21
22    _____
23      KAREN PERLMAN, RPR, CRR
24
25
```

20  (Pages 74 to 77)

APP-360

---

**78**

1 ----------------I N D E X-------------------
2 WITNESS        EXAMINATION BY    PAGE
3 ARTHUR GOLDSTEIN   MR. FLIMAN        6
4
5 ------------------- EXHIBITS --------------------
6 EXHIBIT                FOR I.D.
7 Exhibit 1, document entitled        7
   "Declaration of Arthur Goldstein
8 Pursuant to Bankruptcy Rule 2014
   on Behalf of Tarter Krinsky &
9 Drogin LLP As Proposed Substitute
   Counsel to Trustee and Disclosure
10 Pursuant to Bankruptcy Code
   Sections 327 and 329 and Bankruptcy
11 Rule 2014"
12 Exhibit 2, document entitled        8
   "Supplemental Declaration of
13 Arthur Goldstein Pursuant to
   Bankruptcy Rule 2014 on Behalf of
14 Tarter Krinsky & Drogin LLP As
   Proposed Substitute Counsel to
15 Trustee and Disclosure Pursuant to
   Bankruptcy Code Sections 327 and 329
16 and Bankruptcy Rule 2014"
17 Exhibit 3, document entitled       48
   "Declaration of Arthur Goldstein
18 Pursuant to Bankruptcy Rule 2014 on
   Behalf of Tarter Krinsky & Drogin LLP
19 As Proposed Substitute Counsel to
   Trustee and Disclosure Pursuant to
20 Bankruptcy Code Sections 327 and 320
   and Bankruptcy Rule 2014"
21
   Exhibit 4, document entitled       55
22 "Notice of Appearance and Demand For
   Papers"
23
24
25

---

**79**

1 ----------------I N D E X (continued)---------------
2
   QUESTIONS DIRECTED NOT TO ANSWER
3
       PAGE  /  LINE
4
        16        11
5       39         3
        40        19
6       62         4
        64         1
7       64        19
        65         8
8       72         9
        73         8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**80**

1              INSTRUCTIONS TO WITNESS
2
3     Please read your deposition over carefully
4 and make any necessary corrections. You should state
5 the reason in the appropriate space on the errata
6 sheet for any corrections that are made.
7     After doing so, please sign the errata sheet
8 and date it.
9     You are signing same subject to the changes
10 you have noted on the errata sheet, which will be
11 attached to your deposition.
12    It is imperative that you return the original
13 errata sheet to the deposing attorney within thirty
14 (30) days of receipt of the deposition transcript by
15 you. If you fail to do so, the deposition transcript
16 may be deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25

---

**81**

1              E R R A T A
2
3
4
5     I wish to make the following changes,
6 for the following reasons:
7
8 PAGE LINE
9 ___ ___ CHANGE:_____
10 REASON:_____
11 ___ ___ CHANGE:_____
12 REASON:_____
13 ___ ___ CHANGE:_____
14 REASON:_____
15 ___ ___ CHANGE:_____
16 REASON:_____
17 ___ ___ CHANGE:_____
18 REASON:_____
19 ___ ___ CHANGE:_____
20 REASON:_____
21
22 _____  _____
23 WITNESS' SIGNATURE        DATE
24
25

21  (Pages 78 to 81)

APP-361

**EXHIBIT 1**

APP-362

**Exhibit 1 to Goldstein Declaration Included in Appendix as Docket No. 573-2**

APP-363

**EXHIBIT 2**

APP-364

**Exhibit 2 to Goldstein Declaration Included in Appendix as Docket No. 582**

APP-365

**EXHIBIT 3**

## APP-366

Hearing Date: **June 17, 2014**
Hearing Time: **10:00 A.M.**

**SPIZZ COHEN & SERCHUK, P.C.**
Attorneys for **Alex Spizz, Chapter 7 Trustee**
425 Park Avenue
New York, NY 10022
(212) 754-9400
Alex Spizz, Esq.
Janice B. Grubin, Esq.
Arthur Goldstein, Esq.
Jill Makower, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

In re:                                                Chapter 7

AMPAL-AMERICAN ISRAEL CORPORATION,                    Case No. 12-13689 (SMB)

                                    Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**NOTICE OF CHAPTER 7 TRUSTEE'S MOTION FOR ORDER (I)
AUTHORIZING TRUSTEE TO ENTER INTO LITIGATION FINANCING
AGREEMENT PURSUANT TO 11 U.S.C. §§364(b) AND 364(e), AND (II)
MODIFYING AUTOMATIC STAY PURSUANT TO 11 U.S.C. §362(d) TO
PERMIT TRUSTEE TO IMPLEMENT TERMS OF LITIGATION LOAN**

PLEASE TAKE NOTICE that upon the motion dated May 21, 2014 (the "Motion")

of Alex Spizz, the Chapter 7 trustee (the "Trustee") of the above-captioned debtor, Ampal-

American Israel Corporation ("Debtor"), by his counsel, Spizz Cohen & Serchuk, P.C., the

Trustee will move before the Honorable Stuart M. Bernstein, United States Bankruptcy

Court Judge, in his Courtroom at the United States Bankruptcy Court for the Southern

District of New York, One Bowling Green, New York, New York 10004, on the **17th day of**

**June 2014 at 10:00 A.M.**, or as soon thereafter as counsel can be heard (the "Hearing

Date"), for an order, substantially in the form annexed to the Motion as Exhibit "A",

285132v1


Exhibit 3
K. Perlman
5/14/15

**APP-367**

    (i)    authorizing the Trustee, pursuant to Bankruptcy Code sections 364(b) and (e), Bankruptcy Rule 4001(c) and Local Bankruptcy Rule 4001-2, to enter into a certain proposed "Litigation Financing Agreement" dated May 20, 2014 annexed to the Motion as **Exhibit "B",** by and between (a) the Trustee, (b) the Debtor's indirect subsidiary, Merhav Ampal Group Ltd. ("MAG") and (c) the following indenture trustees: Hermetic Trust (1975) Ltd., Reznik Paz Nevo R.P.N. Trusts 2007 Ltd., and Mishmeret Trust Services Company Ltd.; and

    (ii)    modifying the automatic stay pursuant to Bankruptcy Code section 362(d) to permit the Trustee to implement the terms of the Litigation Loan (as defined in the Motion).

        **PLEASE TAKE FURTHER NOTICE,** that any objections to the Motion must be filed with the Clerk of the Bankruptcy Court with a copy delivered to the Chambers of the Honorable Stuart M. Bernstein and served upon: (i) Spizz Cohen & Serchuk, P.C., attorneys for the Trustee, 425 Park Avenue, New York, New York 10022, Attn: Alex Spizz, Esq. and Janice B. Grubin, Esq.; (ii) the Office of the United States Trustee for the Southern District of New York, 201 Varick Street, Suite 1006, New York, New York 10014, Attn: Andrew D. Velez-Rivera, Esq., (iii) Hermetic Trust (1975) Ltd., 113 Hayarkon Street, Tel Aviv 63573, Israel, Attn.: Dan Offer, Adv.; (iv) DBL Law Offices, attorneys for Reznik Paz Nevo R.P.N. Trusts 2007 Ltd., 1 Azrieli Center (Round Bldg., 22nd Fl.), Tel Aviv, 67201 Israel, Attn: Arye Danzinger, Adv.; and (v) Tarter, Krinsky & Drogin, LLP, Attorneys for Mishmeret Trust Services Company Ltd., 1350 Broadway, New York, New York 10018, Attn: Scott S. Markowitz, Esq., so as to be filed

## APP-368

and received at least seven (7) days prior to the Hearing Date.


Dated: New York, New York
      May 21, 2014

                          SPIZZ COHEN & SERCHUK, P.C.
                          Attorneys for Alex Spizz, Chapter 7
                          Trustee for Ampal-American Israel Corporation,
                          Debtor


                          By:   _____
                              Alex Spizz
                              Janice B. Grubin
                              Arthur Goldstein
                              Jill Makower
                              425 Park Avenue
                              New York, New York 10022
                              (212) 754-9400

# APP-369

| | |
|---|---|
| **Hearing Date:** | **June 17, 2014** |
| **Hearing Time:** | **10:00 A. M.** |

SPIZZ COHEN & SERCHUK, P.C.
Attorneys for **Alex Spizz, Chapter 7 Trustee**
425 Park Avenue
New York, NY 10022
(212) 754-9400
Alex Spizz, Esq.
Janice B. Grubin, Esq.
Arthur Goldstein, Esq.
Jill Makower, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

In re:                                         Chapter 7

AMPAL-AMERICAN ISRAEL CORPORATION,             Case No. 12-13689 (SMB)

                              Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**CHAPTER 7 TRUSTEE'S MOTION FOR ORDER (I) AUTHORIZING TRUSTEE TO ENTER INTO LITIGATION FINANCING AGREEMENT PURSUANT TO 11 U.S.C. §§364(b) AND 364(e), AND (II) MODIFYING AUTOMATIC STAY PURSUANT TO 11 U.S.C. §362(d) TO PERMIT TRUSTEE TO IMPLEMENT TERMS OF LITIGATION LOAN**

TO:  **THE HONORABLE STUART M. BERNSTEIN**
     **UNITED STATES BANKRUPTCY JUDGE**

Alex Spizz, the Chapter 7 trustee (the "Trustee") of Ampal-American Israel

Corporation, the debtor herein (the "Debtor"), submits this motion (the "Motion")

seeking entry of an order, substantially in the form annexed hereto as **Exhibit "A"**,

(i)      authorizing the Trustee, pursuant to sections 364(b) and (e) of title 11,

United States Code (the "Bankruptcy Code"), Rule 4001(c) of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") and Local Bankruptcy Rule ("LBR")

4001-2, to enter into a certain "Litigation Financing Agreement" dated May 20, 2014 (the

285050v4

## APP-370

"LFA") annexed hereto as **Exhibit "B"**, by and among (a) the Trustee, (b) the Debtor's indirect subsidiary Merhav Ampal Group Ltd. ("MAG") and (c) the following indenture trustees (the "Indenture Trustees"): Hermetic Trust (1975) Ltd. ("Hermetic"), Reznik Paz Nevo R.P.N. Trusts 2007 Ltd. ("Reznik"), and Mishmeret Trust Services Company Ltd. ("Mishmeret"); and

(ii)    modifying the automatic stay pursuant to Bankruptcy Code section 362(d) to permit the Trustee to implement the terms of the Litigation Loan (defined below). In support of this Motion, the Trustee respectfully represents:

### JURISDICTION

1.    This Court has subject matter jurisdiction to consider and determine this Motion pursuant to 28 U.S.C. §1334. This is a core proceeding pursuant to 28 U.S.C. §157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§1408 and 1409.

### INTRODUCTION

2.    By this Motion, the Trustee seeks authority pursuant to Bankruptcy Code sections 364(b) and (e) to enter into the LFA in order to borrow funds from the participating bondholders (the "Participating Bondholders") that the Indenture Trustees represent, to finance litigation by the Trustee (on behalf of MAG) against (a) Yosef A. Maiman ("Maiman") and/or (b) Merhav (M.N.F.) Limited ("MNF"), and/or (c) the directors and officers of any corporation which is part of the Ampal group of companies (collectively, the "Maiman Litigation"). The Maiman Litigation will consist of claims to be brought by the Trustee on behalf of MAG based on a Note and Guaranty (as such terms are defined below) and based on Debtor's former directors' and officers' breaches of fiduciary duty to the Debtor and its subsidiaries.

2

## APP-371

3.     This Motion also requests modification of the automatic stay, pursuant to Bankruptcy Code section 362(d), to permit the Trustee to implement the terms of the Litigation Loan (defined below).

4.     The Trustee believes that the proposed financing is in the best interest of the estate, as demonstrated below.

## FACTS

### A.     General

5.     On August 29, 2012 (the "Petition Date"), the Debtor filed a voluntary petition (the "Petition") for relief under Chapter 11 of the Bankruptcy Code.

6.     The Debtor is an investment company, incorporated in New York, which primarily acquired interests in companies located or operating in Israel in the energy, chemicals, real estate, project development and leisure sectors. The Debtor's principal assets are its direct and indirect equity holdings in over 80 corporations (the "Subsidiaries"), and the Debtor's business consisted of managing its equity investments in the Subsidiaries. None of the Debtor's Subsidiaries is a debtor in this or any other U.S. bankruptcy court and none is the subject of any bankruptcy case, insolvency proceeding or receivership proceeding outside of the United States except for Gadot Chemical Tankers and Terminals Ltd., which is in receivership in Israel.

7.     On September 25, 2012, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Creditors' Committee").

8.     On April 8, 2013, the Court ordered the appointment of a Chapter 11 trustee and the Office of the U.S. Trustee thereafter designated Michael Luskin as Chapter 11 trustee.

285050v4

3

### APP-372

9.     Michael Luskin, as Chapter 11 trustee, moved to convert this case to Chapter 7 on the grounds that, among other things, the Debtor was administratively insolvent.

10.     By Order dated May 2, 2013 (the "Conversion Date"), the Court converted the case to one under Chapter 7.

11.     On May 3, 2013, the Office of the U.S. Trustee appointed Alan Nisselson as interim Chapter 7 trustee.

12.     On May 20, 2013 (the "Election Date"), Alex Spizz was elected Chapter 7 Trustee of the Debtor pursuant to section 702 of the Bankruptcy Code and was duly qualified thereafter.

13.     Pursuant to the "Order Authorizing Chapter 7 Trustee To Exercise Debtor's Shareholder Rights" entered on July 25, 2013 [Docket No. 325] (the "Shareholder Rights Order"), the Trustee was authorized, effective as of May 20, 2013, "to exercise the Debtor's shareholder rights with respect to the business and affairs of the Debtor's subsidiaries, as provided for under New York law or other applicable law that may be appropriate[.]" (Shareholder Rights Order at p. 1-2).

### B.     The Note And the Guaranty

14.     On December 25, 2007, Merhav (M.N.F.) Limited ("MNF") signed a promissory note, as amended on December 25, 2008 (the "Note"), in favor of the Debtor with regard to a Twenty Million Dollar ($20,000,000 USD) loan that MNF obtained from the Debtor (the "Loan").  According to the Note, the purpose of the Loan was facilitating an ethanol producing project in Columbia (the "Project") and funding the purchase of 11,000 hectares of real property located in Colombia with regard to the development of

## APP-373

the Project.  In connection with the Loan, the Debtor and MNF also signed a pledge agreement, an option agreement and an exercise agreement, and amendments thereto, between December 25, 2007 and December 31, 2009.

15.    On December 25, 2008, Maiman, the sole owner of MNF and the chairman of Debtor's board of directors and its president and chief executive officer until May 2013, signed an irrevocable, absolute and continuing guaranty (the "Guaranty") for repayment of all sums owed by MNF to the Debtor under the Note.

**C.    The Debtor's Assignment of the Note and Guaranty to MAG**

16.    On December 31, 2010, the Debtor and MAG signed an Assignment and Assumption Agreement (the "Assignment Agreement"), in which Debtor contributed, conveyed, transferred, assigned and delivered to MAG (Debtor's indirect subsidiary) all of Debtor's rights, title and interest in and to the Note, the Guaranty and all other documents relating to the Project.   On December 8, 2011, MNF and MAG signed a second amendment to the exercise agreement.

**D.    The Debtor's Issuance of Bonds Prior To The Petition Date**

17.    Prior to the Petition Date, the Debtor issued three series of bonds, Series A, Series B, and Series C (collectively, the "Bonds").   The Indenture Trustees represent the holders of the Bonds as follows: Hermetic[1] is the Series A Indenture Trustee, Reznik is the

---

[1] Hermetic is the Indenture Trustee with respect to the Deed of Trust dated as of November 20, 2006 (as amended and supplemented, the "Series A Deed of Trust") that the Debtor entered into with Hermetic in connection with the Debtor's issuance of Series A Bonds in the original principal amount of two hundred and fifty million (250,000,000) New Israeli Shekel ("NIS") par value.  The conversion rate as of the drafting of this Motion is $1 U.S. Dollar equals approximately 3.48 NIS.

## APP-374

Series B Indenture Trustee[2] and Mishmeret[3] is the Series C Indenture Trustee.

### E.    **The Sinking Funds**

18.    Prior to the Petition Date, separate bank accounts were established as security for the Debtor's interest obligations under the Bonds for the Series B Bondholders (the "Series B Sinking Fund") and the Series C Bondholders (the "Series C Sinking Fund" and, together with the Series B Sinking Fund, the "Sinking Funds").

### F.    **The Proofs Of Claim Filed By The Indenture Trustees**
**On Behalf Of The Bondholders**

19.    Hermetic, on behalf of the Series A Bondholders, filed a general unsecured claim (the "Hermetic Claim") in the Debtor's case in the amount of "$54,209,981 on account of the Series A Debentures, plus $160,484 on account of the Series A Trustee's fees and expenses, plus accruing and unliquidated amounts."

20.    Reznik, on behalf of the Series B Bondholders, filed a general unsecured claim (the "Reznik Claim") in the Debtor's case in the amount of "$136,696,132 on account of the Series B Debentures, plus the Series B Trustee's fees and expenses ($193,906 as of January 2013), plus other accruing and unliquidated amounts."

21.    Mishmeret, on behalf of the Series C Bondholders, filed a general unsecured claim (the "Mishmeret Claim" and, together with the Hermetic Claim and the

---

[2]   Reznik is the Indenture Trustee with respect to the Deed of Trust dated April 6, 2008 (as amended and supplemented, the "Series B Deed of Trust") that the Debtor entered into with Clal Finances Trusts 2007 Ltd. ("Clal") as indenture trustee in connection with the Debtor's issuance of Series B Bonds in the original principal amount of NIS 577,823,000 (five hundred and seventy-seven million and eight hundred and twenty-three thousand) par value.   (Reznik subsequently replaced Clal as the Series B Indenture Trustee.)

[3]   Mishmeret, formerly known as Ziv Haft Trust Company Ltd., is the Indenture Trustee with respect to the Deed of Trust dated August 31, 2010 (as amended and supplemented, the "Series C Deed of Trust") that the Debtor entered into with Mishmeret in connection with the Debtor's issuance of Series C Bonds in the original principal amount of NIS 170,000,000 (one hundred and seventy million) par value.

285050v4

6

**APP-375**

Reznik Claim, the "Claims") in the Debtor's case in the amount of "$43,790,378.26 on account of the Series C Debentures, plus $153,582 on account of the Series C Trustee's fees and expenses, plus accruing and unliquidated amounts.

### G.    The Trustee's Settlement with the Indenture Trustees

22.    On May 20 2014, the Trustee and the Indenture Trustees entered into a certain "Agreement Concerning Sinking Funds and Alleged Preferential Transfers" dated May 20, 2014 (the "Sinking Funds Agreement"), which resolves, subject to the Court's approval, (a) the issue relating to the Trustee's and the Indenture Trustees' respective rights in certain monies held by Reznik and Mishmeret in Israel banks (the "Sinking Funds Issue"), (b) the Trustee's preference claims against the Indenture Trustees, and (c) Mishmeret's pending motion for an order declaring that the Series C Sinking Fund is not property of the Debtor's estate and, therefore, that the automatic stay does not apply or, in the alternative, for relief from the automatic stay so that Mishmeret could exercise its rights under the Series C Deed of Trust and Israeli law for the benefit of the Series C Bondholders [Docket No. 357].   The Trustee has filed a motion for approval of the Sinking Funds Agreement (the "9019 Motion").   The hearing on the 9019 Motion is scheduled for June 17, 2014 at 10:00 a.m.

### H.    The LFA

23.    On May 20, 2014, the Trustee, MAG, and the Indenture Trustees on behalf of the Participating Bondholders, entered into the LFA, subject to Court approval. The LFA provides for a loan (the "Litigation Loan") in the sum of $1.5 Million U.S.D. to be made to the Trustee to finance the Maiman Litigation.

## APP-376

I.     **The Proposed Litigation Loan**

24.     The principal elements of the proposed Litigation Loan are summarized as follows:

a.     **Amount of Litigation Loan** - The Litigation Loan is in the sum of $1,500,000.00 U.S.D. (LFA § 1)

b.     **Lenders** - The funds will be loaned by the Participating Bondholders. (LFA § 3)

c.     **Priority Status** - The LFA provides that the Trustee's obligations under the Litigation Loan shall, pursuant to Bankruptcy Code section 364(b), constitute a Chapter 7 administrative expense of the Debtor allowable under Bankruptcy Code section 503(b)(1). (LFA § 8)

d.     **Collateral Furnished By MAG** - The Trustee's obligations under the Litigation Loan shall be secured by MAG, by the proceeds recovered from any judgment or settlement reached in the Maiman Litigation (the "Proceeds") or other MAG sources, if possible, subject to the claims of the Israeli Taxing Authorities and Israel Discount Bank against MAG. (LFA § 8)

MAG shall secure the repayment of the Litigation Loan by granting to the Participating Bondholders: (i) a first priority lien, unlimited in amount on all Proceeds received by MAG, and (ii) an irrevocable guaranty by MAG for the full amount due under Litigation Loan, subject to the prior claims set forth in section 8 of the LFA. The lien and guaranty shall be created, registered and governed exclusively by Israeli law, will be subject to the exclusive jurisdiction of the Israeli courts, and their terms shall be confirmed in advance by the Indenture Trustees. (LFA § 12)

8

## APP-377

MAG agrees to refrain from receiving any additional loans, without first requesting said additional loans from its existing creditors. (LFA § 13)

e. **Interest Rate** - The entire Litigation Loan amount shall bear yearly interest at the rate of ten (10%) percent for the first year, eleven (11%) percent for the second year, twelve (12%) percent for the third year and thirteen (13%) percent for the fourth year on. In the event of default in the terms of the LFA, additional arrears interest shall be accrued in an annual rate of an additional five (5%) percent. The interest on the Litigation Loan shall be accrued to the principal and paid upon payment of the principal. (LFA § 14)

f. **Maturity / Repayment** - The Litigation Loan (including the interest stipulated in section 14 of the LFA) shall be repaid within seven (7) days from Trustee's receipt of the Proceeds and/or from any other funds or proceeds received by the Debtor's estate from any other source received by the Debtor's estate in the future. For the avoidance of doubt, the Litigation Loan shall be repaid from any future proceeds received by the Debtor's estate and before any other expense of the estate subject to section 9 of the LFA. The Litigation Loan, if repaid in part, will be performed in minimal payments of $10,000. (LFA § 9)

The Trustee shall have the right to refrain from paying a part of the proceeds received by the estate in the future, in order to maintain a minimal cash balance in the estate in an amount of up to $1.5M. It is understood that as of the Effective Date the estate cash balance will be approximately $2M and no immediate loan repayment is required. (LFA § 9)

285050v4

9

## APP-378

g.    **Prepayment** - The Trustee shall have the right to make a prepayment of the entire outstanding debt on the Litigation Loan and, in such case, shall not pay a penalty. If prepayment is made, the Trustee cannot request additional sums under the LFA. (LFA § 18)

h.    **Other Terms**

- The total sum of the Litigation Loan shall be raised from the Participating Bondholders within thirty (30) days from the resolution issued at a general meeting of the Indenture Trustees confirming the execution of this agreement by a special majority of each of the three series of Bondholders. (LFA § 4)

- No part of the Litigation Loan will be remitted to the Trustee prior to the Court's approval of the Sinking Funds Agreement and the distribution of the Sinking Funds to the Series B and C Bondholders under the terms thereof. If Court approval of the Sinking Funds Agreement is not received within sixty (60) days from the date of the Trustee's filing of a motion to approve it, then the LFA and the Sinking Funds Agreement shall be deemed null and void. (LFA § 5)

- The Litigation Loan shall be remitted to the Trustee in full within seven (7) business days from the later of: (1) the collection of the Litigation Loan amount by the Indenture Trustees, or (2) proof of Court approval of the Sinking Funds Agreement being delivered to the Indenture Trustees. (LFA § 6)

- After remittance of the Litigation Loan to the Trustee, the Trustee shall provide the Indenture Trustees with receipts for payments made from the Litigation Loan within seven (7) business days of such payment. (LFA § 7)

- The Trustee and MAG shall not use the Litigation Loan for any purpose except to fund the Maiman Litigation, and shall not use any Proceeds for any purpose except for the full repayment of the Litigation Loan, together with the interest of such loan and the legal and court costs and expenses in the event that enforcement proceedings are necessary. (LFA § 10)

- The Trustee and MAG agree to use their reasonable efforts to commence the Maiman Litigation as soon as practicable. (LFA § 15)

## APP-379

- MAG and the Trustee shall provide the Indenture Trustees with monthly updates concerning the Maiman Litigation. (LFA § 17)

- Unless otherwise explicitly stated in the LFA, the Court shall retain exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of the LFA. (LFA § 22)

### REQUEST FOR RELIEF

25.     By this Motion, the Trustee seeks an order, substantially in the form annexed hereto as **Exhibit "A"**,

(i)     authorizing the Trustee, pursuant to Bankruptcy Code sections 364(b) and (e), Bankruptcy Rule 4001(c) and LBR 4001-2, to enter into the LFA annexed hereto as **Exhibit "B",** and

(ii)     modifying the automatic stay pursuant to Bankruptcy Code section 362(d) to permit the Trustee to implement the terms of the Litigation Loan.

### I.   THE TRUSTEE SHOULD BE AUTHORIZED TO ENTER INTO THE LFA PURSUANT TO BANKRUPTCY CODE SECTIONS 364(b) and (e)

26.     Under Bankruptcy Code section 364(b), a trustee or debtor in possession may obtain unsecured credit outside of the ordinary course of the debtor's business and provide the entity extending the credit with an administrative priority. See 11 U.S.C. §364(b); 3-364 Collier on Bankruptcy P 364.03 (16th ed. 2014). However, when the credit is obtained outside of the ordinary course of business, the trustee or debtor in possession must obtain prior court authorization, after notice and a hearing. See 11 U.S.C. §364(b); 3-364 Collier on Bankruptcy P 364.03 (16th ed. 2014).

27.     Section 364 of the Bankruptcy Code, entitled, "Obtaining Credit" provides in subsection (b) as follows:

## APP-380

> (b) The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(1) of this title as an administrative expense.

11 U.S.C. § 364(b). Section 503(b)(1) permits administrative expenses for the "actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1).

28.   In moving for authorization to enter into the LFA, the Trustee seeks to cause the Debtor's estate to incur unsecured debt to pursue estate assets. This is a proper exercise of Bankruptcy Code section 364(b). See, e.g. In re Cyrus II Partnership, 2008 Bankr. LEXIS 2320 (Bankr. S.D. Tex. July 31, 2008) (granting Chapter 7 trustee's motion to enter into litigation funding agreement pursuant to Bankruptcy Code section 364(b) and rejecting objectors' argument that the trustee had the responsibility to pursue other forms of funding).

29.   The Trustee's pursuit of the Litigation Loan represents a sound exercise of his business judgment, as demonstrated below. Moreover, the Litigation Loan is proper and appropriate notwithstanding the fact that the Litigation Loan will be made by the Participating Bondholders, who are prepetition creditors of the Debtor. Where, as here, a bankruptcy trustee seeks to finance litigation through a postpetition loan from a prepetition creditor of the debtor, courts have authorized such loans. See, e.g. In re Hartley, 39 B.R. 273,278 (Bankr. W.D. Ohio 1984)(chapter 7 trustee authorized to obtain unsecured credit allowed as an administrative expense under 364(b)); In re McKenzie Energy Corp., 228 B.R. 854,875 (Bankr. S.D. Tex. 1998)(court granted superpriority administrative claim for creditor's advance of credit and approved creditor receiving 75% of net proceeds from the liquidation of any property and/or assets recovered by the chapter 7 trustee on behalf of the estates other than avoidance actions

**APP-381**

and derivative actions); <u>Modanlo v. Ahan (In re Modanlo)</u>, 2006 U.S. Dist. LEXIS 96455

at *21 (D. Md. Aug. 16, 2006)(chapter 11 trustee granted authorization for postpetition

loans from prepetition creditor).

30.    Here, as in <u>Hartley</u>, <u>McKenzie Energy Corp</u> and <u>Modanlo</u>, the financing

from the Debtor's creditors does not impair the Trustee's ability to act independently.

<u>See Hartley</u>, 39 B.R. at 278 (no evidence that the terms of the loan provided express or

implied conditions that "might exert unacceptable control over the Trustee in the

exercise of his fiduciary duties."); <u>McKenzie Energy Corp.</u>, 228 B.R. at 875; <u>Modanlo,</u>

2006 U.S. Dist. LEXIS 96455 at *21.

31.    If Court approval of the Sinking Funds Agreement is not received within

sixty (60) days from the date of the Trustee's filing of a Bankruptcy Rule 9019 motion to

approve it, then the LFA and the Sinking Funds Agreement shall be deemed null and

void.  However, neither the LFA nor the Litigation Loan was or is a condition to any

party entering into the Sinking Funds Agreement (although the approval of the Sinking

Funds Agreement is a condition precedent to the remittance of the Litigation Loan to the

Trustee).  As demonstrated in the 9019 Motion, the Sinking Funds Agreement is fair and

reasonable and serves the best interests of the Debtor's estate.

A.    **The Trustee's Need For Financing**

32.    The Trustee anticipates instituting multiple litigations against Maiman and

other former officers and directors of the Debtor (defined above as the "Maiman

Litigation") both in New York and in Israel.  In order to properly prosecute the Maiman

Litigation, the Trustee will require additional funding beyond what the estate currently

possesses.  For these reasons, access to the Litigation Loan is critical.

## APP-382

33.    Under Bankruptcy Code section 364(b), the Trustee is not required to pursue other forms of funding.  See Cyrus II Partnership, 2008 Bankr. LEXIS 2320 (Bankr. S.D. Tex. July 31, 2008).

**B.    The Terms of the Litigation Loan Are Fair, Reasonable, and Appropriate**

34.    The proposed terms of the Litigation Loan are fair, reasonable and adequate in that these terms reflect market dynamics and neither (a) tilt the conduct of this case or prejudice the powers and rights that the Bankruptcy Code confers on the Trustee for the benefit of all creditors, nor (b) prevent motions by parties in interest from being decided on their merits.

**C.    The Litigation Loan Represents Sound Business Judgment**

35.    Bankruptcy courts routinely defer to the trustee's business judgment on most business decisions.  See Simantob v. Claims Prosecutor, L.L.C. (In re Lahijani), 325 B.R. 282, 289 (B.A.P. 9th Cir. 2005) ("Ordinarily, the position of the trustee is afforded deference, particularly where business judgment is entailed in the analysis or where there is no objection.").

36.    In general, a bankruptcy court should defer to a trustee's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious.  See e.g. In re Cyrus II Partnership, 2008 Bankr. LEXIS 2320 (Bankr S.D. Tex. 2008).

37.    After thorough investigation and analysis, the Trustee has exercised sound business judgment in determining that the terms of the Litigation Loan are fair and reasonable and are in the best interests of the Debtor's estate.  This is especially true given that a non-debtor, MAG, is providing the security for the Litigation Loan.

**APP-383**

38.  The terms and conditions of the Litigation Loan are fair and reasonable, and were negotiated by the parties in good faith and at arm's length. Accordingly, the Participating Bondholders, as lenders, should be accorded the benefits of section 364(e) of the Bankruptcy Code in respect of the Litigation Loan.

39.  Based on the above, the Trustee should be granted authority to enter into the Litigation Loan and borrow funds from the Participating Bondholders on the grounds described above, pursuant to section 364(b) and (e) of the Bankruptcy Code.

## II.  THE AUTOMATIC STAY SHOULD BE MODIFIED TO PERMIT THE TRUSTEE TO IMPLEMENT THE TERMS OF THE LITIGATION LOAN

40.  The Trustee further requests, pursuant to Bankruptcy Code section 362(d), relief from the automatic stay pursuant to Bankruptcy Code section 362(d) to permit the Trustee to implement the terms of the Litigation Loan. The Trustee submits that cause exists for such relief pursuant to Bankruptcy Code section 362(d)(1).

### COMPLIANCE WITH BANKRUPTCY RULE 4001(c)

41.  Bankruptcy Rule 4001(c)(1)(A) requires that a motion for authority to obtain credit be accompanied by a copy of the credit agreement and a proposed form of order. Copies of the proposed Order and the LFA are annexed to this Motion as **Exhibits "A" and "B"**, respectively. This Motion therefore satisfies the requirements of Bankruptcy Rule 4001(c)(1)(A).

42.  Bankruptcy Rule 4001(c)(1)(B) contains various requirements relating to this Motion and LBR 4001-2 supplements the requirements of Bankruptcy Rule 4001(c)(1)(B). This Motion complies with all applicable requirements.

**APP-384**

## NOTICE

43.     Notice of this Motion has been given in accordance with this Court's Order

Granting Chapter 7 Trustee's Motion to Limit Notice and to Establish Case Management

Procedures, entered on September 12, 2013 [Docket No. 342].

## NO PRIOR MOTION

44.     No previous request for the relief sought herein has been made by the

Trustee to this or any other Court.

## CONCLUSION

45.     The Trustee respectfully requests that the Court

(a) enter an order, substantially in the form annexed hereto as **Exhibit "A"**,

(i)     authorizing the Trustee, pursuant to Bankruptcy Code sections

364(b) and (e), Bankruptcy Rule 4001(c) and LBR 4001-2, to enter into the LFA

annexed hereto as **Exhibit "B",** and

(ii)     modifying the automatic stay pursuant to Bankruptcy Code section

362(d) to permit the Trustee to implement the terms of the Litigation Loan; and

(b)  grant such other and further relief as to this Court appears just and proper.

Dated:   New York, New York
          May 21, 2014

SPIZZ COHEN & SERCHUK, P.C.
Attorneys for Alex Spizz, Chapter 7 Trustee

By: _Jill Makower_____
        Alex Spizz, Esq.
        Janice B. Grubin, Esq.
        Arthur Goldstein, Esq.
        Jill Makower, Esq.
        425 Park Avenue
        New York, NY  10022
        (212) 754-9400

285050v4

16

**APP-385**

**EXHIBIT "A"**

## APP-386

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

In re:                                                          Chapter 7

AMPAL-AMERICAN ISRAEL CORPORATION,                              Case No. 12-13689 (SMB)

Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

### ORDER GRANTING CHAPTER 7 TRUSTEE'S MOTION  FOR ORDER (I) AUTHORIZING TRUSTEE TO ENTER INTO LITIGATION FINANCING AGREEMENT PURSUANT TO 11 U.S.C. §§364(b) AND 364(e), AND (II) MODIFYING AUTOMATIC STAY PURSUANT TO 11 U.S.C. §362(d) TO PERMIT TRUSTEE TO IMPLEMENT TERMS OF LITIGATION LOAN

Upon the motion dated May 21, 2014 (the "Motion") filed by Alex Spizz as the

Chapter 7 trustee (the "Trustee") of the above-captioned debtor, Ampal-American Israel

Corporation ("Debtor"), for an order (i) authorizing the Trustee, pursuant to sections

364(b) and (e) of title 11, United States Code (the "Bankruptcy Code"), Rule 4001(c) of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local

Bankruptcy Rule ("LBR") 4001-2, to enter into the "Litigation Financing Agreement"

dated May 20, 2014 (the "LFA") annexed to the Motion as **Exhibit "B",** by and among

(a) the Trustee, (b) the Debtor's non-debtor indirect subsidiary Merhav Ampal Group

Ltd. ("MAG") and (c) the following indenture trustees (the "Indenture Trustees"):

Hermetic Trust (1975) Ltd.,  Reznik Paz Nevo R.P.N. Trusts 2007 Ltd., and Mishmeret

Trust Services Company Ltd.; and (ii) modifying the automatic stay pursuant to

Bankruptcy Code section 362(d) to permit the Trustee to implement the terms of the

## APP-387

Litigation Loan;[1] and the Motion having been heard on June 17, 2014; and upon the

record of the proceedings; and sufficient cause having been shown therefor,

### THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

(i) *Post-Petition Financing.* The Participating Bondholders, as lender (the "Lender"), is willing to provide the Trustee with the Litigation Loan, subject to (1) entry of this Final Order (as hereinafter defined) in form and substance satisfactory to the Indenture Trustees' sole discretion, and (2) the terms and conditions of the LFA.

(ii) *Need for Post-petition Financing.* The Trustee anticipates instituting multiple litigations against Maiman and other former officers and directors of the Debtor (defined in the LFA as the "Maiman Litigation") both in New York and in Israel, and, in order to properly prosecute the Maiman Litigation, the Trustee will require additional funding beyond what the estate currently possesses.

(iii) *Business Judgment and Good Faith.* The terms and conditions of this Order and the LFA have been negotiated in good faith and at arm's length by the parties involved and are fair and reasonable under the circumstances, reflect the Trustee's exercise of his prudent business judgment consistent with his fiduciary duties, and are supported by reasonably equivalent value and fair consideration. Accordingly, the Court finds that the LFA has been made in "good faith" as that term is used in section 364(e) of the Bankruptcy Code.

(iv) *Immediate Entry.* Sufficient cause exists for immediate entry of this Order pursuant to Bankruptcy Rule 4001. No party appearing in this case has filed or made an objection to the relief sought in the Motion, or the entry of this Order, or any objections that were made (to the extent such objections have not been withdrawn) are hereby overruled.

### ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED AND DECREED,

that:

1.    The Motion is hereby granted as set forth herein.

---

[1]  Capitalized terms not defined herein shall have the meanings given in the Motion.

### APP-388

2.    The Trustee is hereby authorized to enter into the LFA and to execute, deliver, perform and comply with all of the terms, conditions and covenants of the LFA and any and all other agreements, documents and instruments executed or delivered or to be executed or delivered in connection therewith and as all of the same have been heretofore been or may hereafter be amended, modified, supplemented, restated or replaced (collectively, the "Financing Agreements") and this Final Order, and to immediately borrow and obtain other financial accommodations from the Lender pursuant to the terms of this Final Order and the terms and conditions set forth in the Financing Agreements in the amount of $1,500,000.00 U.S.D. in accordance with the terms and conditions set forth in the Financing Agreements and this Final Order. No obligations incurred or payments or other transfers made by or on behalf of the Trustee on account of the Financing Agreements with Lender shall be avoidable or recoverable from Lender under sections 542, 544, 547, 548, 549, 550, 553 or any other provision of the Bankruptcy Code.

3.    The automatic stay is hereby modified pursuant to Bankruptcy Code section 362(d) to permit the Trustee to implement the terms of the LFA and the Litigation Loan.

4.    The Trustee's obligations under the Litigation Loan shall, pursuant to Bankruptcy Code section 364(b), constitute a Chapter 7 administrative expense of the Debtor allowable under Bankruptcy Code section 503(b)(1).

285122v2                                              3

**APP-389**

5.    The Trustee and MAG shall not use the Litigation Loan for any purpose except to fund the Maiman Litigation, and shall not use any Proceeds for any purpose except for the full repayment of the Litigation Loan, together with the interest of such loan and the legal and court costs and expenses in the event that enforcement proceedings are necessary.

6.    The Trustee's obligations under the Litigation Loan shall be secured by MAG, by the Proceeds recovered from any judgment or settlement reached in the Maiman Litigation or other MAG sources, if possible, subject to the claims of the Israeli Taxing Authorities and Israel Discount Bank against MAG.

7.    MAG shall secure the repayment of the Litigation Loan by granting to the Participating Bondholders: (i) a first priority lien, unlimited in amount on all Proceeds received by MAG, and (ii) an irrevocable guaranty by MAG for the full amount due under Litigation Loan, subject to the prior claims set forth in section 8 of the LFA.

8.    The lien and guaranty of MAG shall be created, registered and governed exclusively by Israeli law, will be subject to the exclusive jurisdiction of the Israeli courts, and their terms shall be confirmed in advance by the Indenture Trustees.

9.    The Trustee may establish a separate bank account for the proceeds of the Litigation Loan and may pay from such account any and all reasonable professional fees and expenses of MAG in connection with the Maiman Litigation.

**APP-390**

10.    The Lender has extended the Litigation Loan under the LFA in "good faith" in accordance with section 364(e) of the Bankruptcy Code.

11.    Unless otherwise explicitly stated in the LFA, the Court shall retain exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of the LFA.

Dated: New York, New York
_____, 2014

_____
STUART M. BERNSTEIN
UNITED STATES BANKRUPTCY JUDGE

285122v2                                         5

## APP-391

EXHIBIT "B"

## APP-392

### LITIGATION FINANCING AGREEMENT

This agreement (the "Agreement") is made as of April *may* 20, 2014 by and between AMPAL-AMERICAN ISRAEL CORP. (the "Debtor" or "Ampal"), by and through Alex Spizz, in his capacity as Chapter 7 trustee of (the "Trustee"), Merhav Ampal Group Ltd. ("MAG"), Hermetic Trust (1975) Ltd. ("Hermetic"), Reznik Paz Nevo R.P.N. Trusts 2007 Ltd. ("Reznik") and Mishmeret Trust Services Company Ltd. ("Mishmeret" and, together with Hermetic and Reznik, the "Indenture Trustees" and, together with the Trustee, the "Parties") , by and through their respective counsel.

### RECITALS

On December 25, 2007, Merhav (M.N.F.) Limited ("MNF") signed a promissory note, as amended on December 25, 2008 (the "Note"), in favor of Ampal-American Israel Corporation ("Ampal") with regard to a $20,000,000 USD (Twenty million) loan MNF obtained from Ampal (the "Loan"). According to the Note, the purpose of the Loan was facilitating an ethanol producing project in Columbia (the "Project") and funding the purchase of 11,000 hectares of real property located in Colombia with regard to the development of the Project. In connection with the Loan, Ampal and MNF also signed a pledge agreement, an option agreement and an exercise agreement, and amendments thereto, between December 25, 2007 and December 31, 2009.

On December 25, 2008, Yosef A. Maimon, the sole owner of MNF and the chairman of Ampal's board of directors and its president and chief executive officer until May, 2013, signed an irrevocable, absolute and continuing guaranty (the "Guaranty") for repayment of all sums owed by MNF to Ampal under the Note.

### APP-393

On December 31, 2010, Ampal and MAG signed an Assignment and Assumption Agreement (the "**Assignment Agreement**"), in which Ampal contributed, conveyed, transferred, assigned and delivered to MAG all of Ampal's rights, title and interest in and to the Note, the Guaranty and all other documents relating to the Project. On December 8, 2011 MNF and MAG signed a second amendment to the exercise agreement.

On August 29, 2012, Ampal filed a petition for voluntary protection under chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Court**").

On September 25, 2012, the United States Trustee for the Southern District of New York appointed an official creditors' committee (the "**Committee**") pursuant to section 1102(a)(1) of the Bankruptcy Code.

On December 2, 2012, the Committee demanded from Mr. Maiman the immediate payment of the Loan pursuant to the Guaranty, on behalf of Ampal and MAG (the "**Demand**").

As of December 31, 2012, the obligations of MNF under the Note and the loan documents matured and became due and payable in full.

Despite the Demand and the maturity of the Loan, neither Mr. Maiman nor MNF repaid the outstanding balance of the Loan as of May 2, 2013, the date the Court converted the Ampal chapter 11 case to a case under chapter 7 of the Bankruptcy Code.

On May 20, 2013, Alex Spizz was duly elected pursuant to section 702 of the Bankruptcy Code and he thereafter appointed Shlomi Kelsi as the MAG director.

To date, neither Mr. Maiman nor MNF have repaid the outstanding balance of the Loan.

After good faith, arms length negotiations, the Trustee, MAG and the Indenture Trustees have reached the following agreement:

## APP-394

1.    Upon the execution of this Agreement and its approval by the Court (the "Effective Date"), the Indenture Trustees, on behalf of their respective bondholders (the "**Bondholders**"), agree to raise from the Bondholders (each Indenture Trustee from its respective Bondholders), under Israeli Law and in a manner approved in advance by the Indenture Trustees, and provide the Trustee with a loan in the amount of $1.5 million dollars USD (One million and five-hundred thousand) (the "**Litigation Loan**"). The purpose of the Litigation Loan is to finance litigation against Mr. Maiman and/or MNF relating to the Note and Guaranty and/or against the directors and officers of any corporation which is part of the Ampal group (the "**Maiman Litigation**"). The Litigation Loan will be provided <u>pro rata</u> by the Bondholders from the three (3) series of bonds. Each Indenture Trustee shall facilitate the mechanism to raise among its respective Bondholders its part in the Litigation Loan without any liabilities or guaranties of any of the Indenture Trustees to any amount delivered or not delivered by another Indenture Trustee.

2.    The Indenture Trustees shall not be liable for any failure to raise the above-mentioned amount of the Litigation Loan or any part thereof.

3.    The Litigation Loan shall be raised by each of the Indenture Trustees from their respective Bondholders who wish to participate in the provision of the Litigation Loan, and shall be guaranteed by  the commitments of the Bondholders listed in <u>**Annex A**</u> herewith (the "**Underwriters**"). If the Litigation Loan is provided by the Underwriters, than it may be provided to the Trustee in a different ratio between the three (3) series of bonds.

4.    The total sum of the Litigation Loan shall be raised from the Bondholders or the Underwriters within thirty (30) days from the resolution issued at a general meeting of the Indenture Trustees confirming the execution of this agreement by a special majority of each of the three (3) series of Bondholders.

## APP-395

5.    The Parties agree that no part of the Litigation Loan will be remitted to the Trustee prior to the Court's approval of the "Agreement Concerning Sinking Funds And Alleged Preferential Transfers" (the "Sinking Funds/Alleged Transfer Agreement") and the distribution of the Sinking Funds to the Series B and C Bondholders under the terms thereof. If Court approval of the Sinking Funds/Alleged Transfer Agreement is not received within sixty (60) days from the date of the Trustee's filing of a motion to approve it, then this Agreement and the Sinking Funds/Alleged Transfer Agreement shall be deemed null and void.

6.    The Litigation Loan shall be remitted to the Trustee in full within seven (7) business days from the later of: (1) the collection of the Litigation Loan amount by the Indenture Trustees; or (2) proof of the Court approval under section 5 delivered to the Indenture Trustees.

7.    After remittance of the Litigation Loan to the Trustee, the Trustee shall provide the Indenture Trustees with receipts for payments made from the Litigation Loan within seven (7) business days of such payment.

8.    The Litigation Loan will be a Chapter 7 administrative expense of the Debtor pursuant to 11 USC §364(b) and secured by the proceeds recovered from any judgment or settlement reached in the Maiman Litigation (the "Proceeds") or other MAG sources, if possible, subject to the claims of the Israeli Taxing Authorities and Israel Discount Bank. The Litigation Loan (including the interest stipulated in section 14 below) shall be repaid within seven (7) days from receipt of such funds and/or from any other funds or proceeds received by the Debtor's estate from any other source received by the Debtor's estate in the future. For the avoidance of doubt, the Litigation Loan shall be repaid from any future proceeds received by the Debtor's estate and before any other expense of the estate subject to section 9 below. The Litigation Loan, if repaid in part, will be performed in minimal payments of $10,000.

285085 v2

4

## APP-396

9.     The Parties agree that the Trustee shall have the right to refrain from paying a part of the proceeds received by the estate in the future, in order to maintain a minimal cash balance in the estate in an amount of up to $1.5M. It is understood that as of the Effective Date the estate cash balance will be approximately $2M and no immediate loan repayment is required.

10.     The Trustee and MAG hereby undertake not to use the Litigation Loan for any purpose except to fund the Maiman Litigation, and further undertake not to use any Proceeds for any purpose except for the full repayment of the Litigation Loan, together with the interest of such loan and the legal and court costs and expenses in the event that enforcement proceedings are necessary.

11.     Repayment of the Litigation Loan shall have priority over all unsecured creditors of the Debtor and all Chapter 11 administrative and priority expenses.

12.     MAG shall secure the repayment of the Litigation Loan by granting to the Indenture Trustees: (i) a first priority lien, unlimited in amount on all Proceeds received by MAG, and (ii) an irrevocable guaranty by MAG for the full amount due under Litigation Loan, subject to the prior claims set forth in section 8 above. The lien and guaranty shall be created, registered and governed exclusively by Israeli law, will be subject to the exclusive jurisdiction of the Israeli courts, and their terms shall be confirmed in advance by the Indenture Trustees.

13.     MAG agrees to refrain from receiving any additional loans, without first requesting said additional loans from its existing creditors.

14.     The entire Litigation Loan amount shall bear yearly interest at the rate of ten (10%) percent for the first year, eleven (11%) percent for the second year, twelve (12%) percent for the third year and thirteen (13%) percent for the fourth year on. In the event of default in the terms of this Agreement, additional arrears interest shall be accrued in an annual rate of an additional five

## APP-397

(5%) percent. The interest on the Litigation Loan shall be accrued to the principal and paid upon payment of the principal.

15.     The Trustee and MAG agree to use their reasonable efforts to commence the Maiman Litigation as soon as practicable.

16.     The Parties understand, agree and acknowledge that litigation, by its nature, is uncertain and that the Trustee and MAG can give no guarantee as to the success of the Maiman Litigation and the collectability of any judgment or settlement.

17.     MAG and the Trustee shall provide the Indenture Trustees with monthly updates concerning the Maiman Litigation.

18.     The Trustee shall have the right to make a prepayment of the entire outstanding debt on the Litigation Loan and, in such case, shall not pay a penalty. If prepayment is made, the Trustee cannot request additional sums under this Agreement.

19.     This Agreement embodies the entire agreement and understanding of the Parties hereto with respect to the subject matter contained herein.  There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to herein.

20.     This Agreement supersedes all prior agreements and understandings between the parties with respect to its subject matter.

21.     This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall be deemed one in the same instrument.

22.     Unless otherwise explicitly stated hereunder, the Court shall retain exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Agreement

285085 v2

6

## APP-398

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

| Markav Ampal Group Ltd. By: Shlomi Keidy, Director | Reznik Paz Nevo Bd. N. Trust 2007 Ltd. By: Mr. Yoni Reznik |
| Hevrat Taer (1975) Ltd. By: Dan Offer, Adv. | Mishmeret Trust Services Company Ltd. By: |
| Alex, Spizz, Chapter 7 Trustee of Ampal-American Israel Corp By: Alex Spizz, Chapter 7 Trustee | |

7

## APP-399

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date
and year first above written.

| Merhav Ampal Group Ltd.<br><br>By: _____<br>  Shlomi Kelsi, Director | Reznik Paz Nevo R.P.N. Trusts 2007 Ltd.<br><br>By: _____<br>  Mr. Yossi Reznik |
| Hermetic Trust (1975) Ltd.<br><br>By: _____<br>  Dan Offer, Adv. | Mishmeret Trust Services Company Ltd.<br><br>By: _____ |
| Alex, Spizz, Chapter 7 Trustee of Ampal-American Israel Corp<br><br>By: _____<br>  Alex Spizz, Chapter 7 trustee | |

# APP-400

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

| Merhav Ampal Group Ltd.<br><br>By: _____<br>　　Shlomi Kelsi, Director | Reznik Paz Nevo R.P.N. Trusts 2007 Ltd.<br><br>By: _____<br>　　Mr. Yossi Reznik |
|---|---|
| Hermetic Trust (1975) Ltd.<br><br>By: _____<br>　　Dan Offer, Adv. | Mishmeret Trust Services Company Ltd.<br><br>By: _____<br>　　Scott S. Markowitz, Esq |
| Alex, Spizz, Chapter 7 Trustee of Ampal-American Israel Corp<br><br>By: _____<br>　　Alex Spizz, Chapter 7 trustee | |

285085 v2

7

## APP-401

**Annex A**

Klirmark Opportunity Fund

Meitav Gemel & Pension Ltd.

APP-402

**EXHIBIT 4**

# APP-403

TODTMAN, NACHAMIE, SPIZZ & JOHNS, P.C.
for **Hermatic Trust (1975) Ltd.**
**and Mishmeret-Trusts Company Ltd.**
425 Park Avenue
New York, NY 10022
(212) 754-9400
Alex Spizz

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

In re:                                                                        Chapter 11

AMPAL-AMERICAN ISRAEL CORPORATION,                    Case No. 12-13689 (SMB)

                                         Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

### NOTICE OF APPEARANCE & DEMAND FOR PAPERS

**PLEASE TAKE NOTICE** that pursuant to, *inter alia*, Federal Rules of Bankruptcy

Procedure 2002 and 9010(b), Todtman, Nachamie, Spizz & Johns, P.C. hereby appears

on behalf of **Hermatic Trust (1975) Ltd. and Mishmeret-Trusts Company Ltd.**, and

demands that any and all notices given or required to be given in this case and all papers

served or required to be served in this case, be delivered to and served upon:

TODTMAN, NACHAMIE, SPIZZ & JOHNS, P.C.
for **Hermatic Trust (1975) Ltd.**
**and Mishmeret-Trusts Company Ltd.**
425 Park Avenue
New York, New York 10022
Attention:    Alex Spizz, Esq.
Telephone:   (212) 754-9400
Fax:             (212) 754-6262
E-mail:         aspizz@tnsj-law.com

Exhibit 4
K. Perlman
5|14|15

**PLEASE TAKE FURTHER NOTICE** that pursuant to Section 1109(b) of the

Bankruptcy Code, the foregoing demand includes not only the notices and papers referred

to in the Federal Rules of Bankruptcy Procedure specified above but also includes, without

limitation, all orders, notices, hearing dates, applications, motions, including motions to

276043v1

## APP-404

expunge and/or reduce claims, petitions, requests, complaints, demands, replies,

answers, schedules of assets and liabilities and statement of financial affairs, operating

reports, plans  of reorganization and liquidation, and disclosure statements, whether

transmitted or conveyed by mail, courier service, telegraph, telex, telefax or otherwise, that

affect the above-captioned debtor or its estate.

Dated: New York, New York
      August 31, 2012

           TODTMAN, NACHAMIE, SPIZZ
            & JOHNS, P.C.
           for **Hermatic Trust**
           **(1975) Ltd. and Mishmeret-Trusts**
           **Company Ltd.**

           By:  s/ Alex Spizz
               Alex Spizz
           425 Park Avenue
           New York, New York 10022
           Telephone:  (212) 754-9400
           Fax:  (212) 754-6262


TO:   CLERK OF THE COURT (Via Electronic Filing)

      Michelle McMahon, Esq.
      Bryan Cave LLP
      1290 Avenue of the Americas
      New York, NY 10104-3300

## APP-405

```
 1

 2   UNITED STATES BANKRUPTCY COURT

 3   SOUTHERN DISTRICT OF NEW YORK

 4   Case No. 12-13689-smb

 5   - - - - - - - - - - - - - - - - - - - -x

 6   In the Matter of:

 7

 8   AMPAL-AMERICAN ISRAEL CORPORATION,

 9

10              Debtor.

11

12   - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              May 21, 2015

19              10:46 AM

20

21   B E F O R E:

22   HON. STUART M. BERNSTEIN

23   U.S. BANKRUPTCY JUDGE

24

25
```

# APP-406

1

2   Matter:  Application for Retention of Tarter Krinsky & Drogan,

3   substitute counsel for the Trustee

4

5   Matter:  Controlling Shareholders' Cross-Motion to Disqualify

6   the Trustee

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  Penina Wolicki

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

APP-407

```
 1

 2    A P P E A R A N C E S :

 3    TARTER KRINSKY & DROGIN LLP

 4          Proposed Attorneys for Chapter 7 Trustee

 5          1350 Broadway

 6          New York, NY 10018

 7

 8    BY:   ARTHUR GOLDSTEIN, ESQ.

 9          JILL MAKOWER, ESQ.

10          ALEX SPIZZ, ESQ.

11

12

13    UNITED STATES DEPARTMENT OF JUSTICE

14          Office of the United States Trustee

15          201 Varick Street

16          Suite 1006

17          New York, NY 10014

18

19    BY:   SERENE K. NAKANO, ESQ.

20

21

22

23

24

25
```

APP-408

1

2    KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

3            Attorneys for Yosef Maiman and Merhav

4            1633 Broadway

5            New York, NY 10019

6

7    BY:    DANIEL A. FLIMAN, ESQ.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## APP-409

1                  P R O C E E D I N G S

2          MR. FLIMAN:  Good morning, Your Honor.  Daniel Fliman

3  of Kasowitz, Benson, Torres & Friedman, on behalf of Yosef

4  Maiman and Merhav MNF.

5          MR. GOLDSTEIN:  Good morning, Your Honor.  Arthur

6  Goldstein, Tarter Krinsky & Drogin, representing Alex Spizz,

7  the Chapter 7 trustee.

8          MR. SPIZZ:  Good morning, Your Honor.  Alex Spizz, of

9  Tarter Krinsky & Drogin.

10          MS. MAKOWER:  Good morning, Your Honor.  Jill Makower,

11  Tarter Krinsky & Drogin.

12          MS. NAKANO:  Serene Nakano for the U.S. Trustee's

13  Officer.  Good morning, Your Honor.

14          THE COURT:  Good morning.

15          MR. GOLDSTEIN:  Good morning, Your Honor.  We are here

16  this morning with the respect to the application by Mr. Spizz,

17  as the Chapter 7 trustee, for authority to retain the services

18  of Tarter Krinsky & Drogin, LLP, as substitute counsel for

19  Spizz Cohen & Serchuk, as well as the cross-motion by Mr.

20  Maiman and other parties defined as controlling shareholders,

21  to disqualify Mr. Spizz as the Chapter 7 trustee.

22          Numerous papers have been filed for and against the

23  proposed application.  In a nutshell, Your Honor, it is our

24  position that under Bankruptcy Code Section 327(a), the trustee

25  may employ one or more attorneys that do not hold or represent

# APP-410

1  an interest adverse to the estate, and that are disinterested

2  persons, to represent or assist the trustee.

3          327(a) requires that a trustee seeking to retain an

4  attorney satisfy a two-prong test.  The attorney must not

5  presently hold or represent an interest adverse to the estate,

6  and two, that attorney must be a disinterested person.

7  Bankruptcy Code Section 327(c) provides that a person is not

8  disqualified for employment under that section solely because

9  such person's employment by or representation by a creditor,

10 unless there's been an objection filed by another creditor or

11 the U.S. Trustee, in which case the case the court shall

12 disapprove such employment is there is an actual conflict of

13 interest -- actual conflict of interest.

14          One of the issues that have been raised here and which

15 we disagree is whether Mishmeret and Shapira, which were the

16 former clients of Tarter Krinsky & Drogin, have interests

17 adverse to the estate.  Rather, it is our position, the issue

18 is whether Tarter Krinsky presently holds or represents --

19          THE COURT:  Well, it doesn't hold an interest.

20          MR. GOLDSTEIN:  Or represent an interest.

21          THE COURT:  Right.  It may -- the argument is it

22 represents an --

23          MR. GOLDSTEIN:  Or represents an interest.  And in

24 that case, I'll skip the argument with respect to the Tarter

25 Krinsky does not hold an interest adverse to the estate.

## APP-411

1      THE COURT:  It's not a creditor of the estate.

2      MR. GOLDSTEIN:  No, it's not.  It absolutely is not.

3  The question here is, Your Honor, as we've stated in our

4  papers, Tarter Krinsky represented Mishmeret Trust as well as

5  Ofer Shapira and his law firm for approximately one year in

6  three separate matters.  That engagement started in July of

7  2013 and terminated in July of 2014.  Those three matters, as

8  the Court is well aware of, is there was a stay violation

9  motion whereby Tarter Krinsky represented Mishmeret as well as

10  Shapira.  There was also a motion with respect to -- by

11  Mishmeret seeking clarification with respect to the automatic

12  stay, as well as subject to what the Court was going to rule,

13  vacating the automatic stay to allow Mishmeret to proceed in

14  the Israeli State Court.  And number three, the trustee's

15  motion for authority to enter into a litigation funding

16  agreement with Mishmeret and other indenture trustees.

17      All three actions were resolved.  The stay violation

18  motion was resolved in January of 2014, at which point in time

19  Tarter Krinsky's engagement of Shapira terminated.  And with

20  respect to the clarification motion regarding the automatic

21  stay and the litigation funding agreement, both of those

22  motions resolved by orders entered in June 2014.  And there

23  were some services rendered in the early part of July with

24  respect to that.

25      As we've stated, the issue has become, well, there was

1  no formal notification that Tarter Krinsky ceased representing

2  Mishmeret.  As we've cited in our papers, in the case of

3  Revise --

4           THE COURT:  Inc.?

5           MR. GOLDSTEIN:  -- Revise Clothing Inc. v. Joe's Jean

6  Subsidiary, 687 F.Supp. 381, that court almost with the

7  identical issue, ruled that their representation terminates

8  when the service for which that firm were retained had been

9  resolved or ceased.  That's what the court ruled.

10          Specifically what they state is that "the attorney-

11  client relationship ends by the accomplishment of the purpose

12  for which it was formed in the first place."  Again, Tarter

13  Krinsky's engagement terminated no later than July of 2014.  No

14  other services have been provided to Mishmeret or Shapira since

15  that time.

16          The objector in that particular case did not provide

17  and did not identify any rule of professional responsibility

18  that requires a law firm to announce the conclusion of the

19  engagement.  It's almost nonsensical to say okay, my services

20  are terminated, so I need to advise everybody that our services

21  have concluded.

22          As the court in Revise specifically stated, "Any such

23  requirements of that nature would conflict with the principle

24  that the relationship is terminated upon the accomplishment of

25  the purpose for which it was created."  Again, Tarter Krinsky

AMPAL-AMERICAN ISRAEL CORPORATION                                      9

## APP-413

1  represented Shapira and Mishmeret for only a short period of

2  time.  Those services terminated no later than July of 2014.

3  And Tarter Krinsky has not provided any services to either

4  party on any matter since that time.

5          THE COURT:  When did you join the firm?

6          MR. GOLDSTEIN:  April 13th.

7          THE COURT:  Of 20- --

8          MR. GOLDSTEIN:  Of 2015.

9          Tarter Krinsky, additionally, does not represent an

10 interest adverse to the estate.  As I previously stated,

11 Mishmeret and Shapira are former Tarter Krinsky clients.  They

12 have not -- they did not represent these parties before the

13 engagement.  They haven't represented these parties since the

14 engagement concluded.

15         As the court states in Arochem, which is Bank Brussels

16 Lambert v. Coan, also identified as Arochem, A-R-O-C-H-E-M, at

17 176 F.3d 610, the courts determine whether there's an adverse

18 interest on a case-by-case basis -- case-by-case basis.  In

19 Arochem, the court determined in analyzing 327(a) as well as

20 327(c), that there was no such adverse interest.

21         Now, our adversary is saying Arochem is inapposite,

22 because in Arochem, the issue was with respect to the

23 engagement of special counsel.  However, it's not a matter of

24 whether they were engaging special counsel or general counsel.

25 It was more a matter of the analysis under 327(a) as well as

## APP-414

1  327(c).

2          In fact, in both Project Orange, B.R. 363 -- I'm

3  sorry -- 431 B.R. 363, a Judge Glenn case regarding the

4  retention of general counsel, and In re Christine Persaud,

5  P-E-R-S-A-U-D, 496 B.R. 667, where the Eastern District Court

6  affirmed Judge Stong, again having to do with the retention of

7  both general and special counsel; both those cases cited and

8  relied on Arochem and analysis of 327 to determine whether the

9  law firm in question presently held an interest adverse to the

10  estate or whether there was an actual conflict of interest.

11          So our position is that under 327 and based upon the

12  various case law that I've just cited, Tarter Krinsky does not

13  have an interest -- a present interest adverse to the estate,

14  and there is no actual conflict of interest.

15          In addition, Bankruptcy Code Section 101(14) defines

16  the term "disinterested person", as a person that is not a

17  creditor or equity security holder and insider, which obviously

18  is not Tarter Krinsky; is not and was not within two years

19  before the date of the filing of the petition, a director,

20  officer or employee of the debtor -- again, not Tarter Krinsky;

21  and (c), does not have an interest materially adverse to the

22  interests of the estate or of any class of creditors or equity

23  security holders, by reason of any direct or indirect

24  relationship to, connection with, or interest in the debtor or

25  for any other reason.  Again, Tarter Krinsky's engagement

## APP-415

1   terminated in July of 2014.  At this point in time, we're

2   talking about approximately nine to ten months ago.  Mr. Spizz

3   joined the firm in April of 2015.

4           As this Court knows, and as they stated in Granite

5   Partners, "The material adverse standard incorporated in the

6   disinterested test and the interest adverse to the estate

7   language and 327 overlap and form a single test to judge

8   conflicts of interest."  Again, Tarter Krinsky has no actual

9   conflict of interest here.

10          Again objection -- disqualification only follows an

11  objection by the U.S. Trustee or a creditor.  And I must point

12  out, the U.S. Trustee has not objected to Tarter Krinsky's

13  engagement.

14          There are multiple cases, including In re Martin,

15  which -- as well as In re Leslie Fay Case Companies, where the

16  courts have held that the professional has a disabling conflict

17  if it is either a meaningful -- I'm sorry -- if it, the law

18  firm, has either a meaningful incentive to act contrary to the

19  best interests of the estate and if sundry creditors, which is

20  an incentive sufficient to place those parties at more than

21  acceptable risk or the reasonable perception of one.

22  Disqualification is appropriate if it is plausible if the

23  representation of another interest may cause the debtor's

24  attorneys -- or here the trustee's attorneys -- to act any

25  differently than they would without that other representation.

## APP-416

1    THE COURT:  But the argument -- one of the arguments

2   is that the estate has claims against Mishmeret and Shapira,

3   and the trustee, now part of the firm that represented them,

4   will not vigorously investigate them.  In fact, he seems to

5   have blown them off in the reply.

6    MR. GOLDSTEIN:  Well, to address that issue -- Mr.

7   Spizz was going to address that, but I can address that now.

8    One, the purported causes of actions that are being

9   asserted by Mr. Maiman and others concerning alleged causes of

10  action against Mishmeret and Shapira were never identified or

11  disclosed in the debtor's --

12    THE COURT:  I understand all that.

13    MR. GOLDSTEIN:  Okay.

14    THE COURT:  But he's a trustee, and now they have been

15  raised.  And the question is, what is the trustee -- or will

16  the trustee do anything to investigate them?

17    MR. GOLDSTEIN:  Okay.

18    MR. SPIZZ:  Thank you, Your Honor.  If I may, Your

19  Honor, address them.  Alex Spizz, as the trustee.

20    First of all, and as you know, what was the context of

21  these alleged claims?  They were never in the schedules.  And

22  let's just back up for a second.  What are the claims?  There

23  are two claims.  One claim is that pre-petition Mr. Shapira and

24  I believe maybe Mishmeret, made some comments -- defamatory

25  comments to the Israeli press which had caused two things to

### APP-417

1   happen:  one, forced the debtor into bankruptcy; and two,

2   interfered with Mr. Maiman's Colombian ethanol project in

3   Colombia, which as a result -- which the debtor could have had

4   a twenty-five percent interest in, if it converted a certain

5   note.  All right?

6          The first time -- it was in the Chapter 11 filing, the

7   1007 affidavit made no mention of any such claim.  And it

8   mentioned why the debtor filed for bankruptcy.  Nothing in

9   there about any statements to the press.  So again, there's no

10  way to know that there is a claim.

11         The next thing, Your Honor, was that there was a --

12  they filed schedules listing under contingent causes of action

13  that the debtor may have, one cause of action on the EMG

14  pipeline claim.  Nothing.  If there was a pre-petition cause of

15  action that the debtor benefited from, that should have been

16  disclosed so that the trustee would have known, in the

17  schedules.  It was not.  Which --

18         THE COURT:  I understand that.  But the -- now it's

19  been disclosed so --

20         MR. SPIZZ:  Okay, so but --

21         THE COURT:  -- to speak.  So what have you done with

22  the alle --

23         MR. GOLDSTEIN:  -- let's -- let's look of the context

24  of when it was raised.  It was raised for the first time after

25  the trustee commenced an action against Mr. Maiman on a twenty-

### APP-418

1    million-dollar note and guarantee, where now the damages are in

2    excess of twenty-five million dollars.  So it's a note and

3    guarantee.

4            It was raised for the first time -- and the first time

5    it was raised was in a proof of claim.  And the proof of claim

6    did not allege -- it made reference to the defamatory remarks,

7    but it did not allege a claim against -- for the benefit of the

8    estate.

9            THE COURT:  It was alleged -- it was alleged as a

10   defense to a recovery action.

11           MR. SPIZZ:  It was -- well, no.  In -- worse than

12   that, Judge.  In the proof of claim, it was raised that it gave

13   rise to a -- that the debtor was liable to Mr. Maiman.

14           THE COURT:  Yeah.

15           MR. SPIZZ:  So it was just the opposite.  It was a

16   claim against the debtor.  That was the first time that this

17   ever raised its head.

18           The next time it came up, is in an answer to the

19   complaint on the note and guarantee.  And again, it came up in

20   a reference to a defense and a claim against the trustee and

21   Ampal that Mr. Maiman was damaged as a result of that, not that

22   the estate had any claims.  So again, it was raised as an

23   affirmative defense against the trustee and against the

24   trustee's claim on the note and the guarantee.

25           The next time it came up was in connection with the

## APP-419

1  third-party complaint.  The third-party complaint was filed,

2  all right, and there's further evidence Tarter Krinsky did not

3  represent Mishmeret and Shapira in the third-party complaint.

4  They were represented by Akin Gump.  Akin Gump has represented

5  them.  And Akin Gump filed a motion to dismiss.

6         Now, let's talk about their claim.  Their claim is

7  something was said -- we don't know what was said.  It was said

8  to newspapers.  What newspapers?  It was then -- when exactly

9  was it --

10         THE COURT:  Did you ask Mr. Fliman, though, what it is

11  that was said?

12         MR. SPIZZ:  No, I did not.  And the other thing is,

13  Judge, there has never been an allegation that they notified

14  the trustee and said here, here are these claims.  We believe

15  they're valid -- even though we never listed them; we never

16  scheduled them, they're valid claims against the estate.  You

17  should pursue them.  Okay?  Never happened.  Only in connection

18  with ongoing litigation.

19         Well, in talking to special counsel -- we have special

20  counsel, Troutman Sanders, who is representing the trustee in

21  connection -- and Merhav -- in connection with the action on

22  the note, it was clear that the claims that they're raising --

23  the claims that they're raising are counter to the claims that

24  we are raising on the note and the guarantee.

25         Not only aren't there any specifics -- now we're

## APP-420

1  talking about a cause of action that starts in Israel, has an

2  effect in -- possibly in Colombia, with damages here in the

3  U.S. Also, what damages? They've never come to us. They

4  never qualified any damages. This is damages on a -- the

5  debtor lost on a twenty-five -- on a twenty-five percent

6  interest in an ethanol project that never got off the ground,

7  that Mr. Maiman needed years and years and years of extensions

8  and extensions and extensions, because he couldn't get it off

9  the ground.

10      All that being said -- all that being said, do I

11  believe in my mind that this could be and is a litigation

12  tactic in connection with this summary judgment? Yes, Your

13  Honor, I do. However -- however, that case, at their

14  expense -- not the trustee's expense -- the trustee has an

15  obligation not to chase windmills; the trustee has an

16  obligation not to use the resources of the estate to go after

17  claims that are either dubious or speculative; but I have an

18  advantage here, Judge. The advantage is, that issue, on the

19  bona fides of these claims -- the bona fides of these claims,

20  have been teed up. They're before this Court. This Court is

21  going to render a decision one way or another on a motion to

22  dismiss.

23      If it turns out -- if it turns out that this Court

24  finds out -- comes out with a decision -- or some other court,

25  if this Court doesn't take jurisdiction -- or some other court

## APP-421

 1  says that there's a -- they state a claim, there's a cause of

 2  action here, the debtor may be damaged, that's a different

 3  story, Judge.  We have no problem going after those claims if,

 4  in fact -- but right now, to use resources, there's no meat on

 5  the bone.  There's no specifics.  We don't know anything about

 6  this claim except it was raised in a defense in our litigation.

 7          Let's talk about the issue of bias, because I think

 8  that's very important, Judge.  Before I joined Tarter Krinsky,

 9  there's never been a claim to remove the trustee or any claims

10  against the trustee for being biased.  All right?  And what

11  does bias -- the fact that somebody forms an opinion based upon

12  facts and law that are presented to it, doesn't make him

13  biased.  Just like you, Judge.  When you rule against a

14  particular party, okay, on the next matter that comes up,

15  you're not disqualified as biased because you rendered a -- you

16  made a decision and rendered an opinion.  That doesn't make you

17  biased.

18          There's been no evidence that I am biased against Mr.

19  Maiman because I don't accept wholeheartedly what he claims to

20  be a cause of action.  He says -- and if you look at the

21  papers -- I have a cause of action.  Well what is it?  What are

22  the specifics?  What was said?  When was it said?  Who did it

23  say it to?  What are the parties in Colombia that were

24  influenced?  How were they influenced?  All of the things that

25  you would have to put to state a cause of action, none of it is

## APP-422

1  there.  None of it is there.  But we should go ahead and spend

2  money to investigate this, when also, it would be

3  counterproductive to a claim that we believe is worth over

4  twenty-five million dollars.  That is our bird in the hand.

5  That is an important asset to this estate.

6          Now, as far as -- what is my bias?  My bias is that I

7  know Mr. -- I know Ofer Shapira and Mr. Shapira represented

8  Mishmeret?  I didn't have anything to do with Mishmeret before

9  the Ampal case.  I never heard of Mishmeret.  The Code

10  allows -- the Code allows creditors who have the biggest

11  interest here -- creditors to elect a trustee.  That's what 702

12  says.  All right?  Who were they going to elect?  Are they

13  going to elect somebody they don't know, or are they going to

14  elect somebody that they believe will be reasonable in

15  collecting assets for the estate to distribute to creditors.

16          I think Judge Gerber said it very well in the Diva

17  Jewelry case.  What he said was, "Provisions of the Code

18  contemplate that trustees will be chosen with relationships

19  with creditors, and that professionals will likewise have

20  relationships with creditors.  And Section 327(c) provides that

21  prospective trustees' representation of a creditor is not by

22  itself disqualifying."

23          If what they're saying is true, every time -- every

24  time a creditor votes for a trustee -- which they're certainly

25  allowed to do -- there's a bias.  There's a bias, and you won't

## APP-423

1 | go ahead and go after that creditor.  In fact, I showed
2 | evidence to this Court that that is not true.  I showed --
3 | fact.  Because what happened was, in the very beginning of this
4 | case, there was a dispute over these sinking funds.  We
5 | prepared a thirty- or forty-page complaint against all the
6 | indenture trustees seeking a turnover all of the sinking funds
7 | plus various avoidance actions.  That complaint is an exhibit
8 | to our motion -- to our response.

9 |      As a result of that complaint, we ended up settling
10 | the case where the debtor got -- the debtor's estate got a
11 | million-and-a-half dollars.  That settlement was approved by
12 | this Court.

13 |      THE COURT:  Why don't you wrap it up, because I want
14 | to hear from --

15 |      MR. SPIZZ:  Okay, very good.  What I'm saying is,
16 | Judge, there's been no showing that just because they say poof,
17 | we have a claim, there's no evidence; it has never been
18 | scheduled; there's no meat to it; there's no details to it;
19 | there's nothing to investigate at this time; doesn't mean that
20 | I'm biased.

21 |      If they present -- if some court -- if something comes
22 | up that there is, in fact, a cause of action that is viable,
23 | that is worth the estate's resources in going after, even at
24 | the expense of what the twenty-seven-million-dollar -- twenty-
25 | five-million-dollar cause of action on the note and guarantee,

## APP-424

1    we will gladly bring that action.  We will not hesitate to

2    bring that action.  But right now, what they've done is put us

3    in a Catch-22 position.  You're biased because you won't bring

4    the action, but if you bring the action, you're going to bring

5    it at the expense of the action that you filed against us.

6    Thank you, Your Honor.

7            THE COURT:  Thank you.

8            MR. FLIMAN:  Good morning, Your Honor.  Daniel Fliman,

9    Kasowitz, Benson, Torres & Friedman, on behalf of Yosef Maiman

10   and Merhav MNF.

11           Your Honor, before I begin, I think it's important to

12   highlight what we did not hear from Mr. Spizz and did not hear

13   from Mr. Goldstein, and that's a statement that comes directly

14   out of their memorandum of law, filed I believe last week.  And

15   that is the following:  The trustee and TKD -- meaning Tarter

16   Krinsky -- concede that TKD's prior representation -- and I'm

17   not sure it's prior -- but prior representation of Shapira and

18   Mishmeret may preclude TKD from representing the trustee in any

19   contest as to Mishmeret's proof of claim or in any other matter

20   that may arise that would be directly adverse to Shapira or

21   Mishmeret in this case.  The trustee would likely need to

22   retain conflicts counsel to handle such matters.  We heard

23   nothing about that in the last forty minutes of dialog.

24           And I think that is extremely important here, Your

25   Honor.  They may be arguing right now that the engagement is

APP-425

1   over, and we don't know that.  And I can --

2          THE COURT:  Let's assume it is, for the argument.

3          MR. FLIMAN:  Let's assume it is, Your Honor.  What I

4   think that statement tells us is that under the rules of

5   ethics, they acknowledge they have continuing loyalty and

6   obligations to Mishmeret and Shapira.  And that is why,

7   allegedly, they set up an ethical wall.  And that is because

8   that ethical wall protects Mishmeret and Shapira and their

9   files and their privileges, and screens off the people that

10   worked on those files from working from the trustee.  And they

11   can't stand here and say let's just wipe our hands clean; it's

12   all done.  Because they continue to have those obligations;

13   they continue to have those loyalties to Mishmeret and Shapira.

14         And while I think Your Honor asked the question two,

15   maybe three times, I'm not sure Mr. Spizz actually ever

16   answered it, which is well, now you know about the claims what

17   are you going to do about the claims?  And the reason why he

18   can't really answer that is because of the statement I just

19   read, which is that he can't do anything.  He can't

20   investigate.  He can't sue.  He can't prosecute any causes of

21   action against Mishmeret or Shapira.

22         The testimony and submissions here by the trustee

23   contain conflicting testimony between Mr. Spizz and Mr.

24   Goldstein, given only hours apart.  They disagree completely on

25   very key issues.  And the testimony that's been provided relies